IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| W. NORMAN SCOTT and GILES R. SCUDERI, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 10-772 GMS |
| | ) |
| ZIMMER, INC. and ZIMMER | ) |
| TECHNOLOGY, INC., | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM**

## I.    **INTRODUCTION**

In this correction of inventorship action, plaintiffs W. Norman Scott, M.D., ("Dr. Scott")

and Giles R. Scuderi, M.D., ("Dr. Scuderi" or collectively, "the plaintiffs") seek to add

themselves as inventors of U.S. Patent No. 6,123,729, U.S. Patent No. 6,402,786, and U.S.

Patent No. 6,319,283 ("the patents") presently assigned to defendants Zimmer, Inc., and Zimmer

Technology, Inc. (collectively "the defendants" or "Zimmer"). Dr. Scuderi also seeks to rescind

an agreement with Zimmer based on the doctrine of mutual mistake. The court held a five-day

bench trial in this matter on June 25 through June 29, 2012. Presently before the court are the

parties' post-trial proposed findings of fact and conclusions of law. (D.I. 88 & 90.)

Pursuant to Fed. R. Civ. P. 52(a), and after having considered the entire record in this

case and the applicable law, the court concludes that Dr. Scott and Dr. Scuderi are not inventors

of U.S. Patent No. 6,123,729, U.S. Patent No. 6,402,786, or U.S. Patent No. 6,319,283, and that

that Dr. Scuderi cannot rescind his agreement with Zimmer. These findings of fact and

conclusions of law are set forth in further detail below.

## II. FINDINGS OF FACT[1]

### A. The parties

1.     W. Norman Scott, M.D. is an individual domiciled in the State of New York with a residence at 941 Park Avenue, New York, NY. Dr. Scott is an orthopedic surgeon and a director and co-founder of the Insall-Scott-Kelley Institute ("ISK").

2.     Giles R. Scuderi, M.D. is an individual domiciled in the State of New York with a residence at 56 Second Street, Garden City, NY. Dr. Scuderi is an orthopedic surgeon and a director at ISK.

3.     Zimmer Inc. is a Delaware corporation with a principal office at 345 East Main Street, Warsaw, IN.

4.     Zimmer Technology, Inc. is a Delaware corporation with a principal office at 345 East Main Street, Warsaw, IN.

### B. Relevant Persons

5.     Dr. John Insall was an orthopedic surgeon and a co-founder of ISK.

6.     Cary Reeves is a patent attorney formerly employed by Zimmer's legal department.

7.     Paul Schoenle is an attorney formerly employed by Zimmer's legal department.

8.     Todd Dawson is a patent attorney formerly employed by Zimmer's legal department.

---

[1] Prior to trial, the parties submitted an exhibit of uncontested facts in conjunction with their Pretrial Order. (D.I. 82-1, Ex. 1.) The court takes most of its findings of fact from the parties' uncontested facts. Where necessary, the court has overruled objections to the inclusion of these facts. The court also corrected some spelling and formatting errors, and made minor edits for the purposes of concision and clarity that it does not believe alters the meaning of the paragraphs from the Pretrial Order. Otherwise, any differences between this section and the parties' statement of uncontested facts are unintentional.

The court's findings of fact with respect to matters that were the subject of dispute between the parties are included in the Discussion section of this opinion, preceded by the phrase "the court finds" or "the court concludes."

9.      Jacque Wilson is a patent attorney formerly employed by Zimmer's legal

department.

10.     Mark Heldreth is a former Zimmer employee.

11.     Roy Hori is a former Zimmer employee.

12.     Kyoko Okhuni is a former Zimmer employee.

13.     Steve Zawadski is a current Zimmer employee.

14.      Vince Webster is a current Zimmer employee.

15.     Audrey Beckman is currently the Senior Vice President of the Zimmer Institute at

Zimmer.

16.     Audrey Beckman's married name was Audrey Patmore.

17.     Dr. William Rohr is a former Zimmer employee.

18.     Christopher McLean is a current Zimmer employee.

19.     Linggawati Tanamal is a former Zimmer employee.

20.     Clayton Miller is a former Zimmer employee.

21.     Mark Lazzeri is a former Zimmer employee.

22.     Todd Davis is a former Zimmer employee.

23.     Joseph Topmiller is an attorney employed by Zimmer.

24.     Elizabeth "Betzy" Keiley is an attorney formerly employed by Zimmer's legal

department.

25.     Jennifer Martiniez is a current employee at Zimmer.

26.     Kathleen Lenhardt is the business director of ISK.

27.     Deborah Lans is an attorney at Cohen Clair Lans Greifer & Thorpe LLP.

28.     David Lerner is an attorney at Morrison Cohen LLP.

## C. The '729 Patent

29.    U.S. Patent No. 6,123,729 (the "'729 Patent") entitled "Four Compartment Knee" issued on September 26, 2000, from U.S. Patent Application No. 09/037,417 filed March 10, 1998. U.S. Patent No. 6,123,729 lists John N. Insall, Mark Heldreth, Vince Webster, Steve Zawadski, Roy Yoshikazu Hori, Audrey Beckman, and William Rohr as inventors.

30.    The expiration date for the '729 Patent is March 10, 2018.

## D. The '786 Patent

31.    U.S. Patent No. 6,402,786 (the "'786 Patent") entitled "Four Compartment Knee" issued on June 11, 2002, from U.S. Patent Application No. 09/606,608 filed June 29, 2000. U.S. Patent No. 6,402,786 lists John N. Insall, Mark Heldreth, Vince Webster, Steve Zawadski, Roy Yoshikazu Hori, Kyoko Ohkuni, Audrey Beckman, and William Rohr as inventors. U.S. Patent Application No. 09/606,608 is a divisional application of, and claims priority to, U.S. Patent Application No. 09/037,417, which is the application that led to the '729 Patent.

32.    The expiration date for the'786 Patent is March 10, 2018.

## E. The '283 Patent

33.    U.S. Patent No. 6,319,283 (the "'283 Patent") entitled "Tibial Knee Component with a Mobile Bearing" issued on November 20, 2001, from U.S. Patent Application No. 09/346,850 filed July 2, 1999. U.S. Patent No. 6,319,283 lists John Insall, Audrey (Patmore) Beckman, Christopher McLean, Linggawati Tanamal, and Clayton R. Miller as inventors.

34.    The expiration date for the '283 Patent is July 2, 2019.

## III. DISCUSSION

The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1367(a). The court has subject matter jurisdiction over Zimmer's declaratory

judgment counterclaims under 28 U.S.C. §§ 1331, 1338(a) and 1367(a), as well as, 28 U.S.C. §§

2201 and 2202. Venue is proper under 28 U.S.C. §§ 1391(b) and 1391(c). After having

considered the entire record in this case, the substantial evidence in the record, the parties' post-

trial submissions, and the applicable law, the court concludes that the patents should not be

corrected to add the plaintiffs as inventors, and that Dr. Scuderi and Zimmer did not make a

mutual mistake to render their agreement rescindable. The court's reasoning follows.

### A.    Correction of Inventorship

The named inventors on an issued patent are presumed correct. *Amax Fly Ash Corp. v.*

*United States*, 514 F.2d 1041, 1047 (Ct. Cl. 1975). People not named, are presumed not to be

inventors. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456,1460 (Fed. Cir. 1998). Thus,

plaintiffs seeking to add themselves as inventors "must meet the heavy burden of proving [their]

case by clear and convincing evidence." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358

(Fed. Cir. 2004); *see also Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997).

This standard responds to some plaintiffs' temptation "to reconstruct, in a manner favorable to

their own position, what their state of mind may have been years earlier," or "to reconstruct, so

as to further their own position, the extent of their contribution to the conception of the

invention." *Hess v. Adv. Cardiovascular Sys., Inc.,* 106 F.3d 976, 980 (Fed. Cir. 1997).

To be an inventor, one must contribute to the conception of the invention. *Burroughs*

*Wellcome Co. v. Barr Labs., Inc.,* 40 F.3d 1223, 1227-28 (Fed. Cir. 1994). "Conception is

defined as 'the formation in the mind of the inventor, of a definite and permanent idea of the

complete and operative invention.'" *Stern v. Trs. of Columbia Univ.,* 434 F.3d 1375, 1378 (Fed.

Cir. 2006). Thus, plaintiffs must show that they each individually made a "contribution to the

claimed invention that is not insignificant in quality, when that contribution is measured against

the dimension of the full invention, and [did] more than merely explain to the real inventors well-known concepts and/or the current state of the art." *Acromed Corp. v. Sofamor Danek Grp., Inc.,* 253 F.3d 1371, 1379 (Fed. Cir. 2001). A plaintiff's contribution must be to the conception of the claims, not something outside of the claims (*e.g.*, unclaimed aspects of the specification). *Eli Lilly*, 376 F.3d at 1362-63; *Ethicon*, 135 F.3d at 1461-63. A plaintiff's contribution also must have been something more than what is in the prior art and more than an exercise of normal skill in the art, without an inventive act. *Eli Lilly*, 376 F.3d at 1362; *Fina*, 123 F.3d at 1473.

Participation in reduction to practice is insufficient to make a plaintiff an inventor. *Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1303 (Fed. Cir. 2010). "[A] person is a joint inventor only if he contributes to the conception of the claimed invention." *Eli Lilly*, 376 F.3d at 1358-59; *Ethicon*, 135 F.3d at 1460.

Furthermore, plaintiffs' testimony regarding their own inventorship claim "is regarded with skepticism" and "cannot, standing alone, rise to the level of clear and convincing proof." *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993); *Ethicon*, 135 F.3d at 1461. As such, plaintiffs "must supply evidence to corroborate [their] testimony." *Ethicon*, 135 F.3d at 1461; *Singh v. Brake*, 222 F.3d 1362, 1367 (Fed. Cir. 2000). Corroboration is determined under a "rule of reason" analysis, *i.e.,* the court evaluates "all pertinent evidence" to determine "the credibility of the [alleged] inventor's story." *Ethicon*, 135 F.3d at 1461. "Reliable evidence of corroboration preferably comes in the form of physical records that were made contemporaneously with the alleged prior invention." *Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1302 (Fed. Cir. 2002). Further, one co-plaintiff's testimony cannot corroborate another's testimony, and vice versa. *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171

6

(Fed. Cir. 2006) ("One consequence of the independence requirement is that testimony of one [alleged] co-inventor cannot be used to help corroborate the testimony of another.").

The court finds that the plaintiffs have not established by clear and convincing evidence that they contributed to the conception of any novel element of any claim in the patents.

### 1. The '729 Patent

#### a. Thickening the posterior condyles to safely accommodate increased flexion[2]

The primary novel aspect of the '729 and '786 Patents is the thickening of the posterior condyles to safely accommodate increased flexion. Dr. Insall first conceived this idea and then disclosed it to Zimmer on April 28, 1995. (See DTX 142; Transcript of trial from June 25 through June 29, 2012 ("Tr.") at 679:14-24.) Although Dr. Scuderi claims that he and Dr. Scott were involved in face-to-face meetings with Dr. Insall in Dr. Insall's New York office discussing this concept prior to Dr. Insall's disclosure to Zimmer (Tr. at 183:22-185:10), Zimmer offered documentary and testimonial evidence that contradicts this claim. Ms. Beckman claims that Dr. Insall, having just returned to his California home from Japan, called her on April 28, 1995 to tell her how thickening the posterior condyles would help accommodate the cultural needs of Japanese knee replacement patients. (Tr. at 680:13-681:2; DTX 142.) Dr. Insall did not mention that the plaintiffs had any involvement in the conception of his idea. (Tr. at 679:25-680:4.)

Furthermore, on May 1, 1995, while still in California, Dr. Insall faxed Ms. Beckman his sketch depicting his idea for thickening the posterior condyles to safely accommodate increased flexion, which could be implemented in either a modular or non-modular embodiment. (See Tr.

---

[2] "[I]nventorship is determined on a claim-by-claim basis." *Trovan*, 299 F.3d at 1302. To determine inventorship, the court first construes each claim and then compares the alleged contributions of each asserted co-inventor with the properly construed claim. *Id.*

Because the Plaintiffs do not identify any terms that require construction, the claims are given their ordinary and customary meaning as they would have been understood by a person of ordinary skill in the art at the time of the invention. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).

at 619:17-22; 659:14-19; 680:5-9; 695:20-696:2; DTX 89; 91 at 080; 110.) The sketch makes no mention of the plaintiffs, and Drs. Scott and Scuderi admitted that they had not seen the sketch prior to this litigation. (Tr. at 190:25-191:2; 618:22-619:10.) Thus, if the plaintiffs did have a meeting with Dr. Insall to discuss these topics, it was likely after his disclosure of the concept to Zimmer.[3]

Even before Dr. Insall sent his sketch to Zimmer, Dr. Rohr claims to have created a sketch disclosing this same idea on a trip he took to Korea. (Tr. at 88:5-90:12; 90:25-91:15; 94:3-19.) The plaintiffs did not contribute to Dr. Rohr's sketch. (See Tr. at 91:16-20; 96:20-22; 97:25-98:2; 105:4-13.) Around this time, Dr. Rohr and Dr. Insall met and discussed their ideas for increasing flexion. (Tr. at 94:21-95:4.) In fact, Dr. Rohr claims this feature was already established before Dr. Scott became involved. (Tr. at 107:18-108:15.)

### b.    Claim 1

Dr. Scott only specifically claims that he *discussed* thickening the posterior condyles with Drs. Insall and Scuderi, not that he contributed to the *conception* of the idea. (See Tr. at 471:2-10; 496:18-20.) However, the plaintiffs' mere participation in meetings during which product development topics, and/or topics related to the patent's claims, were discussed is not evidence of a specific contribution to conception and does not corroborate. *Eli Lilly*, 376 F.3d at 1362-64; *Hess*, 106 F.3d at 980-91.

The documentary evidence contradicts any suggestion that Dr. Scott contributed to conception. (See DTX 110; 142; PTX 57; Tr. at 828:3-24; 682:21-684:12.) DTX 110 shows a thickened posterior condyle, a smaller posterior radius, and a smooth transition between the posterior and superior condyles. (Tr. at 828:3-24.) Dr. Insall came up with this idea without Dr.

---

[3] Throughout the trial, both parties alluded to their great respect for Dr. Insall as a friend, colleague, and doctor. Drs. Scott and Scuderi testified that Dr. Insall was a man of integrity, and that neither of them thought that he would deliberately attempt to cheat them out of proper designation as inventors. (Tr. at 280:16-25; 627:3-9.)

Scott's involvement. (DTX 142.) DTX 110 and 142 show that Dr. Insall's idea was novel. Moreover, neither the '729 nor the '786 Patents include claim elements requiring a smaller posterior radius. *Eli Lilly*, 376 F.3d at 1362; *Ethicon*, 135 F.3d at 1461-63.

Dr. Scott also testified that he contributed to the concept of the "box" as used in this patent. However, claim 1 of the '729 Patent includes no elements directed to the PS box discussed in PTX 70, 71, and 341. This PS box is different from the box described in claims 2 and 3 of the '729 Patent. (See Tr. at 723:10-724:4.) Furthermore, PTX 70, 71, and 341 do not exhibit any novel ideas from Dr. Scott, but only a decision to continue to use the box from the prior art NexGen PS in the prior art LPS.[4] (Tr. at 723:1-9; 724:5-725:2; PTX 70 at 350.) Dr. Scott was not involved in the design of the NexGen PS. (Tr. at 457:15-22.)

Likewise, the court finds no independent evidence showing that Dr. Scuderi met with Dr. Insall prior to April 28, or May 1, 1995, to discuss thickening of the posterior condyles. (Tr. at 279:19-25; 419:19-23; DTX 110; 142.) Further, no independent evidence shows any contribution by Dr. Scuderi to thickening the posterior condyles. (Tr. at 419:19-23; 732:12-16; DTX 110; 142.)

For the same reasons as with Dr. Scott, the evidence contradicts any suggestions that Dr. Scuderi contributed to conception as well. Dr. Insall came up with this idea without Dr. Scuderi's involvement. (See DTX 110; 142.) The meeting minutes from May 15, 1995 (PTX 57) on which Dr. Scuderi relies, do not list him as an attendee and attributes meeting contributions to Dr. Insall, but not to Dr. Scuderi.[5] (Tr. at 682:21-684:12.)

---

[4] Any matter patented or described in a printed publication, or publicly used or offered for sale in the United States, more than one year prior to the filing of the applications for the Patents constitutes prior art with respect to those patents. 35 U.S.C. § 102(b); *see also In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004).

[5] PTX 57 does list Dr. Scott as an attendee, however, it does not attribute any contributions to him. Furthermore, the meeting described in PTX 57 occurred two weeks after Dr. Insall sent his sketch to Zimmer, and the minutes from it do not reflect the fact that the meeting added anything to Dr. Insall's already conceived high-flexion concepts.

9

## c.    Claims 4 and 5

The court concludes that the plaintiffs did not contribute a novel element to claims 4 or 5. The court finds that Dr. Scott's testimony that he was involved in the conception of the cam-spine interaction in claim 4—the concept of having the cam move down the spine from 90 degrees to 130 degrees—is uncorroborated. In fact, Dr. Rohr contradicted any suggestion of Dr. Scott's contribution to this concept when he testified that Todd Johnson, a Zimmer engineer, was specifically tasked with coming up with a solution whereby the cam would roll down the spine during flexion. (Tr. at 117:2-17.) Further, this design was implemented in the LPS and is therefore prior art. (See DTX 140 at 4.8 (Figs. 4-21, 4-22.))

The documentary evidence also contradicts any suggestion that Dr. Scott conceived of this element. The meeting minutes on which Dr. Scott relies, PTX 50 & 53, do not relate to high flexion knee prosthesis designs. (See Tr. at 623:23–625:1; 678:3–20.) Further, nothing in PTX 50 or 53 attributes any comments regarding the cam-spine interaction to Dr. Scott. Instead, PTX 53 credits work on the cam-spine mechanism to Todd Johnson. (PTX 53 at 121, 123.) PTX 153 also does not show any contributions to conception by Dr. Scott; it does not contain Dr. Scott's name or attribute any design ideas to him. Instead, Mr. Heldreth stated "we," *i.e.*, Zimmer, made the modifications to the cam-spine interaction. (PTX 153 at 594; Tr. at 791:24–792:14.) The evidence does not show that Dr. Scott conceived of placing the cam between the superior condyles either; no documents attribute the conception of cam location to Dr. Scott. PTX 70, 71, and 341, as described above, relate to PS and LPS, not high flexion designs. Claims 4 and 5 also do not involve the PS box. Furthermore, Dr. Scott offers no testimony or evidence of his contribution to the conception of claim 5.

10

Moreover, the cam-spine interaction described in claims 4 and 5 was not novel. It was implemented in the NexGen PS, LPS, and LCCK designs; all prior art to the '729 Patent. (Tr. at 117:22-25; 440:6-11; 713:6-714:14; 830:16-833:12; DTX 140 at 4.8 (Figs. 4-21, 4-22).) High cam placement between the posterior condyles was also in the NexGen PS and LPS. (Tr. at 439:24-440:2; DTX 1 at 4:48-51.)

As with Dr. Scott, Dr. Rohr's testimony contradicts Dr. Scuderi's claim that he was involved in the conception of the cam moving down the spine from 90 degrees to 130 degrees. (See Tr. at 117:2-27.) And, as discussed, the cam-spine interaction in claims 4 and 5 was not novel. Furthermore, the court finds that none of the documents on which Dr. Scuderi and Dr. Callaghan rely show any contribution to conception by Dr. Scuderi.[6]

### d. Claims 6, 8, and 9

The court finds Dr. Scott and Dr. Scuderi's testimony regarding their contributions to the conception of the non-cylindrical cam of claim 6 to be uncorroborated. No independent evidence shows that either doctor was involved in the conception of a non-cylindrical cam with two spine contacting portions. (See Tr. at 804:23-805:22.) Neither Dr. Scott nor Dr. Scuderi testified that they contributed to claims 8 or 9. Further, the court finds Dr. Callaghan's basis for claiming that the Plaintiffs contributed to the conception of these claims to be unsubstantiated. (See Tr. at 387:21-24.) Rather, the evidence shows that Mark Heldreth, Vince Webster, and

---

[6] PTX 135 never mentions Dr. Scuderi and the letter indicates that the ideas therein come from Zimmer's engineers. PTX 137 does not attribute any contributions to conception to Dr. Scuderi, nor does it discuss the interaction of the cam and spine as claimed in claims 4 and 5. PTX 152 does not attribute anything to Dr. Scuderi and merely discusses an anticipated meeting at ISK. As discussed as to Dr. Scott, PTX 153 reflects Mark Heldreth's proposed cam-spine modifications and does not contain Dr. Scuderi's name or attribute any design ideas to him. Lastly, PTX 189 attributes ideas about the cam-spine interaction only to Dr. Insall, not to Dr. Scuderi.

11

Steve Zawadski contributed to the conception of claims 6-11 of the '729 Patent.[7]  (Tr. at 804:23-805:22.)

## 2.    The '786 Patent

The court finds that the plaintiffs did not present sufficient evidence to show that they contributed anything novel to the conception of the '786 Patent. Dr. Callaghan did not testify about either doctor's claims of conception related to the '786 Patent. (See Tr. at 446:1-17.) Dr. Rohr testified that he does not recall who came up with the original idea of using a modular addition to thicken the posterior femoral condyles, but he had no recollection of Dr. Scuderi being involved in those discussions. (Tr. at 18:14-22; 120:2-5.)

Dr. Scott testified only that he was involved in discussions of the module, but made no specific reference to his involvement in its conception. (Tr. at 496:11-14.) Such general claims of involvement, without stating where the discussions took place, who was involved, or what specifically was discussed, are insufficient to meet the requirements for being named as a patent inventor. *See Eli Lilly*, 376 F.3d at 1362-62 (reversing and finding no inventorship based on plaintiff's attendance of a meeting where patent's subject was discussed, but no "direct evidence of communication of conception" was introduced by the alleged inventor). Furthermore, PTX 60 attributes the idea for a modular attachment to Dr. Insall, not Dr. Scott. (PTX 60 at 330.)

Similarly, no independent evidence corroborates Dr. Scuderi's claim that he, Dr. Scott, and Dr. Insall jointly conceived of a modular augment. Indeed, the plaintiffs conceded that there is no documentary evidence of the alleged meetings at ISK prior to May 1, 1995, the period during which Dr. Scuderi claims to have discussed the concept of using a module to thicken the posterior femoral condyles. (Tr. at 419:19-23; 619:23-620:6; 621:20-23; 622:9-13.)

---

[7] Similarly, PTX 153 and 92 do not show either doctor's contribution to the conception of a non-cylindrical cam.

12

### 3.     The '283 Patent

The court finds that the plaintiffs did not present clear and convincing evidence to show that they contributed anything novel to the conception of the '283 Patent. Dr. Scuderi offered no evidence of his contribution to the conception of any element of claim 1 of the '283 Patent. Dr. Scott did not testify that he contributed to the conception of the fastener claimed in claims 9-12.

#### a.     Claim 1

The plaintiffs failed to introduce any independent evidence to show that Dr. Scott was involved in the conception of any novel element of claim 1 of the '283 Patent. Dr. Rohr admitted to having no knowledge of who conceived the claims of the '283 Patent. (Tr. at 84:7-12.) Indeed, what Dr. Rohr identified as inventive is in the prior art: an articular surface substantially entirely supported by a tibial baseplate. (Tr. at 717:19-718:17; 836:12-838:13; DTX 17 at 2832.) The prosecution history of the '283 Patent recognizes Zimmer's MBK prosthesis and the Brosnahan patent as prior art. (DTX 4 at 2119, 2132, 2145.) PTX 90 does not discuss the inclusion of an entirely substantially supported limitation, or attribute any ideas to Dr. Scott.

Similarly, the prosecution history also reflects an articular surface having fifty degrees of rotation as being in the prior art. (DTX 4 at 2119-20, 2132, 2145.) It is also in the MBK prosthesis. Furthermore, no evidence shows that Dr. Scott contributed to the conception of using a single notch and post design, and such a design to limit rotation of a bearing surface was generally known in the art when the '850 Application was filed. (Tr. at 510:19-23.) Neither PTX 164 nor 94, on which Dr. Scott relies, discuss the post-notch design, much less attribute conception of the claimed invention to him.

#### b.     Claims 9-12

13

Although Dr. Callaghan testified that Dr. Scott was involved in the conception of the claimed fastener, his claim is unsupported, and is in fact contradicted by Dr. Scuderi's testimony that PTX 191 reflects an idea he came up with *independent* of Dr. Scott. (Tr. at 293:13-15.)

The court finds Dr. Scuderi's testimony regarding the fastener claimed in claims 9-12 to be uncorroborated. In fact, meeting minutes that were introduced attribute the idea of using a screw to secure the articular surface to the tibial tray to Dr. Insall. (PTX 203 at 266.) Dr. Scuderi did not introduce any evidence that attributes the use of a fastener to attach an articular surface to a tibial tray in a *mobile* bearing knee to him.

PTX 191 is not relevant because it relates to a fixed (not mobile) bearing prosthesis, and it is based on the screw in the prior art LCCK prosthesis. (PTX 191 at 176; DTX 132; Tr. at 841:19-25.) The purpose of the screw is irrelevant because claims 9-12 do not require the fastener to be used to prevent liftoff as opposed to varus/valgus movement. (Tr. at 437:21-438:17.) Dr. Scuderi's claim that his notes regarding a locking screw in a *fixed* prosthesis evidence a contribution to the conception of a locking screw in a *mobile* prosthesis is contradicted by the evidence which shows that in a mobile bearing prosthesis, unlike in a fixed prosthesis, the articular surface must remain mobile. (Tr. at 844:24-845:22.) Lastly, as reflected in the prosecution history, the mere use of a fastener to secure an articular surface to a tibial tray in a mobile bearing prosthesis was also in the prior art. (DTX 4 at 2118-19, 2130, 2145-46; Tr. at 304:22-25.) Dr. Scuderi presented no evidence to show that PTX 191 depicts the novel element of the screw: a head seated against the articular surface.

### 4. **Corroboration**

The court finds that in light of all the pertinent evidence, Dr. Scott and Dr. Scuderi's testimony regarding their alleged contributions is not corroborated. *Ethicon,* 135 F.3d at 1461.

No potentially corroborating witnesses testified about any specific statements that Dr. Scott or Dr. Scuderi made at any design or development meeting. (Tr. at 332:22-339:25.) No named inventor or other independent witness remembered either Dr. Scott or Dr. Scuderi making any contribution to the conception of any of the claims of the '729, '786 or '283 Patents.

To begin, Dr. Rohr did not corroborate the plaintiffs' assertions. In fact, on cross-examination, Dr. Rohr admitted that with regards to the thickening of the posterior condyles Dr. Scott was involved in reduction to practice ("Norm was very much a part of that discussion of how we reduced this to practice."), and to his recollection Dr. Scuderi was not involved at all ("Q: Is it not true that you have no recollection of Dr. Scuderi being involved in the thickening of the posterior condyles? A: I don't remember that, no."). (Tr. at 107:18-108:8; 120:2-5.)

Furthermore, Dr. Insall—who based on his alleged close working relationship with the plaintiffs would have been in the best position to know their roles—was involved in inventorship determinations and patent draftings for the patents and the LPS-Flex design and development. Dr. Insall signed an inventorship declaration naming all inventors, but not the plaintiffs. (DTX 106; Tr. at 99:18-100:8.) Dr. Insall had paid attention to which of his colleagues were named as co-inventors in the past, and had alerted Zimmer when he thought an application needed to be amended. (Tr. at 699:19-700:19; 730:16-24.) Both plaintiffs praised Dr. Insall as a fair and honest man. (Tr. at 280:16-25; 627:3-9.)

Zimmer's design and development meeting minutes do not corroborate the plaintiffs' claims. These contemporaneous documents identify the individuals present at a meeting and attribute many comments to specific individuals. (Tr. at 669:10-672:3.) No meeting minutes

15

reflect an inventive contribution by either plaintiff to any element of any claim of the patents.[8]
(Tr. at 682:21-683:12; 685:8-21; 687:9-15; 688:1-7; 792:24-793:1; 798:12-17; 825:16-22.)

The plaintiffs also make much of Zimmer promotional documents stating that the LPS-
Flex was "designed and developed in conjunction with" them. However, these documents are
not corroborative because they do not speak to patentability or conceptive contributions as
opposed to reduction of practice and/or commercialization. *Eli Lilly*, 376 F.3d at 1358-59;
*Ethicon*, 135 F.3d at 1460. In sum, the court concludes that the plaintiffs have not met their
burden of establishing, by a clear and convincing evidence, a specific contribution made by them
to the conception of a novel element of a patent claim, and that they have not corroborated their
testimony. *Eli Lilly*, 376 F.3d at 1362-64.

## B.     Choice of Law

Dr. Scuderi's Royalty Resolution Agreement and Dr. Scott's Release are governed by
Indiana law. *Maloney-Refaie v. Bridge at Sch., Inc.*, 958 A.2d 871, 879 n.16 (Del. Ch. 2008).
Delaware courts honor choice of law provisions in contracts as long as there is some material
connection to the chosen jurisdiction. *Brown v. SAP America, Inc.*, 1999 WL 803888, at *4
(D.Del. Sept. 13, 1999).

A release is a "contract which surrenders a claimant's right to prosecute a cause of
action." *Prall v. Ind. Nat'l Bank*, 627 N.E.2d 1374, 1377 (Ind. Ct. App. 1994). It is interpreted
as a matter of law according to its clear and unambiguous language in light of all facts and
circumstances. *Id; Dick Corp. v. Geiger*, 783 F.E.2d 368, 374 (Ind. Ct. App. 2003). A party

---

[8] The plaintiffs contend that the accuracy of the meeting minutes as a whole is suspect. (D.I. 88 at 5.)
While Zimmer's minute keeping procedures may have been sub-standard at this time, this fact does not corroborate
the plaintiffs' claims, and the meeting minutes remain a valuable source to identify the contributions of different
individuals. (Tr. at 335:8-25; 669:10-672:3; 675:16-676:15.) Furthermore, attendance alone at a meeting does not
make one an inventor. *Hess*, 106 F.3d at 980-81.

must prove a claim has been released by a preponderance of the evidence. *Landers v. McComb Window & Door Co.*, 248 N.E.2d 358, 365 (Ind. Ct. App. 1969).

## C.  Dr. Scuderi's Release

Dr. Scuderi and Zimmer entered into a Flex Royalty Resolution Agreement ("FRRA") on December 1, 2008. The FRRA states that Dr. Scuderi released all known and unknown claims against Zimmer which relate to the License Agreement. (PTX 35 ¶ 6(A.))  Dr. Scuderi admitted that his correction of inventorship claims relate to the License Agreement. (See Tr. at 258:20-259:13.)

Dr. Scuderi now claims that the FRRA should be rescinded because there was a mutual mistake on behalf of both parties at the time the agreement was executed. Dr. Scuderi contends that to compute the estimated present value owed to him at the time of the agreement, Zimmer's valuation firm, Alix Partners, prepared a valuation analysis using two key mistaken assumptions: first, that because Dr. Scuderi was not named as an inventor on any patents, there were no patents covered by the initial Flex Agreement, and second, that, because there were no patents, the Flex Agreement would expire on August 15, 2009. (PTX 38; D.I. 88 at 21-22.) Therefore, Dr. Scuderi claims that the present value calculation was premised on a mistaken belief, held by Zimmer and himself, that because he was not named as an inventor on any patents, he was only entitled to payments under the Flex Agreement through August 15, 2009. (PTX 38; Tr. at 262:22-263:18.)

The court concludes that Dr. Scuderi and Zimmer were not mutually mistaken at the time of entering into the FRRA. Under controlling Indiana law, Dr. Scuderi must prove that he "exercised at least reasonable diligence in ascertaining the facts if readily within his power," and "prompt[ly sought] his remedy within a reasonable time after the facts [were] discovered."

17

*Griffin v. Axsom,* 525 N.E.2d 346, 347 (Ind. Ct. App. 1988). The court finds no evidence of Dr. Scuderi's diligence. (See infra, Section E.) Further, under Indiana law, "[f]ull restoration of the consideration received for a release is a condition precedent to the maintenance of an action for the rescission of a contract or the avoidance of the bar raised by the pleading of the release." *Prall,* 627 N.E.2d at 1379. Dr. Scuderi has *offered* to return the money he was paid if the contract is rescinded, however, he has not returned the compensation as a condition precedent to his action. (Tr. at 232:7-11; D.I. 88 at 22.)

To prevail on his claim of mutual mistake, Dr. Scuderi must prove "by clear and satisfactory proof the true intentions common to all parties to the instrument, that a mistake was made, and that the mistake was mutual and consequently the instrument, as written, does not state the true intention or agreement of the parties." *Kruse, Kruse & Miklosko, Inc. v. Beedy,* 353 N.E.2d 514, 529 (Ind. Ct. App. 1976). This mistake must be "of the essence of the agreement," and "must be such that it animates and controls the conduct of the parties." *Breeden Revocable Trust v. Hoffmeister-Repp,* 941 N.E.2d 1045, 1054 (Ind. Ct. App. 2010). When an issue was never discussed or considered, no mistake is made. *See Hybarger v. Am. States Ins. Co.*, 498 N.E.2d 1015, 1019 (Ind. Ct. App. 1986). Furthermore, this mistake must be one of fact, not law; a mistake of law, *e.g.*, a mistake about the existence of a cause of action, cannot support rescission based on mutual mistake. *Mid-States Gen. & Mech. Contracting Corp. v. Town of Goodland,* 811 N.E.2d 425, 435 (Ind. Ct. App. 2004).

The court finds that the mistake on which Dr. Scuderi relies is neither mutual, nor one of fact. At the time of the FRRA, only Dr. Scuderi was allegedly mistaken about the fact of the existence of the patents. (Tr. at 270:16-22; 271:21-272:4.) Also, the parties were not mistaken about the *fact* that Dr. Scuderi was not a named inventor on the patents; this is a fact. Rather, Dr.

18

Scuderi's alleged mistake, is one of law: whether he had a cause of action to try to correct inventorship. *See Sewall v. Walters*, 21 F.3d 411 (Fed. Cir. 1994) (holding that inventorship is a question of law). This alleged mistake of law cannot support rescission. *Dickerson*, 2001 WL 401416, at *7.

## D. Dr. Scott's Release

In 1994, Dr. Scott and Zimmer signed a License Agreement, which was amended in 1995 and 2005. In the 2005 Settlement Agreement, Dr. Scott granted Zimmer a covenant not to sue them on "any and all of the claims . . . presently known or which could be reasonably known to Dr. Scott or his attorney, including as a result of disclosures made during Arbitration." (DTX 46 at ¶3.)

Dr. Scott claims that the present action is outside the scope of that release. The court disagrees, and finds that Dr. Scott's correction of inventorship claim could have been reasonably known by him or his attorney at the time of entering into the 2005 Settlement Agreement. To begin, Dr. Scott was aware, or could have reasonably been aware, of the patents through documents available to him or in his possession. At trial, the parties disputed whether Dr. Scuderi or Dr. Scott was in possession of a September 9, 1997, letter from Mr. Reeves to Dr. Insall that the Plaintiffs produced. The letter related to the '417 Application and discussed Mr. Reeve's "patent related activities regarding high flexion knees." (DTX 261; Tr. at 617:14-618:8.) Although Dr. Scott may have had access to this letter at ISK—even if the copy produced came from Dr. Scuderi's files—there is in fact another letter dated June 8, 2001, from Zimmer to Dr. Insall's estate attorney that specifically identified the '729 Patent and the '850 Application and which came from Dr. Scott's files. (DTX 72; Tr. at 296:1-298:19.)

Moreover, Dr. Scott investigated Zimmer's knee patents in or around 2004, identifying

numerous patents listing Zimmer as assignee, including one naming Dr. Insall as an inventor.

(DTX 71; Tr. at 520:11-21.) Dr. Scott's hand-written note listing the patents he investigated was

produced at trial. (DTX 71.) While Dr. Scott claims to have never looked up the patents on this

list he created during the 2004 Arbitration, the list contains the title and the named inventors for

some of the patents—information that suggests that he had, at one point, searched for them.

Additionally, the court finds that Mr. Lerner, Dr. Scott's attorney[9], knew or reasonably

could have known of the patents. By 2001, Mr. Lerner had numerous pieces of correspondence

in his possession disclosing the patents. (Tr. at 913:22-915:21; DTX 61; 62 at 88; 63 at 24.)

Further, in August 2002, Dr. Scott sought legal advice from Mr. Lerner regarding patents.[10] (Tr.

at 916:18-917:8.) Furthermore, Mr. Lerner assisted Dr. Scott and Ms. Lans during the 2004

Arbitration. (Tr. at 908:1-16.)

The court also finds that Ms. Lans knew or reasonably could have known of the patents.

During the 2004 Arbitration, Ms. Lans moved to compel a list of patents held by NexGen design

team members. (DTX 33; 29.) Zimmer produced a list that specifically lists the '729 and '283

Patents and associates those patents with the LPS-Flex Fixed and Mobile prostheses. (DTX 35;

37; Tr. at 590:22-591:13.) Ms. Lans admitted to reviewing this list and giving it sufficient

consideration to decide to challenge its confidentiality designation. (Tr. at 928:19-24.) Ms. Lans

---

[9] The parties debate the importance of the 2005 Settlement Agreement's use of the term "Dr. Scott or his attorney." (DTX 46 at ¶3.) Dr. Scott claims that because the word "attorney" is singular, not plural, it only refers to Ms. Lans, Dr. Scott's primary counsel in the 2004 Arbitration. (D.I. 88 at 23.) Dr. Scott claims that Ms. Lans's practice focuses on matrimonial law and commercial litigation and that she has very limited knowledge of U.S. patent law. (*Id.*) As the finder of fact, the court concludes that Zimmer did not limit its release to those claims known or knowable to Dr. Scott or Ms. Lans, specifically. Zimmer had been involved in a lengthy arbitration dispute with Dr. Scott, who was represented by Ms. Lans. Thus, if Zimmer, or for that matter Dr. Scott, had wanted to limit the scope of the release to those claims known or knowable to Dr. Scott or his *present* attorney, Ms. Lans, they could have done so. Furthermore, assuming *arguendo* that the release was limited to those claims known or knowable by Dr. Scott or Ms. Lans, the court finds that Ms. Lans could have reasonably known of the patents. (See Section D.)
[10] The specific content of Dr. Scott's request, or the patents he referenced in that request remain unknown due to his claim of privilege.

20

also admitted that she would have understood the connection between these patents and the LPS-Flex Fixed and Mobile implants. (Tr. at 956:21-958:1.)  Based on the foregoing and on Indiana law, the court concludes that Dr. Scott released his claim because he and his attorney knew or reasonably could have known that he had a correction of inventorship claim. *See Samuel E. Pentecost Constr. Co. v. O'Donnell,* 39 N.E.2d 812, 818 (Ind. Ct. App. 1942) (holding that a claim "could reasonably be known" when it "could have [been] learned").

### E.     Laches

Zimmer claims that the plaintiffs' correction of inventorship claims are barred by laches because the doctors (1) delayed filing the suit for an unreasonable and inexcusable length of time from the time they knew or should have known of their claims against Zimmer, and (2) the delay prejudiced or injured Zimmer. *Serdarevic v. Advanced Med. Optics, Inc.,* 532 F.3d 1352, 1358, 1360 (Fed. Cir. 2008).  "A delay of more than six years after the omitted inventor knew or should have known of the issuance of the patent will produce a rebuttable presumption of laches." *Adv. Cardiovascular Sys., Inc., v. SciMed Life Sys., Inc.,* 988 F.2d 1157, 1161 (Fed. Cir. 1993).  Zimmer may establish its laches defense by a preponderance of the evidence. *Hor v. Chu,* 765 F.Supp.2d 903, 913 (S.D.Tex. 2011).

For the reasons stated in the previous Section, the court concludes that Dr. Scott and Dr. Scuderi knew or should have known of the issuance of the patents by 1997, or by 2001.[11] Therefore, the court finds that the rebuttable presumption of laches applies to the plaintiffs' correction of inventorship claims. *Serdarevic,* 532 F.3d at 1358.  The court further finds, however, that the plaintiffs' have rebutted the presumption of laches by showing that Zimmer

---

[11] Even by the plaintiffs' own testimony both doctors had constructive notice of the patents by 2001. Dr. Scuderi claimed that he was in possession of the September 9, 1997, letter from Mr. Reeves to Dr. Insall, and that Dr. Scott was in possession of the June 8, 2001, letter from Zimmer to Dr. Insall's estate. (DTX 261; Tr. at 617:14-618:8; DTX 72; Tr. at 296:1-298:19.)

has not suffered any material prejudice that could be attributable to the delay in bringing the suit. *Hemstreet v. Com. Entry Sys. Corp.*, 972 F.2d 1290, 1293-94 (Fed. Cir. 1992).

"Material prejudice . . . may be either economic or evidentiary. Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts . . . . Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028, 1032 (Fed. Cir. 1992). Zimmer does not claim to have suffered economic prejudice. (See D.I. 90 at 30, 40.)

Zimmer claims to have suffered evidentiary prejudice due to "the loss of Dr. Insall's documents and fading of witnesses' memories. . . ." (Id.) Evidentiary prejudice is a question that must be answered by evaluating whether delay in filing the case resulted in the party raising the defense not being able to present a full and fair defense on the merits of the claim. *Barrois v. Nelda Faye, Inc.*, 597 F.2d 881, 885 (5th Cir. 1979); *Smith v. Sinclair Ref. Co.*, 257 F.2d 328, 330 (2d Cir. 1958); *Gillons v. Shell Co.*, 86 F.2d 600, 608-09 (9th Cir. 1936), *cert denied*, 302 U.S. 689, 58 S.Ct. 9, 82 L.Ed. 532 (1937). The court finds that Zimmer's contention that it has suffered evidentiary prejudice is unsupported by any evidence that it has not been able to present a full and fair defense on the merits of the claim. *A.C. Aukerman Co.*, 960 F.2d at 1028, 1033. Zimmer does not claim that the loss of Dr. Insall himself prejudiced its defense, but rather that the loss of his files did. (D.I. 90 at 40.) However, Dr. Insall did not keep files in his office, and he did not have a computer. (Tr. at 900:1-21.) Furthermore, Zimmer has not pointed to any specific files that were lost and that might have aided its defense. Zimmer also argues that "the

22

fading of witnesses' memories" prejudiced its ability to present its defense. (D.I. 90 at 40.)
However, such "[c]onclusory statements . . . that witnesses' memories have lessened . . . are not
sufficient." *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992). Finally, Zimmer
contends that "Mr. Reeves can no longer identify the specific contributions of named inventors,"
causing harm to its defense. (D.I. 90 at 30.) However, the specific contributions of the named
inventors of the patents are not at issue since the patentee is "under no obligation to substantiate
each inventor's contribution." *Canon Computer Sys., Inc., v. Nu-Kote Int'l, Inc.,* 134 F.3d 1085,
1088 (Fed. Cir. 1998). Thus, the court concludes that laches does not apply to the plaintiffs'
correction of inventorship claims since the plaintiffs have rebutted the presumption of laches by
showing that Zimmer was not materially prejudiced by their delay. *Aukerman*, 960 F.2d at 1038;
*see also Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1297 (Fed. Cir. 2004).

## IV. CONCLUSION

Based on the factual record in this case, and the documentary and testimonial evidence
presented at trial, the court concludes that neither plaintiff has proven by clear and convincing
evidence that he contributed to the conception of a novel element of any claim of the patents and,
therefore, neither shall be added as inventors. Furthermore, the court concludes that Dr. Scuderi
has not shown by clear and satisfactory proof that a mutual mistake was made. Finally, the court
concludes that the plaintiffs have rebutted the presumption of laches as a bar to their claims. An
appropriate order will follow.

Dated: August **27**, 2012

CHIEF UNITED STATES DISTRICT JUDGE

23

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

W. NORMAN SCOTT and GILES R. SCUDERI, )
                                             )
       Plaintiffs,                 )
                                             )
v.                                     )    C.A. No. 10-772 GMS
                                           )
ZIMMER, INC. and ZIMMER        )
TECHNOLOGY, INC.,            )
                                           )
       Defendants.         )
                                           )

## ORDER

At Wilmington, this 27th day of August, 2012, consistent with the memorandum opinion

issued this same date, IT IS HEREBY ORDERED that:

1. Neither Dr. Scott nor Dr. Scuderi is an inventor of any of the patents;

2. Dr. Scuderi's agreement with Zimmer is not rescinded.

3. The Clerk of Court is directed to enter judgment in favor of the defendants and against

    the plaintiffs.

Dated: August 27, 2012

CHIEF, UNITED STATES DISTRICT JUDGE