:53:28

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4    W. NORMAN SCOTT AND GILES R.    )    Civil Action
     SCUDERI,                        )
5                                    )
                  Plaintiffs,        )
6                                    )
         v.                          )
7                                    )
     ZIMMER, INC. AND ZIMMER         )
8    TECHNOLOGY, INC.,               )
                                     )
9                  Defendants.       )    No. 10-772-GMS

10                         - - -
                     Wilmington, Delaware
11               Wednesday, June 27, 2012
                         9:00 p.m.
12                   Day 3 of Trial
                         - - -

13

     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

14

     APPEARANCES:

15
             KAREN JACOBS LOUDEN, ESQ.
16           Morris, Nichols, Arsht & Tunnell, LLP
                         -and-
17           JACOB W. BUCHDAHL, ESQ.,
             SHAWN J. RABIN, ESQ., and
18           GENEVIEVE VOSE, ESQ.
             Susman Godfrey LLP
19           (New York, N.Y.)
                         -and-
20           MARC S. FRIEDMAN, ESQ.
             SNR Denton
21           (New York, N.Y.)
                         -and-
22           JOEL N. BOCK, ESQ.,
             ANDREW M. GRODIN, ESQ., and
23           MATTHEW P. PARSON, ESQ.
             SNR Denton
24           (Short Hills, N.J.)

25                           Counsel for Plaintiffs

1    **APPEARANCES CONTINUED:**

2         **FREDERICK R. COTTRELL, III, ESQ.**
         **Richards, Layton & Finger**
3                    **-and-**
         **BRYAN S. HALES, P.C., and**
4        **DAVID W. HIGER, ESQ.**
         **Kirkland & Ellis**
5        **(Chicago, IL)**

6                         **Counsel for Defendants**

7                    **- - -**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

:03:34　　1　　　　　　　　　THE COURT:  Good morning.  Please take your

:03:36　　2　　seats, everyone are.

:03:37　　3　　Doctor, good morning.

:03:41　　4　　　　　　　　　THE WITNESS:  Good morning.

:03:42　　5　　　　　　　　　THE COURT:  Counsel.

:03:44　　6　　　　　　　　You are still under oath.

:03:46　　7　　　　　　　　... WILLIAM ROHR, having been previously

　　　　8　　　　　　sworn as a witness, was examined and testified

　　　　9　　　　　　further as follows ...

:03:52　　10　　　　　　　　　　DIRECT EXAMINATION CONTINUED

:03:52　　11　　BY MR. FRIEDMAN:

:03:54　　12　　Q.　　Just to recall where we left off, I had asked you

:04:00　　13　　whether based on your experience and review of the material

:04:03　　14　　you had formed a conclusion about whether Drs. Scott and

:04:09　　15　　Scuderi make three different contributions to the femoral

:04:14　　16　　condyles.  Do you remember that?

:04:16　　17　　A.　　Yes, I remember it.  And I went through the three

:04:19　　18　　areas.

:04:20　　19　　Q.　　You also stated that you relied upon Dr. Scuderi's

:04:28　　20　　testimony and a number of documents, including the May 1,

:04:31　　21　　1995 drawing?

:04:33　　22　　A.　　Correct.

:04:34　　23　　Q.　　That's where I would like to pick up.

:04:37　　24　　A.　　Okay.

:04:37　　25　　Q.　　Could we please have DTX-110?

Rohr - direct

:04:41   1          Now, this is the drawing you were referring to.

:04:51   2   Correct?

:04:52   3   A.    Correct.

:04:53   4   Q.    What does that drawing demonstrate to you?

:04:57   5   A.    That drawing demonstrates a femoral component as seen

:05:02   6   from the side.  And there is a dotted line that shows a

:05:09   7   buildup on the posterior femoral condyle where it's

:05:18   8   somewhere around five to six millimeters with a question

:05:23   9   mark.

:05:23   10   Q.    Have you formed an opinion as to whether Dr. Scott and

:05:30   11   Scuderi contributed to this particular design?

:05:34   12   A.    I have.

:05:35   13   Q.    Was this a final design?

:05:43   14   A.    Not at all.  It's typical of the design process, I

:05:52   15   think, where, when ideas are generated, you brainstorm

:06:00   16   together, put together a visual of it.

:06:04   17   Q.    Are there other components that would be required to

:06:09   18   achieve high flexion?

:06:14   19   A.    As you see, just from the development of this

:06:17   20   particular design, there were definitely iterative

:06:27   21   conceptualizations that needed to be done in order for you

:06:31   22   to get the type of motion that the initial concept wanted.

:06:38   23         So if you take as an example, you want -- if

:06:42   24   their goal was to get to 160 degrees of flexion, you would

:06:49   25   have to look at every part of the design of the knee, so the

Rohr - direct

:06:55    1    femoral component, the tibial component, and those

:07:00    2    interactions, to see where you could get to that degree of

:07:04    3    motion.

:07:05    4              The other thing that I think is important is you

:07:08    5    can design anything to go wherever you want it to go.  The

:07:13    6    issue is, in a knee, I can tell you that, but the issue is

:07:18    7    to do it safely.  I think that's the other terminology here,

:07:24    8    that if somebody is looking at this who may not have done a

:07:28    9    lot of design work, they need to appreciate.

:07:30    10             So at this point, that is the beginning of a

:07:36    11   concept, I would say.

:07:37    12   Q.   Are there any other materials that you considered

:07:40    13   regarding the contributions of Dr. Scott and Scuderi

:07:44    14   concerning the thickening of the posterior condyles or the

:07:49    15   forming of a smooth articular surface?

:07:55    16   A.   I think we mentioned that also the other day, that the

:07:58    17   three -- they are not the only ones.  But the three

:08:01    18   documents that I put in order to kind of show the

:08:06    19   conceptualization of it would be that the Dr. Insall not of

:08:16    20   coming back from Asia and thinking there might be a need to

:08:20    21   get more motion than we might be getting in knee

:08:24    22   replacements.  Then during that next month, just by what I

:08:27    23   understand of Insall Scott Kelly referred to recently, even

:08:33    24   in the last day when I have been here, that there is a whole

:08:36    25   month in between there of discussions.  And then on May 1st,

Rohr - direct

:08:40    1    this shows up.  And then on May 15th, there was another

:08:45    2    design meeting.

:08:45    3            So in the course of about a six-week period, the

:08:49    4    way I understand design, the way I have been involved in it,

:08:53    5    that's where all of this is being developed.  I think I even

:08:56    6    said it yesterday, it's not like suddenly a brainstorm comes

:09:00    7    that we are going to get this thing all together.  It is

:09:03    8    more of an iterative thinking process, even.

:09:06    9            Sometimes it's collaboration, sometimes it's

:09:08   10    corroboration, sometimes it's actually arguing back and

:09:12   11    forth the points.

:09:12   12            THE COURT:  When you say this shows up, you mean

:09:14   13    the Insall sketch?

:09:15   14            THE WITNESS:  The Insall sketch, yes, shows up

:09:18   15    in early May.

:09:20   16    BY MR. FRIEDMAN:

:09:21   17    Q.    Could you please put up PTX-57?

:09:23   18            This is the last document I think you referred

:09:30   19    to in the answer you just gave.  Correct?

:09:34   20    A.    Correct.

:09:36   21    Q.    Is this a document that you relied upon, also, to

:09:41   22    reach the conclusion that you did?

:09:43   23    A.    It is.

:09:43   24    Q.    Now, how does this memo show the involvement of Drs.

:09:50   25    Scott and Scuderi to you?

Rohr - direct

:09:52    1    A.      So once again, this occurred in New York.  It talks

:09:57    2    about PSCK/CCK knee system.  It shows that on the attendees

:10:07    3    that are written on here for the minutes are Dr. Insall and

:10:11    4    Dr. Scott.

:10:15    5             Then I would refer you to the third page, where

:10:22    6    it talks about a full flexion Asian knee.

:10:27    7             There is two critical points here, as far as,

:10:35    8    once again, going over this whole idea, that ideas don't

:10:38    9    just spring up and then the concept of them just being

:10:41   10    developed in a day and sketched out in a day, because here

:10:45   11    it says, the second sentence, the plots indicated that more

:10:49   12    posterior bone needs to be resected and an additional

:10:52   13    smaller posterior radius needs to be added to prevent

:10:58   14    excessive posterior contacts in deep flexion.

:11:01   15             That is the safety issue.  If you look at that

:11:06   16    drawing from before, it's kind of a single radius.

:11:11   17    Q.      When you say the drawing before, the May 1?

:11:13   18    A.      The May 1 drawing.  Then, if you look at this, what

:11:18   19    the engineers are claiming at this point is they think this

:11:21   20    might be able to get you to 145 degrees of flexion, whereas

:11:26   21    the goal still of the design is to get it to 160 degrees of

:11:32   22    flexion.

:11:32   23             So at this point -- and you just see it again

:11:36   24    here, just once again from the standpoint of being involved

:11:40   25    in these design processes, where it takes a number of things

Rohr - direct

:11:45   1    to get to even conceptualization to get to the language

:11:50   2    that's in those patents, at least from my standpoint.

:11:54   3              I think this whole month or two-month period

:12:00   4    shows that.

:12:00   5    Q.    The smaller posterior radius that needed to be added,

:12:07   6    which was disclosed, is this document contained in the May 1

:12:13   7    drawing that was fax'd from Dr. Insall to Ms. Beckman?

:12:18   8    A.    No.  In fact, you see a radius on that May 1 document

:12:22   9    that is pretty much, it's a single radius.

:12:25   10   Q.    In your opinion, did the May 1 drawing disclose a way

:12:34   11   of achieving high flexion up to 160 degrees?

:12:41   12   A.    Once again, you can't get motion with one component of

:12:48   13   a knee.  You would have to have how that component would

:12:51   14   mate with the tibial component.  So a femoral component

:12:54   15   mating with a tibial component.

:12:55   16             So there is no way of doing that.

:12:59   17             Now, in fairness to Dr. Insall, I think in that

:13:03   18   same drawing, it says something like this might be able to

:13:07   19   be used with the LPS.  As we all know, that is not what

:13:12   20   ended up happening, and that probably would not have been a

:13:16   21   safe way of doing it.  That is why there were the

:13:18   22   modifications to other things, that being the cam as well as

:13:21   23   the post and the articulating surface of the tibia.

:13:24   24             So at that point, you couldn't do that, I am

:13:32   25   sure.  In fact, I guess the support of that was that in the

Rohr - direct

:13:37    1    15th, that's after some drawings, the engineers could only

:13:40    2    come up with 145 degrees of flexion at this point.  That was

:13:48    3    knowing that drawing from May 1st, the engineers here say

:13:51    4    that the femoral component, you know, they could only come

:13:55    5    up with plots.  So that would have been those CAD drawings,

:13:59    6    you start out with these drawings, they could only use those

:14:02    7    plots.  And with those plots and moving the knee through

:14:06    8    motion, it could only go to 145, is what they are saying

:14:10    9    there, as I understand it.

:14:11   10    Q.    Is the design which is disclosed in the May 15, 1995

:14:17   11    minutes found in any of the claims of the '729 patent?

:14:23   12    A.    I believe there is a description of that.

:14:26   13    Q.    Let's, if you would, put up DTX-1, particularly the

:14:36   14    claims.

:14:42   15    A.    So it would be in Claim 1 there, at Column 5, down

:14:47   16    around just before Line 60.

:14:49   17    Q.    What language particularly are you referring to?

:14:53   18    A.    So it says that, you know, a superior condyle

:14:58   19    extending superiorly from the distal condyle to form a

:15:02   20    superior articular surface, and then further down, the

:15:05   21    superior condyles, a smooth articular surface extending

:15:12   22    around the exterior of the implant for articulation with the

:15:16   23    tibial articular surface.

:15:20   24    Q.    Is this what is disclosed to you in the May 15, 1995

:15:28   25    document that we just looked at?

:15:31    1    A.    That's correct.  And there is actually one other place

:15:33    2    just above 60, up around 55, a superior condyle extending

:15:38    3    superiorly.

:15:44    4    Q.    Now, let's turn to another topic.  Based on your

:15:55    5    experience and based on the materials that you reviewed,

:15:58    6    what is your understanding about whether Dr. Scott and

:16:00    7    Scuderi contributed to the initial ideas of modifying the

:16:06    8    shape of the cam?

:16:08    9    A.    So base on what I read and my experience, looking at

:16:13    10   all the documents that I looked at in that Exhibit B, I

:16:20    11   think they -- that Dr. Scott and Dr. Scuderi significantly

:16:24    12   contributed to the concept of cam shaped -- the

:16:30    13   remodification of the shape of the cam in this design.

:16:36    14   Q.    Now, were there specific materials that you reviewed

:16:41    15   that you relied on to reach that conclusion?

:16:44    16   A.    There were.

:16:45    17   Q.    All right.  Could you put up, please, PTX-92.

:16:57    18         You have seen this document before.  Right?

:17:00    19   A.    I have.

:17:00    20   Q.    Is this a document that you relied upon to reach a

:17:05    21   conclusion with respect to the modification of the shape of

:17:09    22   the cam that you just referred to?

:17:10    23   A.    It is.

:17:11    24   Q.    All right.  What does this document show regarding Dr.

:17:15    25   Scott's contributions to the shaping of the cam?

:17:19   1   A.      So this is a letter from Mr. Blamey, who sends it to

:17:30   2   Dr. Scott specifically.  There are some cc's there as you

:17:38   3   can see on the back, one of which was to Dr. Insall.  And

:17:44   4   most importantly, as far as what we are talking about, if

:17:49   5   you would look on the third page, where they show some

:17:55   6   drawings, the drawing in the upper right-hand portion will

:18:02   7   show you that the radius changes in that cam.  And, also, it

:18:11   8   shows you up at the top that the superior condylar radius is

:18:17   9   changed versus the diagram that we had previously looked at

:18:23   10   from that early May diagram.

:18:31   11           In some of those other diagrams you can see more

:18:33   12   that the cam is moved forward.  These are all things that

:18:37   13   are important for the safety of the component.  So what you

:18:41   14   don't want is the cam to jump out or dislocate out of the

:18:46   15   spine.  And especially, it's more of a concern as you are

:18:51   16   trying to get higher flexion.  And these are the type of

:18:55   17   modifications.  It's also some of the descriptions in the

:18:58   18   patents that the radius is changed there, and where you put

:19:05   19   that cam, et cetera.

:19:08   20   Q.      Does this document, what we have referred to as the

:19:13   21   Blamey document, disclose a change in the shape of the cam?

:19:18   22   A.      It does.

:19:18   23   Q.      Where is that?

:19:22   24   A.      That's where I was saying that you see that the radius

:19:25   25   is starting to -- the cam pictured on the top of that

Rohr - direct

:19:30    1    posterior femoral condyle just in front of it is changing

:19:35    2    the radius.  That makes it more oblong, eventually more

:19:43    3    oblong.

:19:44    4    Q.    This document does not mention Dr. Scuderi.  Correct?

:19:49    5    A.    This document does not mention Dr. Scuderi.

:19:52    6    Q.    Do you have an opinion as to whether Dr. Scuderi was

:19:57    7    involved in the creation of the concept?

:20:00    8    A.    Based on all the previous testimony, once again, I

:20:06    9    showed you the time frame from that April time frame to the

:20:11    10    mid-May time frame, there were some, I can't remember all

:20:18    11    the memos that were going back and forth between Zimmer and

:20:26    12    ISK at that time, but, obviously, I remember they were

:20:32    13    trying to get from 145 to 160 in that interim period, so

:20:38    14    there must have been a lot of discussion of how you would do

:20:41    15    that safely.

:20:42    16           This would just be my experience.  And then now

:20:45    17    they are coming up with some ways to potentially do that.

:20:49    18           MR. HIGAN:  Your Honor, actually, in the last

:20:54    19    answer that this witness gave, he was conjecturing about

:20:59    20    conversations that must have happened.  We think it's

:21:01    21    inappropriate for this expert to speculate what could have

:21:05    22    happened rather than his review and analysis of documents

:21:08    23    that he has actually reviewed.

:21:09    24           THE COURT:  Well, speculation is inappropriate.

:21:12    25    I didn't take it as speculation.  I took it, given the

:21:17     1   overall context of his testimony thus far, experientially as

:21:22     2   well as based on his review of the overall documents.

:21:24     3          So I am going to overrule the objection.

:21:27     4   BY MR. FRIEDMAN:

:21:28     5   Q.    If we could, please put up PTX-137?

:21:31     6          Do you have it there in your book, Dr.

:21:45     7   Callaghan?

:21:46     8   A.    I do.

:21:46     9          THE COURT:  This is what number?

:21:54    10          MR. FRIEDMAN:  PTX-137.

:21:56    11   BY MR. FRIEDMAN:

:21:57    12   Q.    Is this one of the documents that you were referring

:21:59    13   to, also, that you relied upon?

:22:01    14   A.    It is.

:22:01    15   Q.    What does this document show with respect to Dr.

:22:05    16   Scott's and Dr. Scuderi's contributions?

:22:08    17   A.    Once again -- and this goes back to the whole idea of

:22:13    18   cadaver studies and cadaver labs again, and I remind you

:22:18    19   that this occurs one year later than that initial drawing.

:22:23    20   So this, once again, can give you a flavor of how design

:22:28    21   comes about.

:22:29    22          You know, as I said before, even to come up with

:22:33    23   one picture like they came up with in May of 1995, I don't

:22:38    24   think that comes up in a day, at least from my experience.

:22:44    25   I don't think that the document that you see there in June

| :22:46 | 1 | of '96, that you can up with that concept in a day.  And you |
| :22:51 | 2 | can see, it takes a whole other year, and they are still |
| :22:54 | 3 | trying to modify a concept with some of the language that I |
| :22:59 | 4 | see in the claims, anyway, still being developed, that just |
| :23:05 | 5 | that document back in '96 is not the extent of the claims, |
| :23:18 | 6 | as I read them. |
| :23:19 | 7 | Q.    Looking at this document, what design concepts |
| :23:22 | 8 | resulted from the cadaver study that it relates to? |
| :23:26 | 9 | A.    So once again, the highlight of this would be when you |
| :23:31 | 10 | go to the second page, and they say prototypes, the |
| :23:35 | 11 | following variations of the current high flexion design. |
| :23:39 | 12 | Q.    Dr. Scuderi is mentioned specifically, am I correct, |
| :23:50 | 13 | at the top of this memo? |
| :23:51 | 14 | A.    That's correct. |
| :23:51 | 15 | Q.    Now, Dr. Scott is not mentioned anywhere on this |
| :23:56 | 16 | document.  Correct? |
| :23:57 | 17 | A.    He is not.  You have already heard -- |
| :24:02 | 18 | THE COURT:  Counsel, I am being a little bit of |
| :24:06 | 19 | a nudge on this, I know.  But you got to know one of my |
| :24:11 | 20 | nudges is lawyers leading their own witnesses.  Obviously, |
| :24:15 | 21 | leading is appropriate in certain areas.  Judges have |
| :24:18 | 22 | discretion.  We can let lawyers lead.  But there is no need |
| :24:22 | 23 | to lead these witnesses.  These are brilliant people who |
| :24:26 | 24 | don't need to be led. |
| :24:28 | 25 | MR. FRIEDMAN:  That is correct. |

:24:29      1                    THE COURT:   Okay.

:24:30      2      BY MR. FRIEDMAN:

:24:34      3      Q.    Is Dr. Scott's name mentioned anywhere in the

:24:37      4      document?

:24:38      5      A.    It is not.

:24:38      6      Q.    Why is it that you have concluded that he also

:24:41      7      contributed to the designs that are reflected in this

:24:45      8      document?

:24:46      9      A.    That would be based on the testimony and my experience

:24:49     10      of how things were done at ISK and the collaborative

:24:53     11      experience.

:24:53     12      Q.    Are there other examples that showed Dr. Scott and

:24:58     13      Scuderi's contributions to the cam and spine?

:25:02     14      A.    I believe there is one other cadaver lab.

:25:08     15      Q.    Could you please put up PTX-153?

:25:12     16                    Is this one of the documents that you relied

:25:24     17      upon?

:25:24     18      A.    This is the one I was thinking of.

:25:26     19      Q.    Now, based on your experience and review, where does

:25:34     20      this document demonstrate Dr. Scott's and Dr. Scuderi's

:25:37     21      contributions?

:25:41     22      A.    Specifically here, this to me is a really good example

:25:46     23      of all the issues that we were talking about as far as

:25:50     24      documenting minute notes, et cetera.

:25:53     25                    So this is a 12/19/97 note.  So this is a note

Rohr - direct

:26:01    1    that's written after something else was done.  I don't know

:26:05    2    if we are going to get into it, but there is another note

:26:09    3    where Mr. Heldreth talks about wanting to come out to do a

:26:15    4    cadaver lab and to view surgery.

:26:17    5              So nowhere is it really stated here in this 19th

:26:24    6    note that that is what happened.  But I am making an

:26:26    7    assumption, I don't know if I should, that this is based on

:26:30    8    a cadaver interoperative session.

:26:38    9              Actually, the way that Mr. Heldreth stated it is

:26:41   10    that he was going to come out for two days.  I don't know if

:26:46   11    we will get to that document.  Anyway, it's in another

:26:49   12    document.  I specifically recall that.

:26:51   13    Q.    What does this document that is in front of us show?

:26:54   14    A.    So once again, this document shows that, if you look

:27:00   15    at Paragraph 3, you know, the modified cam shape is slightly

:27:05   16    oblong, so that is that change in radius we were talking

:27:07   17    about, and it may pose some additional challenges for our

:27:11   18    manufacturing people.

:27:11   19              So even at this point, this concept is still

:27:16   20    being developed as of that day.

:27:19   21    Q.    And again, let me ask you, what is it that causes you

:27:25   22    to conclude that these were features that Drs. Scott and

:27:31   23    Scuderi were involved in?

:27:33   24    A.    Once again, because they were there.  And once again,

:27:36   25    you can see, if I go down to the next paragraph, another

:27:39    1   benefit of the oblong shape, which is what was developed a

:27:42    2   year earlier, is that the femur -- it says femoral but I

:27:47    3   think it means femur -- is not driven as far back as 165

:27:52    4   degrees.

:27:52    5   Q.    Now, are the cam features that you indicated that were

:27:55    6   contributed by Dr. Scott and Dr. Scuderi that are identified

:27:58    7   in this drawing found in any of the claims of the '729

:28:02    8   patent?

:28:03    9   A.    I believe they are.

:28:04   10   Q.    Can we put the '729 patent back up and again the claim

:28:10   11   section, please.

:28:25   12          Do you have it in front of you?

:28:26   13   A.    I have the claim in front of me.

:28:28   14   Q.    All right.  In which claims are the features that we

:28:32   15   have just talked about found?

:28:35   16   A.    I believe they can be seen in Claim 4, 6, 8 and 9.

:28:41   17   Q.    Could you point out specifically where in Claims 4, 6,

:28:46   18   8 and 9?

:29:04   19   A.    So it probably starts there around 23, there is a cam

:29:11   20   between the superior and posterior condyles.  The cam having

:29:15   21   an articular surface.  The cam articular surface containing

:29:18   22   the spine articular surface at varying vertical locations as

:29:23   23   the femoral and tibial components, as it goes beyond 90

:29:28   24   degrees.

:29:31   25   Q.    Continue with your answer?

Rohr - direct

:29:33    1    A.    No.

:29:33    2    Q.    Anyplace else in Claim 4?

:29:39    3    A.    That is the main place, is in Claim 4.

:29:41    4    Q.    What about Claim 6?

:29:43    5    A.    In Claim 6 --

:29:53    6    Q.    If you identify the line you just did before, that

:29:55    7    would be helpful.

:29:59    8    A.    If you look at around 49 it says the cam has a

:30:03    9    non-cylindrical articular surface with a first spine

:30:07   10    contacting portion and a second spine contacting portion

:30:13   11    located further posteriorly than the first spine contacting

:30:18   12    portion.

:30:18   13    Q.    Now, you also --

:30:22   14              THE COURT:  Where was that, Doctor?

:30:25   15              THE WITNESS:  It's Claim 6, and it's down around

:30:28   16    Line 39.

:30:29   17              THE COURT:  Okay.

:30:30   18    BY MR. FRIEDMAN:

:30:50   19    Q.    Let's turn to Claim 8 that you had mentioned.  Could

:30:54   20    you identify where in Claim 8 the design features that we

:30:58   21    are talking about that Dr. Scott and Scuderi contributed to

:31:01   22    are found?

:31:02   23    A.    So in Claim 8, they are at the end of the first line,

:31:05   24    it says the cam articular surface has a curved surface whose

:31:11   25    radius increases from the first contact portion to the

Rohr - direct

:31:13    1    second contact portion.

:31:17    2    Q.    And if you would, Claim 9, please.

:31:21    3    A.    Then Claim 9, where it says once again --

:31:24    4    Q.    Wait until it's up on the screen.  I am sorry.

:31:27    5    A.    I am sorry.

:31:29    6    Q.    Now I will ask you, what about Claim 9?

:31:34    7    A.    It says the first spine contact portion has a radius,

:31:37    8    and the second spine contact portion has a radius, the

:31:41    9    radius of the second spine contact portion being larger than

:31:44    10   the radius of the first spine contact portion.

:31:53    11   Q.    I would like to move on to a different subject, a

:31:57    12   different aspect of this.  Something that has been referred

:32:04    13   to as a lock-down screw.

:32:07    14         Now, based on your experience and based on the

:32:11    15   materials that you reviewed, do you have an opinion as to

:32:15    16   whether Dr. Scott and Dr. Scuderi were involved in the

:32:20    17   initial ideas of a lock-down screw for the mobile-bearing or

:32:23    18   articular surface?

:32:25    19   A.    I do.

:32:26    20   Q.    And what is the conclusion that you reached?

:32:30    21   A.    So after reading the documents, a lot of the memos

:32:40    22   back and forth, some cadaver data, some sketches that I saw,

:32:47    23   I conclude that Drs. Scott and Scuderi significantly

:32:52    24   contributed to the conception of the design of a lock-down

:32:59    25   screw to prevent liftoff in mobile bearings.

Rohr - direct

:33:02     1     Q.     Could you please put up PTX-191?

:33:06     2            Is this document, PTX-191, a document you have

:33:16     3     relied upon to reach your conclusion?

:33:18     4     A.     It is.

:33:18     5     Q.     What does this document show concerning Dr. Scuderi's

:33:25     6     contributions?

:33:26     7     A.     So, first of all, I understand that this is Dr.

:33:30     8     Scuderi's signature.  I can't decipher that myself.  But if

:33:39     9     we assume that it is, and that was on 8/4/1998, so I assume

:33:48    10     that this is his drawing.

:33:50    11     Q.     Well, what does this drawing demonstrate to you about

:33:54    12     a design contribution?

:33:58    13     A.     In this drawing, you see a screw with a head on it

:34:07    14     that is going proximal to a tibial articulating component,

:34:16    15     and driven down into a stem.  And the screw is being screwed

:34:23    16     into the bottom of the stem, so that would bring the

:34:27    17     articulating component down on onto the what we call a tray.

:34:39    18     Q.     Are there any other documents that would show to you

:34:43    19     Dr. Scuderi's contribution to the design of the lock-down

:34:49    20     mechanism?

:34:50    21     A.     There are.

:34:50    22     Q.     Could you put up PTX-203, please?

:34:53    23            Do you have that in your book?

:35:02    24     A.     I do have this one in my book.

:35:05    25     Q.     Is this a document that you are referring to?

Rohr - direct

:35:08    1    A.    It is.

:35:08    2    Q.    Now, where or how does this document describe Dr.

:35:14    3    Scuderi's contributions?

:35:17    4    A.    So once again, this was a cadaver lab.  We have gone

:35:27    5    back, how these cadaver labs were run, and I am not going to

:35:32    6    get into that again unless somebody wants me to.  But

:35:35    7    basically, these cadaver labs are set up, doctors at ISK,

:35:41    8    they are kind of in a room based on where they can have

:35:44    9    these things.  And that's why it's so convenient, as you see

:35:48    10   during this process, for Zimmer to come in, them have these

:35:51    11   cadaver labs, and do all of this thinking.

:35:55    12         During this time period, I was involved with

:36:02    13   this institution and the people here during the whole time

:36:04    14   of Dr. Insall's death, illness and death, this was toward

:36:10    15   the end of his life.  And it wouldn't even be toward the end

:36:14    16   of his life.  It's just that I know that Dr. Insall was

:36:20    17   always involved in this.

:36:22    18         But cadaver work is -- you know, I told you that

:36:25    19   Dr. Scuderi was always involved in Dr. Insall's surgeries

:36:29    20   during this time.  So during the cadaver work, once again, I

:36:35    21   can't assume anything, but I would imagine again that they

:36:38    22   do the cadaver work like always, it involves all the

:36:41    23   participants.  And I will just leave it at that.

:36:45    24         MR. HIGER:  Your Honor, again, we object to the

:36:47    25   witness speculating.

Rohr - direct

:36:49   1        THE COURT:  Again, he used the word I imagine,

:36:53   2  it contextually does appear that he is speculating.  I don't

:36:57   3  think he is.  He has already testified, based upon his

:37:00   4  experience, as well as listening to the testimony in the

:37:03   5  courtroom, his examination of the record, the documents and

:37:08   6  everything that was presented to him by counsel to help him

:37:13   7  formulate his opinion, that this is not speculation.

:37:18   8        So I want to give you a full explanation for

:37:20   9  your record upstairs, so that the circuit understands why I

:37:25  10  am exercising my discretion to overrule the objection.

:37:29  11        MR. HIGER:  Thank you, Your Honor.

:37:35  12        THE WITNESS:  Based on that, they then have the

:37:38  13  cadaver lab.  That is where they started looking at

:37:41  14  potential solutions and taking this screw to hold it down.

:37:49  15        The one thing that is important, and I don't

:37:52  16  know -- I don't say it in case everybody already understands

:37:56  17  this or not, but the screw that was used for the CCK was

:38:01  18  actually used to prevent motion in this direction, we call

:38:05  19  it valgus varus, Dr. Scuderi actually said that at the time.

:38:09  20  So it's this motion.  The purpose of this screw is totally

:38:13  21  different.  It's to prevent the motion coming off this way.

:38:17  22        So those --

:38:18  23        THE COURT:  You mean the lift?

:38:19  24        THE WITNESS:  That's what they call liftoff.  So

:38:23  25  if you are designing implants, those are two totally

Rohr - direct

:38:26　　1　different concepts, of providing a screw to prevent things

:38:30　　2　from going in one direction versus providing a screw from

:38:34　　3　coming in a different direction.

:38:36　　4　　　　　So I wanted to at least point that out.

:38:38　　5　　　　　Dr. Scuderi's initial screw was also to prevent,

:38:43　　6　once again -- not to prevent, his drawing is not to prevent

:38:46　　7　the valgus varus motion, it is to prevent the problem that

:38:51　　8　they found in their cadaver lab previously, which was this

:38:54　　9　liftoff that we are now talking about.

:38:56　　10　　　　　I just want to clarify that.

:38:59　　11　BY MR. FRIEDMAN:

:38:59　　12　Q.　　Could you put up the '283 patent, please?

:39:03　　13　　　　　I am sorry.  I would like to go back to PTX-203.

:39:22　　14　　　　　Is this also a document that you relied upon?

:39:35　　15　A.　　It is.

:39:36　　16　Q.　　All right.  Now let's go to the -- one more question.

:39:43　　17　You have talked about Dr. Scuderi's contributions to the

:39:52　　18　lock-down mechanism.  Did you form a conclusion as to

:39:56　　19　whether Dr. Scott also contributed to it?

:39:59　　20　A.　　I did.

:40:00　　21　Q.　　And what is that?

:40:02　　22　A.　　That is, once again, based on all the evidence, and

:40:09　　23　all the materials that I saw, all the testimonies, all of

:40:14　　24　the -- my understanding of how these designs come about, my

:40:19　　25　understanding of the collaborative relationship between the

Rohr - direct

:40:23    1    three of these, that -- and once again, it includes the

:40:28    2    testimonies, that he did contribute.

:40:30    3              THE COURT:  Counsel, I want to be careful, on my

:40:33    4    last comments to your objection, to not leave anyone on

:40:37    5    either side with the impression as to what the outcome will

:40:41    6    be, as I am sitting here thinking about that, I didn't mean

:40:43    7    to suggest that you are going to be appealing my ruling.  Do

:40:50    8    you understand?

:40:51    9              MR. HIGER:  Yes, Your Honor.

:40:52   10              THE COURT:  I want to make sure that both sides

:40:54   11    understand, I have not judged this issue.

:40:57   12              MR. FRIEDMAN:  My optimism was unfounded.

:41:00   13              THE COURT:  You never know what you guys are

:41:02   14    going to talk about up at the Circuit Court.

:41:09   15    BY MR. FRIEDMAN:

:41:10   16    Q.    Now if we could go to DTX-3, the '283 patent, please.

:41:14   17    Could you identify --

:41:22   18    A.    Just a second, sorry.

:41:23   19    Q.    Are the design features that we have been discussing

:41:31   20    concerning the lock-down screw mechanism that were shown in

:41:36   21    the last couple documents we looked at reflected in any of

:41:41   22    the claims of the '283 patent?

:41:44   23    A.    I believe they are.

:41:45   24    Q.    All right.  Could we go to the claims, please?

:41:51   25              Which claims do you believe that the screw, the

Rohr - direct

| :41:57 | 1 | lock-down mechanism is represented in? |
| :42:01 | 2 | A.    I think it's Claims 9, 10, 11 and 12. |
| :42:06 | 3 | Q.    And where in Claim 9? |
| :42:09 | 4 | A.    So in Claim 9, it would be -- |
| :42:19 | 5 | Q.    Take your time. |
| :42:34 | 6 | A.    There where it says "a," 28, 29, a fastener extending |
| :42:40 | 7 | through the said opening and attached with said projection, |
| :42:43 | 8 | said fastener seen against said shoulder, said fastener |
| :42:48 | 9 | inhibiting movement of said bearing relative to said tibial |
| :42:52 | 10 | plateau in a direction generally parallel to said axis of |
| :42:56 | 11 | rotation. |
| :42:57 | 12 | Q.    And what about Claims 10, 11 and 12? |
| :43:02 | 13 | A.    So 10, 11 and 12, it says, once again, said fastener |
| :43:06 | 14 | comprises a bolt with a head which seats against said |
| :43:10 | 15 | shoulder. |
| :43:15 | 16 | THE COURT:  Comprises a bolt.  Right? |
| :43:17 | 17 | THE WITNESS:  Excuse me, yes. |
| :43:18 | 18 | Then 11 would be said bolt head is recessed |
| :43:25 | 19 | within said opening. |
| :43:26 | 20 | Then in 12 it says, Said projection includes a |
| :43:32 | 21 | female threaded hole, and said fastener comprises a bolt. |
| :43:38 | 22 | MR. FRIEDMAN:  I have no further questions, Your |
| :43:40 | 23 | Honor. |
| :43:40 | 24 | THE COURT:  Counsel, you may cross-examining. |
| :43:43 | 25 | MR. HIGER:  May I have one moment, Your Honor? |

Rohr - direct

| | | |
|---|---|---|
| :43:45 | 1 | THE COURT:  Sure.  While you are getting |
| :43:47 | 2 | together, I am just going to run out here for a second.  I |
| :43:51 | 3 | will be right back. |
| :45:34 | 4 | MR. HIGER:  May I proceed, Your Honor? |
| :45:35 | 5 | THE COURT:  Yes, please. |
| :45:37 | 6 | CROSS-EXAMINATION. |
| :45:37 | 7 | BY MR. HIGER: |
| :45:38 | 8 | Q.   Good morning, Dr. Callaghan. |
| :45:39 | 9 | A.   Good morning. |
| :45:40 | 10 | Q.   We haven't met.  My name is Dave Higer and I represent |
| :45:45 | 11 | Zimmer. |
| :45:46 | 12 | A.   Nice to meet you. |
| :45:47 | 13 | Q.   Good to meet you as well. |
| :45:49 | 14 | Now, on your direct exam, you talked about your |
| :45:52 | 15 | relationship with Depew.  Do you recall that? |
| :45:54 | 16 | A.   Yes, I do. |
| :45:55 | 17 | Q.   And Depew is a major competitor of Zimmer.  Is that |
| :45:58 | 18 | right? |
| :45:59 | 19 | A.   Yes. |
| :45:59 | 20 | Q.   In the first quarter of this year, Depew has actually |
| :46:07 | 21 | paid you in excess of $570,000.  Is that correct? |
| :46:12 | 22 | A.   I am not sure. |
| :46:14 | 23 | Q.   You wouldn't dispute with me that they have paid you |
| :46:17 | 24 | $570,000 in the first quarter of 2012, would you? |
| :46:21 | 25 | A.   I would say that's probably in the ballpark.  I don't |

:46:23  1  have those figures in front of me.  If you have found them

:46:26  2  on some site, I would respect what you have said.

:46:30  3          This is all, as you know now, it's all

:46:35  4  transparent and totally disclosed on websites since the DOJ

:46:39  5  2007 agreements.  So that's -- I would rather take it right

:46:45  6  as it's set from a website.  I say that at my deposition at

:46:50  7  one point, too, because my university does the same thing.

:46:53  8          So we are totally transparent in all of this

:46:57  9  today.

:46:57  10  Q.    And you wouldn't dispute as well that you have been

:47:00  11  paid almost 2.4 million dollars from Depew in 2011?

:47:05  12  A.    I wouldn't.

:47:06  13  Q.    Now, I think on direct you claim that you had done a

:47:10  14  lot of research work with Zimmer.  Do you recall that?

:47:13  15  A.    I did.

:47:13  16  Q.    But isn't it true that Zimmer's only involvement in

:47:18  17  your research work was to fund two grants?

:47:23  18  A.    To my knowledge, back in the eighties, I might

:47:27  19  disclose that Roy Crowninshield, who was talked about at one

:47:31  20  time, worked for Zimmer, he had worked at the University of

:47:33  21  Iowa as a Ph.D.  So he and I had a very good relationship as

:47:38  22  far as understanding the science we were doing and then

:47:40  23  willing to fund that science.

:47:43  24  Q.    That wasn't really my question.  I am just focused

:47:47  25  on --

Callaghan - cross

:47:47   1   A.     I am sorry.  I was just trying to disclose my

:47:50   2   relationship there.

:47:50   3   Q.     Zimmer's involvement in the two grants was to fund

:47:55   4   them.  They didn't control them.  Is that correct?

:47:57   5   A.     That's correct.

:47:58   6   Q.     Now, you have talked a fair amount about the meetings

:48:09   7   and things that occurred at Zimmer during the design and

:48:11   8   development process.  Do you recall that?

:48:13   9   A.     Yes.

:48:13   10  Q.     You weren't personally involved in any of the design

:48:17   11  and development meetings.  Right?

:48:19   12  A.     I was not.

:48:20   13  Q.     You never collaborated with Dr. Insall on any implant

:48:24   14  design projects?

:48:25   15  A.     I never did.

:48:26   16  Q.     You never had any meetings with ISK surgeons about the

:48:30   17  development of Zimmer knee implant designs?

:48:38   18  A.     Designs, but not the Zimmer knee specifically.

:48:39   19  Q.     You actually don't recall any of the specifics

:48:41   20  regarding what you discussed with ISK surgeons at any of the

:48:45   21  meetings that you had at ISK?

:48:47   22  A.     I did not.

:48:47   23  Q.     You also have never done any consulting work on any

:48:53   24  implant design for Zimmer?

:48:55   25  A.     I have not.

:48:55    1   Q.    Just so we are clear, you weren't present for any of

:49:06    2   the collaboration or the alleged collaboration that you have

:49:10    3   discussed related to the patents at issue?

:49:13    4   A.    I was not.

:49:13    5   Q.    You also don't have any personal knowledge that would

:49:21    6   call into question the accuracy of Zimmer's meeting minutes.

:49:24    7   Is that right?

:49:25    8   A.    Any personal knowledge, would that include if I saw

:49:30    9   some documents that were or were not there, or -- you mean

:49:38   10   that -- I can't say.  I was not at the meeting, so I

:49:41   11   wouldn't know what those minutes were and I wasn't at any

:49:45   12   meeting, so I would never know what should have been written

:49:47   13   or not, you are correct.  If we are taking it in that

:49:50   14   context, you are correct.

:49:51   15   Q.    So if the documents say that somebody wasn't present,

:49:54   16   you wouldn't have any ability to dispute that that was

:49:57   17   correct?

:49:58   18   A.    I would not.

:49:58   19   Q.    Now, in your experience with design over the years,

:50:16   20   how much documentation is typically generated in a design

:50:19   21   and development process?

:50:21   22   A.    Today, or in 1999?  Where do you want me to put it in

:50:25   23   context?

:50:26   24   Q.    In the 1995 to 2000 time frame.

:50:29   25   A.    It was not -- my own personal experience with design,

:50:34     1    it was not very well-documented.

:50:36     2    Q.    I am not talking about documentation.  I am talking

:50:40     3    about the volume of documents that would be generated during

:50:43     4    a design and development process in the mid-95 to 2000 time

:50:47     5    frame, based on your experience?

:50:49     6    A.    So based on my experience versus what I am doing today

:50:55     7    for design projects, I bet it wouldn't be one-fifth the

:50:57     8    amount, I bet it wouldn't be one-tenth the amount.

:51:00     9    Q.    What volume?

:51:04    10    A.    I can't tell you.  Stacks of it, no question.

:51:09    11    Actually, I don't know in '95.  I was involved in a couple

:51:13    12    of projects in '95.  I don't know how much volume there was.

:51:17    13    There may have been only a stack this high (indicating),

:51:20    14    whereas I guarantee you today the stack goes to the ceiling,

:51:26    15    regulatory-wise, to.

:51:28    16         It is not just a matter of, in fairness to the

:51:30    17    companies, it is just not a matter of -- back in those days

:51:36    18    the regulations weren't the same that they have to go

:51:39    19    through the FDA and that.  In fairness, when I say tenfold,

:51:42    20    it is not just because our documentation since the

:51:45    21    Department of Justice issues came up in '07 are different.

:51:48    22    I think it's really based on all the regulations that are

:51:51    23    required today for the companies to take something to

:51:54    24    market.

:51:57    25    Q.    Do you still have a copy of your expert report in

Callaghan - cross

| | | |
|---|---|---|
| :52:01 | 1 | front of you, with Exhibit B? |
| :52:06 | 2 | A.    I don't think I have my expert report here. |
| :52:09 | 3 | Q.    Sorry.  Do you have a copy of Exhibit B of the |
| :52:14 | 4 | documents considered? |
| :52:17 | 5 | A.    Could you give me a copy, so we don't have to waste |
| :52:22 | 6 | time? |
| :52:22 | 7 | THE COURT:  You may approach, counsel. |
| :52:25 | 8 | BY MR. HIGER: |
| :52:26 | 9 | Q.    Now, in your testimony with Mr. Friedman, you referred |
| :53:27 | 10 | to the documents that support your opinions as being |
| :53:30 | 11 | identified in Exhibit B to your report.  Do you remember |
| :53:32 | 12 | that? |
| :53:32 | 13 | A.    Yes. |
| :53:33 | 14 | Q.    Is what I have handed you the Exhibit B that you were |
| :53:38 | 15 | testifying to? |
| :53:39 | 16 | A.    Yes.  I am very familiar with that exhibit. |
| :53:42 | 17 | Q.    And do you understand that documents with the Bates |
| :53:53 | 18 | label ZIM would have been produced by Zimmer? |
| :53:59 | 19 | A.    You know, I told you, this is really not my area.  I |
| :54:03 | 20 | just read the documents.  I didn't specifically look at |
| :54:06 | 21 | where documents came from.  In the descriptions, I would |
| :54:11 | 22 | read it afterwards, but I didn't know specifically where |
| :54:14 | 23 | they came from. |
| :54:15 | 24 | Q.    Okay.  Let's take a look at the documents that start |
| :54:18 | 25 | with ZIM, because I will tell you that documents produced |

Callaghan - cross

:54:21   1   with a the ZIM Bates were produced by Zimmer.

:54:26   2   A.     Okay.

:54:26   3   Q.     And if you look at that first document --

:54:32   4   A.     I don't have the documents in front of me.

:54:34   5   Q.     Not the document itself.  The Bates range that's

:54:38   6   identified, ZIM1497 to 1664.

:54:42   7   A.     Okay.

:54:42   8   Q.     Would you agree with me, that is about 168 pages?

:54:47   9   A.     Yes.  Now that you have told me that those are the

:54:51   10   pages, yes.

:54:51   11   Q.     And if you look at the next ones, ZIM20151, that is a

:54:59   12   single page?

:55:00   13   A.     Yes.

:55:00   14   Q.     If you look at the next one down, that is ZIM20155 to

:55:05   15   60, do you agree with me that is six pages?

:55:09   16           THE COURT:  Perhaps we could get a stipulation

:55:11   17   as to the number of pages of documents without taking the

:55:13   18   Court's time.

:55:14   19           MR. FRIEDMAN:  No problem.

:55:15   20           THE COURT:  What is the number?

:55:16   21           MR. HIGER:  775 pages, Your Honor.

:55:18   22           THE COURT:  Can you agree with that number?

:55:20   23           THE WITNESS:  Yes.

:55:21   24           MR. HIGER:  Thank you, Your Honor.

:55:22   25   BY MR. HIGER:

:55:23   1   Q.   So you reviewed 775 pages of documents that were

:55:28   2   produced by Zimmer to the plaintiffs in this case.  Is that

:55:31   3   right?

:55:32   4   A.   That's correct.

:55:32   5   Q.   Would it surprise you to learn that Zimmer actually

:55:39   6   produced over 70,000 pages of design and development

:55:43   7   documents in this case?

:55:44   8   A.   It wouldn't surprise me.

:55:45   9   Q.   Did you ask counsel how many pages Zimmer had produced

:55:49   10   in this case?

:55:50   11   A.   No, I did not.

:55:51   12   Q.   In fact, you relied on Dr. Scott and Dr. Scuderi's

:55:55   13   counsel to provide the documents to you that you reviewed.

:55:59   14   Right?

:55:59   15   A.   I relied on counsel to give me the information that I

:56:07   16   would need to come up with my opinion and my conclusions,

:56:13   17   based on whether or not, in a very small focus -- the way I

:56:18   18   understand my purpose here is the very small focus.  And

:56:23   19   that is whether or not the documents and the testimonies and

:56:26   20   my experience, whether or not from that, that whole global

:56:32   21   testimony, whether Dr. Scott and Dr. Scuderi contributed in

:56:38   22   a significant way to the concept of the designs that are

:56:42   23   described in the patent.

:56:44   24        So that is my understanding of why I am here,

:56:48   25   and only that.  I told you, I am not a lawyer or anything

:56:51     1    else.  You have seen a number of times where I don't have a

:56:54     2    great understanding of some of the legal issues.

:56:57     3             But that's -- I think I stated that in my

:57:01     4    deposition, too, and wanted to make it very clear, because

:57:04     5    of where I am in orthopedics in this country and my

:57:11     6    relationships with everybody.

:57:14     7             I hope that was clear.  I wanted to make it

:57:16     8    clear, and would like to make it clear on the record one

:57:19     9    more time.

:57:20    10    Q.    My question was a whole lot simpler than that.

:57:23    11    A.    Okay.

:57:23    12    Q.    Counsel selected the documents that you reviewed.  Is

:57:27    13    that right?

:57:28    14    A.    Correct.

:57:28    15    Q.    And so you didn't get any -- you have no way to know

:57:32    16    if they gave you a complete record, do you?

:57:35    17    A.    I don't.

:57:35    18    Q.    You have no way to know if they gave you a complete

:57:38    19    set of the design meeting minutes for the LPS project?

:57:42    20    A.    I don't have.

:57:42    21    Q.    You have no way to know if they gave you a complete

:57:45    22    set of the design meeting minutes for the LPS Flex project?

:57:49    23    A.    I don't.

:57:50    24    Q.    You are only relying on what they selected for you?

:57:52    25    A.    That's correct.

Callaghan - cross

:57:53    1    Q.    Let me hand you what is DTX-318.  All right.  If you

:59:18    2    would look at the Bates range of DTX-318, it's ZIM28034 and

:59:26    3    ZIM28035.  Do you see that?

:59:28    4    A.    I see that, yes.

:59:29    5    Q.    Can you also take a look at your Exhibit B.  You can

:59:33    6    see that DTX-318 is not in your materials considered list.

:59:39    7    Is that right?

:59:40    8    A.    I am just briefly producing it.  I don't see it there.

:59:44    9    Q.    Okay.  That means you didn't consider this meeting

:59:48    10   minute that reflects a meeting with John Insall, Jim Smith

:59:53    11   and Audrey Beckman?

:59:54    12   A.    That's correct.

:59:56    13   Q.    And this was a meeting that talks about, if you look

:59:59    14   at the second page, Zim28035, it says High-Flex knee, and

:00:09    15   High-Flex knee is what we are here talking about.  Right?

:00:12    16   A.    Correct.

:00:13    17   Q.    So you didn't have a chance to consider the concepts

:00:19    18   and things that were discussed amongst Dr. Insall, Mr. Smith

:00:22    19   and Ms. Beckman?

:00:24    20   A.    I did not.

:00:25    21   Q.    And if you look --

:00:30    22             THE COURT:  At least on May 22nd, 1997.

:00:33    23             MR. HIGER:  Right.  This particular document.

:00:35    24   BY MR. HIGER:

:00:35    25   Q.    If you look at this figure, you can see here they are

Callaghan - cross

| | | |
|---|---|---|
| :00:38 | 1 | talking about this concept of thickening and extending the |
| :00:43 | 2 | condyle? |
| :00:44 | 3 | A.     Correct.  Now, I don't want to interrupt you, but I am |
| :00:50 | 4 | going -- the Judge actually brought it up for me.  I was |
| :00:54 | 5 | trying in my head as we were going through all this to put |
| :00:57 | 6 | where 5/22/97 is in relationship to all the other dates we |
| :01:03 | 7 | discussed, because that would be very critical to knowing -- |
| :01:07 | 8 | I already explained this before, that this is a process of |
| :01:11 | 9 | years, if you really look at it, in development of these |
| :01:14 | 10 | patents. |
| :01:15 | 11 |      I will answer all your questions.  But I am |
| :01:17 | 12 | going to start by just making sure you understand that you |
| :01:20 | 13 | are showing me context on a day, this is the first time I |
| :01:24 | 14 | have seen a complex paper.  And as you probably know, I am |
| :01:28 | 15 | fairly thorough and it takes some time.  But I will try to |
| :01:32 | 16 | answer all your questions. |
| :01:35 | 17 |      The first one that I have is trying to put this |
| :01:37 | 18 | to context of where it sits in relationship to time of |
| :01:42 | 19 | everything else. |
| :01:43 | 20 |      Maybe I should just take it out of that context |
| :01:46 | 21 | and just start with what you are showing me. |
| :01:47 | 22 | Q.     5/22/97 was during the design and development process |
| :01:52 | 23 | for LPS Flex.  Right? |
| :01:53 | 24 | A.     Yes.  But I don't know where it fits, I am trying in |
| :01:57 | 25 | my head to see where it fits in the three or four documents |

:02:00    1    we discussed today and I don't have that, because I wasn't

:02:03    2    asked to prepare for that.

:02:04    3    Q.    These are meeting minutes related to the LPS Flex

:02:10    4    project?

:02:11    5    A.    Yes.

:02:11    6    Q.    Let's look at the figure.  In this meeting, Doctor

:02:16    7    Insall, Mr. Smith and Ms. Beckman are talking about specific

:02:21    8    aspects of thickening and extending the posterior condyle.

:02:26    9    Right?

:02:27   10    A.    That's correct.

:02:27   11    Q.    And you can see here, that's the cam.  Right

:02:33   12    (indicating)?

:02:35   13    A.    Correct.

:02:35   14    Q.    Is that an oblong cam shape?

:02:40   15    A.    That is.  Once again, now I am getting my time frames

:02:43   16    set.  So '95, you have the one picture.  May 15th of '95,

:02:50   17    two years earlier, they are already talking about that

:02:53   18    concept.  And you are showing me something now two years

:02:57   19    later and telling me, yeah, that they are discussing it.

:03:00   20    Q.    Well, is it your opinion, Dr. Callaghan, that

:03:05   21    documents from around May 22nd, '97 and later can't be

:03:09   22    relevant to any of the claimed contributions by Dr. Scott

:03:13   23    and Dr. Scuderi?

:03:14   24                THE COURT:  He is not a lawyer.  Why don't you

:03:16   25    rephrase that.

Callaghan - cross

| | | |
|---|---|---|
| :03:17 | 1 | **BY MR. HIGER:** |
| :03:17 | 2 | **Q.    In your analysis of what you believe to be the** |
| :03:21 | 3 | **contributions of the plaintiffs, are you suggesting that** |
| :03:24 | 4 | **there is no need for you to consider documents that occurred** |
| :03:28 | 5 | **as late as May 22nd, 1997?** |
| :03:32 | 6 | **A.    I think all documents need to be considered, you know,** |
| :03:36 | 7 | **the documents that I have seen all need to be considered.** |
| :03:38 | 8 | **But I am trying to put it in a time reference, once again,** |
| :03:43 | 9 | **inventorship and time of inventorship, and that is not my** |
| :03:46 | 10 | **field.  I am just trying my best right now to put this into** |
| :03:50 | 11 | **context.** |
| :03:51 | 12 | **Q.    I can appreciate that you haven't seen this document** |
| :03:55 | 13 | **before, because it hadn't been provided to you.** |
| :03:59 | 14 | **But thank you for that.** |
| :04:55 | 15 | **Q.    I have just handed you DTX-79.  DTX-79, if you look** |
| :05:02 | 16 | **down at the bottom, is Bates ZIMSS23102 to 23103.  Do you** |
| :05:09 | 17 | **see that?** |
| :05:09 | 18 | **A.    Yes, I do.** |
| :05:10 | 19 | **Q.    If you look at your B, documents considered list, you** |
| :05:14 | 20 | **can see that ZIMSS23102 is not a document identified as one** |
| :05:20 | 21 | **that you considered?** |
| :05:22 | 22 | **A.    Okay.** |
| :05:23 | 23 | **Q.    And if you look at this, at the top of the first page,** |
| :05:33 | 24 | **this is talking about a conversation that Bill Rohr, who is** |
| :05:37 | 25 | **an inventor on the '729 and '786 patents -- right?** |

:05:41     1    A.      That's correct.

:05:43     2    Q.      -- had with Dr. Insall, also a named inventor on the

:05:47     3    '729 and '786 patents?

:05:51     4    A.      I am sorry.  I am still trying to read.  I will try to

:05:56     5    listen to you and then I will tried try to read the

:05:59     6    document.

:05:59     7    Q.      If you need to take a minute to look at the document,

:06:02     8    go ahead.  I understand you haven't seen it before.

:06:05     9    A.      Okay.  Thank you.

:06:35    10            I will tell you, this is not that new concept of

:06:38    11    that date, just from my own personal experience.

:06:43    12    Q.      So you have had a chance to take a look at the

:06:46    13    document?

:06:47    14    A.      Yes, I have now.

:06:47    15    Q.      So let me go back to my question.  This is reflecting

:06:53    16    a conversation between Bill Rohr and Dr. Insall, both of

:06:56    17    which are named inventors on the '729 and '786 patents.

:07:00    18    Right?

:07:02    19    A.      Yes.

:07:02    20    Q.      And this is talking about a conversation that the two

:07:05    21    of them had related to the development of a mobile-bearing

:07:09    22    knee system?

:07:11    23    A.      Yes.

:07:11    24    Q.      And the date of this is May 17, 1996?

:07:17    25    A.      Correct.

Callaghan - cross

:07:17    1    Q.    If you look at what's been referred to as the Blamey

:07:23    2    document, PTX-92, it should be in the materials that Mr.

:07:29    3    Friedman gave you.

:07:30    4    A.    Yes.

:07:31    5    Q.    Could you go ahead and turn to that document?

:07:34    6    A.    Which document is it again?

:07:36    7    Q.    PTX-92.

:07:38    8    A.    92.  Okay.

:07:47    9    Q.    You can see that the date of the Blamey document is

:07:51   10    June 20th, 1996, after the DTX-79, reflecting the

:08:01   11    conversation between Dr. Rohr and Dr. Insall?

:08:03   12    A.    Correct.

:08:05   13    Q.    So that means that Dr. Rohr and Dr. Insall were

:08:08   14    talking about concepts related to a mobile-bearing knee PS

:08:12   15    version prior to the Blamey memo?

:08:15   16    A.    Yes.  It doesn't discuss anything of the specifics

:08:20   17    that are brought up in the Blamey memo, which shows the IP.

:08:25   18    In fact, as I said before, I just know, from my experience

:08:29   19    with what he had done in the past, that the concept that

:08:33   20    they are talking about was already developed well before

:08:41   21    that time.

:08:41   22          The concept they are talking about in May of

:08:45   23    1996 -- and I think that's a different concept that you are

:08:51   24    seeing in the Blamey document, where they are actually

:08:54   25    talking about how the cam will interact to do that, that is

Callaghan - cross

:08:57   1   new intellectual property, that at least I had not seen at

:09:02   2   that time.

:09:02   3           THE COURT:  The Blamey document being 92?

:09:07   4           THE WITNESS:  Yes.  A month later.  What they

:09:10   5   were talking about is just general specifics.  And that had

:09:13   6   all been designed by another company at that time.

:09:16   7           But what they are talking about on that Blamey

:09:20   8   document, that is new intellectual property that would not

:09:26   9   have been previously conceptualized.

:09:34   10           I will leave it.

:09:38   11           THE COURT:  In other words, what you are saying

:09:39   12   is that the May 17 Zimmer document, comparing the May 17

:09:46   13   document and the Blamey document is not comparing, as they

:09:50   14   say, apples to apples?

:09:51   15           THE WITNESS:  That's right.

:09:52   16   BY MR. HIGER:

:09:52   17   Q.    Let's take a look at the Blamey document.

:09:55   18   A.    Okay.

:09:56   19   Q.    Specifically, let's go to the last page, the one with

:10:02   20   the figures, and look at the one that you identified in the

:10:06   21   upper right-hand corner.

:10:08   22   A.    Correct.

:10:08   23   Q.    You had said that this area with the dashes is a

:10:17   24   reflection of a change, or what you think is a change to the

:10:21   25   radius of the cam?

Callaghan - cross

:10:22    1    A.    It gives the concept of it a bit, yes.

:10:25    2    Q.    Well, the concept of having a cam was well known.

:10:29    3    Right?

:10:29    4    A.    Yes.

:10:29    5    Q.    And the concept of the cam being between the femoral

:10:32    6    condyles was also well known?

:10:34    7    A.    Yes.

:10:35    8    Q.    And this shows a cam that actually projects into the

:10:40    9    interior of the box.  Would you agree with me?

:10:43   10    A.    Yes.

:10:43   11    Q.    The cam, though, is actually implemented and LPS Flex

:10:50   12    does not protrude into the box at all?

:10:52   13    A.    Right.

:10:52   14    Q.    So this does not reflect anything that showed up in

:10:54   15    the design and development of LPS Flex?

:11:00   16    A.    It's -- unless you design prostheses, you don't

:11:08   17    understand the process that it takes to come from

:11:10   18    formulating the initial concept to what actually ends up

:11:14   19    being the final product, and the final product even of the

:11:18   20    description in the claims.

:11:20   21           It's an iterative process.  I have tried to show

:11:25   22    you that.  I have tried to take documents that show you

:11:28   23    that.  And that's why time frames are so important.

:11:30   24           You are absolutely right.  It's kind of like

:11:33   25    that first drawing of Insall's.  If somebody wanted to say

:11:37  1    that everything that ended up being in a patent came from

:11:41  2    that one drawing, at least me as a designer would have some

:11:44  3    huge issues with that.

:11:45  4    Q.    So there is a lot of reduction to practice work that

:11:49  5    goes on between conception?

:11:51  6    A.    I am not talking reduction to practice now.  I am

:11:53  7    talking about intellectual property that potentially is new

:11:58  8    conceived property, that nobody else has thought of.  And in

:12:01  9    design, those can be little things that are as important as

:12:05  10   what would seem like a big global thing.

:12:08  11   Q.    In your view the intellectual property doesn't show up

:12:10  12   until you have a final commercial product?

:12:13  13   A.    No.  I didn't say that at all.  What goes into the

:12:16  14   patent takes a development phase of that concept, too, that

:12:22  15   it's not just the very first idea that you have.  You modify

:12:26  16   that, et cetera.

:12:29  17          Once again, in fairness to the folks at ISK, if

:12:33  18   I am collaborating with somebody, they are not right

:12:35  19   next-door to me.  I have got to call up to the institution

:12:38  20   where they are at, I have to, when we get around to it,

:12:42  21   three or four weeks later.

:12:45  22          These notes, what they show you, is that people

:12:47  23   were right there all together and they were able to go back

:12:50  24   and forth very quickly.  But it takes a time period to just

:12:55  25   develop the concepts.  One drawing doesn't give you a

:12:59    1    concept that will work in a patient.  I guess that's what I

:13:05    2    have been trying to say the last day of my testimony, too.

:13:08    3    Q.    Well, if we look at this, I think you also testified

:13:11    4    that this reflects a change to the condylar radius.  Do you

:13:16    5    recall that?

:13:17    6    A.    I think that up at the top the condylar radius has

:13:21    7    changed from the first diagram that you look at in early

:13:25    8    May.  That is all that I meant to say by that.

:13:27    9    Q.    You are saying that the figure in the upper right-hand

:13:30   10    corner of this exhibit shows a change in the condylar radius

:13:34   11    of Dr. Insall's sketch?

:13:36   12    A.    Yes.

:13:36   13    Q.    Do you know in what design and development project

:13:44   14    this document arose?

:13:49   15    A.    All I read was the Blamey -- was the Blamey document.

:13:56   16    That is all that I have.

:13:57   17    Q.    If you look at the first page of the Blamey

:13:59   18    document --

:14:01   19    A.    Yes.  I did look at the -- at --

:14:07   20    Q.    This document is from the MBK design and development

:14:14   21    process.  Are you aware of what the condylar geometry was in

:14:18   22    the MBK prosthesis?

:14:20   23    A.    I am not as familiar with that device.  That device

:14:23   24    was never really used in the United States.

:14:25   25    Q.    So you would have no way to know whether that figure

:14:27   1   is actually a depiction of the MBK prosthesis with the

:14:32   2   addition of a potential cam?

:14:35   3   A.    I would not.  I don't know the design, their designs

:14:38   4   well enough.

:14:38   5   Q.    So you have no way to say that this particular

:14:42   6   exhibit, PTX-92, is actually related to the discussion that

:14:46   7   was going on with respect to the LPS Flex development

:14:49   8   process?

:14:50   9   A.    When you look at the entire time frame there and when

:14:53  10   they are talking about changing of cams, and that, I think

:14:56  11   it doesn't.  That you -- once again, they didn't come up

:15:00  12   with the final idea of that oblong cam and where that would

:15:03  13   be.  We have already gone through that testimony from

:15:06  14   various cadaver sessions, where Mark Heldreth came back, Mr.

:15:13  15   Heldreth came back and the back-and-forth there.

:15:14  16            This is just one small example of developing

:15:21  17   that concept that then ends up in claims.

:15:24  18   Q.    Do you know that the NexGen LPS had a non-cylindrical

:15:30  19   cam?

:15:31  20   A.    The what?  I am sorry.

:15:32  21   Q.    NexGen LPS.

:15:34  22   A.    I don't know specifically what that cam looks like.

:15:38  23   And once again, just to further some of my previous

:15:44  24   testimony, very small changes -- and you saw that from the

:15:48  25   documents we discussed -- can make big differences.  You

:15:52  1    can't see those changes to the eye.  So even if I used that

:15:55  2    device, I wouldn't know exactly what that cam looked like.

:15:58  3    The only way I would know it is if I went back to the

:16:02  4    materials and they actually had specific drawings.

:16:04  5            And most companies don't even have specific

:16:08  6    drawings to the millimeter or half-millimeter that is there.

:16:12  7    I don't know any way anybody would be able to determine that

:16:15  8    for you, except people that were involved in the process.

:17:06  9    Q.    I have handed you DTX-101, which is a document

:17:26  10   ZIMSS22853 to 22854.  Do you see that?

:17:30  11   A.    I do.

:17:31  12   Q.    This is also not a document that was on your materials

:17:33  13   considered list.  Right?

:17:35  14   A.    I could go look it up.  As we go through this, I will

:17:39  15   tell you that I trust that you are telling me it wasn't.  I

:17:41  16   am not going to go look for it specifically just to save

:17:45  17   time.

:17:45  18           If you tell me it was not on the list, it is not

:17:48  19   on my list, and we can go from there.

:17:50  20   Q.    This document is reflecting conversations with Dr.

:17:56  21   Insall about some of the original ideas for what resulted in

:17:59  22   the '729 and '786 patents?

:18:02  23   A.    Do you want me to read it?  I haven't seen it.  So I

:18:05  24   will have to go through reading all these documents to

:18:10  25   make --

Callaghan - cross

:18:10    1    Q.    Go ahead, give it a read.

          2          (Pause.)

:19:40    3    A.    I have read the document.

:19:41    4    Q.    This is really a conversation that was had with Dr.

:19:45    5    Insall.  Do you see that?

:19:46    6    A.    That is what is stated in the document.

:19:47    7    Q.    And this is in the concept of trying to find out if a

:19:51    8    Dr. Kondo should be an inventor on the '729 and '786

:19:55    9    patents?

:19:58   10    A.    That is how I understand it.

:19:59   11    Q.    And during that conversation, what Dr. Insall -- what

:20:08   12    we are talking about is that, the idea of the thickening the

:20:15   13    femoral implant posteriorly to allow a fuller articulation

:20:19   14    radius of the posterior superior aspect of the knee were all

:20:22   15    done by Dr. Insall prior to any meetings he had with Dr.

:20:26   16    Kondo.  Do you see that?

:20:31   17    A.    I see what the document says.

:20:32   18    Q.    And the patent, which here is an application,

:20:35   19    describes and claims only Dr. Insall's original idea,

:20:38   20    communicated in the May 1st, 1995 sketches, and subsequent

:20:42   21    refinements and additions by Zimmer employees.  Do you see

:20:45   22    that?

:20:45   23    A.    I see what it says there.

:20:47   24    Q.    When we are talking about the May 1st, 1995 sketch,

:20:54   25    you understand that to be the Insall sketch that there has

:20:57    1    been a fair amount of discussion about today?

:20:59    2    A.    I do.

:21:00    3    Q.    And if we can, let's pull that up, I believe that's

:21:14    4    DTX-110.   I guess the first question I have is, you haven't

:21:18    5    seen any documentation that there were any meetings that

:21:21    6    occurred before the creation of this document discussing

:21:26    7    what's reflected in the document that involve Dr. Insall,

:21:30    8    Scott and Scuderi.   Is that right?

:21:33    9    A.    That's not correct.

:21:34    10    Q.    What document have you seen?

:21:36    11    A.    I saw a deposition of Dr. Scuderi, and yesterday I

:21:41    12    heard testimony of Dr. Scuderi.

:21:43    13    Q.    Let me focus on contemporaneous documents.

:21:47    14    A.    You are going to have to tell me what you mean by

:21:50    15    that.

:21:50    16    Q.    I am not talking about a deposition transcript, and I

:21:54    17    am also not talking about Dr. Scuderi's testimony yesterday.

:21:57    18    A.    Okay.

:21:57    19    Q.    I am asking about documents dated prior to May 1, 1995

:22:04    20    that actually reflect a meeting with Dr. Insall, Dr. Scott

:22:09    21    and Dr. Scuderi that predate and also discuss this concept.

:22:15    22    You haven't seen those documents?

:22:17    23    A.    I haven't.

:22:18    24    Q.    So to the extent you were relying on or you are

:22:22    25    believing that there were conversations that occurred

:22:24   1   before, you are relying on Dr. Scuderi's testimony?

:22:28   2   A.    No, not totally.  It's on my understanding of their

:22:32   3   collaborative relationship and how they developed things

:22:35   4   over the years.

:22:36   5          It's a little bit more than that.  But that is

:22:41   6   part of it, yes.

:22:42   7   Q.    So you don't have any knowledge that they collaborated

:22:46   8   on these issues.  Right?

:22:50   9   A.    No.  I know that there is five or six weeks when Dr.

:22:55   10   Insall comes back from Asia to this document.  And once

:23:02   11   again, from a legal standpoint, I don't understand all of

:23:04   12   this, but in those five weeks, I just can't, from what I

:23:08   13   know of the ISK and the way the system ran out there, that

:23:13   14   there was no discussion about how to achieve high flexion

:23:16   15   between those five weeks.

:23:18   16   Q.    You are just assuming that that was the case?

:23:20   17   A.    Not assuming.  I don't know what I would say.  I am

:23:27   18   trying to put it in context of time, five weeks with three

:23:30   19   guys who are operating every day with each other, seeing

:23:34   20   patients in clinic with each other every day and who have

:23:38   21   always discussed all sorts of design issues and design

:23:41   22   prosthesis together, then for five weeks not talking about

:23:48   23   this at all.  That is the context that I use.

:23:51   24   Q.    Now, how is it you have said five weeks or six weeks?

:23:57   25   A.    I apologize.  I don't know the exact dates.  Whenever

:24:00    1    Dr. Insall -- I apologize for that, too, because I don't

:24:04    2    have it in front of me.  But from whenever the date that Dr.

:24:08    3    Insall came back from Asia to the time of this document.

:24:10    4    Q.    Do you have any idea when Dr. Insall's trip to Asia

:24:12    5    was in 1995?

:24:14    6    A.    No.

:24:14    7    Q.    It could have been the end of April 1995.  Right?

:24:18    8    A.    Yes.

:24:18    9    Q.    Not five to six weeks before, you are just speculating

:24:23   10    about that?

:24:23   11    A.    I thought I had seen one case where it was a few

:24:26   12    weeks.  But I don't want to speculate on that.  I would have

:24:29   13    to have documents in front of me to give you any -- what I

:24:34   14    thought.

:24:34   15    Q.    When you have talked about how long it had been from

:24:36   16    when Dr. Insall returned before the May 1st, 1995 sketch

:24:42   17    either with me in testimony or earlier with your counsel,

:24:44   18    you were just guessing about the time?

:24:46   19    A.    I thought I had read something that gave me a little

:24:49   20    bit of a time reference.  But I can't remember that

:24:52   21    document.

:24:59   22    Q.    Now, if we look at this document, this is from Dr.

:25:07   23    Insall to Audrey Beckman.  Right?

:25:10   24    A.    The document is sent from Dr. Insall to Audrey

:25:14   25    Beckman.

Callaghan - cross

| | | |
|---|---|---|
| :25:14 | 1 | Q.    And it says, "I think." |
| :25:22 | 2 | Do you see that? |
| :25:31 | 3 | A.    So he thinks -- I don't want to take two words.  It |
| :25:35 | 4 | says, "I think the concept is clear however." |
| :25:41 | 5 | So he didn't say that he developed that concept. |
| :25:43 | 6 | He says he thinks the concept is clear. |
| :25:45 | 7 | Q.    My question is a little bit different.  I am focusing |
| :25:49 | 8 | on this document right now.  If you can stay with me on this |
| :25:52 | 9 | document? |
| :25:53 | 10 | A.    I am, too. |
| :25:53 | 11 | Q.    The document says, after it says "Dear Audrey," who |
| :25:58 | 12 | you understand that is Audrey Beckman.  "I think." |
| :26:03 | 13 | Not, "We think." |
| :26:06 | 14 | "I think"? |
| :26:07 | 15 | THE COURT:  The document speaks for itself.  I |
| :26:08 | 16 | will draw the conclusions and inferences that are necessary |
| :26:10 | 17 | or not draw them. |
| :26:12 | 18 | MR. HIGER:  I will move on, Your Honor.  By |
| :26:45 | 19 | BY MR. HIGER: |
| :26:51 | 20 | THE COURT:  Let's everyone take a stretch. |
| :26:52 | 21 | (Recess taken.) |
| :57:01 | 22 | MR. FRIEDMAN:  Your Honor, may counsel approach |
| :57:01 | 23 | at sidebar? |
| :57:01 | 24 | (Discussion off the record at sidebar.) |
| :57:02 | 25 | (End of sidebar conference.) |

Callaghan - cross

:57:05    1                 THE COURT:  Let's break at 12:30 today.

:57:22    2   BY MR. HIGAN:

:57:22    3   Q.    I handed you before the break PTX-355.

:57:26    4   A.    Yes.

:57:26    5   Q.    Do you have that in front of you?

:57:28    6   A.    I do, yes.

:57:29    7   Q.    And PTX-355 is correspondence from Dr. Insall to Ms.

:57:35    8   Beckman?

:57:35    9   A.    Yes, it is.

:57:35   10   Q.    This is, again, an example of Dr. Insall providing

:57:40   11   ideas and design thoughts to Ms. Beckman, and it's dated

:57:44   12   April 27, 1995.  Right?

:57:47   13   A.    That's correct.

:57:47   14   Q.    Also among the documents that you did not consider in

:57:59   15   forming your opinions in this case are the file histories

:58:01   16   for the patents at issue.  Right?

:58:04   17   A.    When I wrote my expert witness testimony?

:58:08   18   Q.    Yes.

:58:09   19   A.    Yes.  When I wrote my testimony, I think I told you

:58:12   20   that I reviewed a few documents since then.  I did review

:58:15   21   those.

:58:16   22   Q.    But at the point you were rendering the opinions that

:58:19   23   are set forth in your report, you had not considered the

:58:22   24   prosecution histories for the '729 patent, the '786 patent,

:58:27   25   or the '283.  Is that right?

:58:28    1   A.    That's correct.

:58:29    2   Q.    Now, let's also talk about some of the deposition

:58:37    3   transcripts.  Do you still have that Exhibit B in front of

:58:40    4   you?

:58:41    5   A.    Yes.

:58:43    6   Q.    And Exhibit B also includes the deposition transcripts

:58:48    7   that you considered before rendering the opinions that you

:58:50    8   set forth in your expert report.  Is that right?

:58:53    9   A.    That's correct.

:58:54   10   Q.    And so if you look there, there is not a deposition of

:59:01   11   Mr. Cary Reeves.  Correct?

:59:03   12   A.    That's correct.

:59:03   13   Q.    And Mr. Cary Reeves is the attorney who prosecuted the

:59:07   14   '729 and drafted the application for the '786 patent?

:59:12   15   A.    That's my understanding.

:59:13   16   Q.    You also do not see there a deposition for Mr. Clayton

:59:20   17   Miller.  Correct?

:59:21   18   A.    That's correct.

:59:21   19   Q.    Mr. Clayton Miller is actually one of the named

:59:24   20   inventors of the '283 patent?

:59:26   21   A.    Okay.

:59:26   22   Q.    Do you agree with me?

:59:28   23   A.    I will look it up.  I am sure he is.

:59:32   24   Q.    You also don't see a deposition of Mr. Christopher

:59:35   25   McClain?

Callaghan - cross

:59:35    1    A.    That's correct.

:59:36    2    Q.    Mr. McClain is also a named inventor on the '283

:59:39    3    patent.  Correct?

:59:41    4    A.    Correct.

:59:41    5    Q.    What I have handed you is a copy of Mr. McClain's

:00:31    6    deposition transcript.

:00:31    7    A.    Okay.

:00:32    8    Q.    If you will take a look at Page 112, Lines 13, to

:00:41    9    113-20.

:00:48   10    A.    Where again?  I am sorry.  It's on Page 113, what

:00:52   11    lines?

:00:53   12    Q.    My apologies.  That's the wrong one.

:00:56   13                Take a look at Page 32 of Mr. McClain's

:00:59   14    deposition.

:01:00   15                If you look at 2 to 17 and 14 to 19?

:01:15   16    A.    14 to 19, where else?

:01:17   17    Q.    2 to 7 of Mr. McClain's deposition?

:01:21   18    A.    Okay, I think I have it.

:01:24   19    Q.    When Mr. McClain is testifying about --

:01:28   20                THE COURT:  Do you want to have him read it

:01:35   21    first?

:01:36   22                MR. HIGAN:  Sorry.

:02:07   23                THE COURT:  Have you read it, Doctor?

:02:10   24                THE WITNESS:  I have read it, sorry.

:02:12   25    BY MR. HIGAN:

:02:13    1    Q.    When you were rendering your opinions set forth in

:02:15    2    your report, you didn't have the benefit of Mr. McClain's

:02:18    3    testimony that Dr. Insall would be providing feedback.  I

:02:21    4    can read it, specifically.

:02:22    5              "Question:  And what type of feedback would you

:02:26    6    get from Dr. Insall specifically?  On a model.  Let's start

:02:29    7    with a model.

:02:31    8              "Answer:  He would give his opinion whether he

:02:32    9    thought we had to do more modifications or less

:02:35   10    modifications or if what we had was appropriate.

:02:39   11              "Question:  And did Dr. Scott ever get involved

:02:41   12    in these types of conversations?

:02:44   13              "Answer:  No.

:02:46   14              "Question:  Did Dr. Scuderi ever get involved in

:02:48   15    these types of conversations?

:02:50   16              "Answer:  I don't recall.  I would say no."

:02:52   17              You didn't have the benefit of that testimony

:02:54   18    when you were rendering your opinions.  Correct?

:02:56   19    A.    No.  But in all due respect, you have seen where at

:02:59   20    least some documentations all three of them were involved.

:03:05   21    I would have to put this -- it's hard to take something like

:03:08   22    this in context without looking at everything else that has

:03:13   23    been said around it at least for me personally.  I showed

:03:15   24    you that on that last document we talked about, too.  I

:03:20   25    think there are other documents that show where it was

:03:23    1    discussed amongst all three of them.

:03:25    2        I don't even know -- I am unfamiliar, as you

:03:31    3    know, with this particular engineer or what his part of the

:03:33    4    project was, et cetera.  It would be hard for me to say.

:03:38    5    Q.    You know Mr. McClain was a named inventor on the '283

:03:42    6    patent.  Right?

:03:42    7    A.    No.

:03:43    8    Q.    Go ahead an take a look at Page 47 of Mr. McClain's

:03:47    9    transcript, Lines 17 to Page 48, Line 5.  Let me know when

:03:59   10    you have had a chance to look at that.

:04:09   11    A.    Give it to me one more time?

:04:12   12    Q.    Page 47, Line 17, down to Page 48, Line 5.

:04:53   13    A.    Okay.

:04:53   14    Q.    So the testimony that you just read says, "Do you

:04:58   15    recall any instances where Dr. Insall did a surgery that Dr.

:05:06   16    Scott would join in the postoperative operations?

:05:10   17        "Answer:  I don't recall.

:05:10   18        "Question:  The same thing with Dr. Scuderi.  Do

:05:12   19    you remember him joining in postoperatively?

:05:14   20        "Answer:  On Dr. Insall's surgery?

:05:17   21        "Question:  Yes.

:05:17   22        "Answer:  I don't recall.

:05:18   23        "Question:  I will ask it the other way.  On Dr.

:05:22   24    Scuderi's surgeries, do you remember Dr. Scott joining in

:05:25   25    conversations at all post-surgically?

Callaghan - cross

:05:27 1     "Answer:  I don't recall that at all."

:05:29 2     You didn't have the benefit of that testimony,

:05:31 3 either.  Correct?

:05:33 4 A.  No, I didn't have that testimony of somebody not

:05:34 5 recalling something.

:05:38 6 Q.  If you would go ahead and turn to Page 5 of Mr.

:05:46 7 McClain's deposition, starting at Line 8, down to Page 52,

:05:50 8 Line 11.  Let me know when you have had a chance to look at

:05:55 9 that.

:05:55 10     (Pause.)

:06:32 11 Q.  Have you read it?

:06:34 12 A.  I have.

:06:34 13 Q.  Mr. McClain's testimony is:

:06:39 14     "Okay.  Do you recall who from ISK participated

:06:41 15 in the CAD study that you attended?

:06:44 16     "Answer:  Yes.  Dr. Insall.

:06:46 17     "Question:  Anyone else that you recall?

:06:47 18     "Answer:  No.

:06:48 19     "Question:  Dr. Scott wasn't there?

:06:50 20     "Answer:  No.

:06:51 21     "Question:  Dr. Scuderi?

:06:53 22     "Answer:  No.

:06:54 23     "Question:  Okay.  Do you know what device was

:06:57 24 being tested at the cadaver study that you were attending?

:07:01 25 When I say device, I mean implant.

| :07:03 | 1 | "Answer: Yes. I believe we were working with |
| :07:05 | 2 | prototype versions of the LPS Flex mobile. |
| :07:08 | 3 | "Question: A minute ago when I asked whether |
| :07:15 | 4 | Dr. Scott attended the cadaver lab you said you don't |
| :07:18 | 5 | recall. Do you know if you just don't recall? |
| :07:20 | 6 | "Answer: Dr. -- you know, it's been a long |
| :07:22 | 7 | time. |
| :07:22 | 8 | "Question: Yes. |
| :07:23 | 9 | "Answer: Dr. Scott was not there and I don't |
| :07:25 | 10 | recall if Dr. Scuderi was there, quite frankly. I remember |
| :07:29 | 11 | specific -- still have a visual memory of Dr. Insall and |
| :07:32 | 12 | definitely I was working very, very strongly with Mark |
| :07:35 | 13 | Heldreth at the time." |
| :07:37 | 14 | You didn't have the benefit of that testimony, |
| :07:39 | 15 | either, did you? |
| :07:40 | 16 | A. I did not. |
| :07:41 | 17 | Q. You also didn't review the deposition transcript of |
| :08:08 | 18 | Joseph Topmiller. Correct? |
| :08:10 | 19 | A. I did not. |
| :08:11 | 20 | Q. You did not review the deposition transcript of |
| :08:14 | 21 | Jennifer Martinez. Correct? |
| :08:16 | 22 | A. I did not. |
| :08:17 | 23 | Q. You did not review the deposition transcript of |
| :08:20 | 24 | Elizabeth Kiley. Correct? |
| :08:22 | 25 | A. I did not. |

:08:22    1    Q.    You did not review the deposition transcript of Debra

:08:26    2    Lanz?

:08:27    3    A.    I did not.

:08:27    4    Q.    You did not review the deposition transcript of David

:08:30    5    Lerner?

:08:30    6    A.    I did not.

:08:31    7    Q.    And you did not review the deposition transcript of

:08:33    8    Kathleen Lanhardt?

:08:35    9    A.    I did not.

:08:36    10   Q.    If you would go ahead and turn to PTX-57.  It is one

:08:55    11   of the documents which you talked about.

:09:10    12   A.    I have it in front of me, yes.

:09:12    13   Q.    Aside from Dr. Scott's name appearing as an attendee,

:09:16    14   there is no reference to any comments or contributions to

:09:18    15   Dr. Scott.  Correct?

:09:23    16   A.    Correct.

:09:24    17   Q.    But there are comments attributed to Dr. Insall.

:09:29    18   Right?

:09:32    19   A.    Yes, a few.  This may be a good example of that last

:09:39    20   testimony you talked about, where it goes again, just

:09:45    21   knowing the situation, I don't know if it was appropriate or

:09:52    22   not appropriate, but a lot of people talk to groups.  But

:09:55    23   they always would have Dr. Scott in the forefront of this

:09:59    24   and the point man of the whole thing.

:10:01    25         That is why I could see how somebody a few years

| | | |
|---|---|---|
| :10:05 | 1 | later might really recall Dr. Insall being there and not |
| :10:09 | 2 | really recall anyone else being there.  It's happened to me |
| :10:13 | 3 | in my own situation in design issues, you know, working with |
| :10:19 | 4 | more senior members and that.  Just to put some reference to |
| :10:23 | 5 | it. |
| :10:25 | 6 | MR. HIGAN:  Your Honor, there has been a number |
| :10:27 | 7 | of times with this witness where I have asked something that |
| :10:30 | 8 | is basically a yes or no question and then the witness has |
| :10:32 | 9 | added on additional testimony about something that I didn't |
| :10:35 | 10 | ask. |
| :10:35 | 11 | I am just going to ask if the witness can be |
| :10:39 | 12 | directed to focus on the questions I am asking.  If counsel |
| :10:43 | 13 | wants to elicit more explanation on redirect... |
| :10:47 | 14 | THE COURT:  What he is referring to is a process |
| :10:49 | 15 | that he employed here. |
| :10:50 | 16 | It's fair for him to ask that I direct you to |
| :10:56 | 17 | focus on his questions, to answer his question.  Mr. |
| :10:59 | 18 | Friedman will have another opportunity to ask you additional |
| :11:02 | 19 | questions. |
| :11:03 | 20 | I am trying to amend what counsel has sort of |
| :11:11 | 21 | subliminally suggested to you, it is to say this:  Not all |
| :11:16 | 22 | questions are capable of yes or no answers.  So you have |
| :11:18 | 23 | that freedom. |
| :11:22 | 24 | BY MR. HIGAN: |
| :11:22 | 25 | Q.    If you look at Page 3 of PTX-57, you talked about the |

| | | |
|---|---|---|
| :11:34 | 1 | Size B femoral components that are referenced there on the |
| :11:37 | 2 | first line.  Do you recall that? |
| :11:38 | 3 | A.    On which page now, again? |
| :11:40 | 4 | Q.    The third page, ZIM201557. |
| :11:45 | 5 | A.    Yes. |
| :11:45 | 6 | Q.    Do you see it references plots of the Size B femoral |
| :11:49 | 7 | component? |
| :11:50 | 8 | A.    Yes, I do. |
| :11:50 | 9 | Q.    Are you suggesting when they are talking about the |
| :11:53 | 10 | Size B femoral component they were looking at a prototype or |
| :11:57 | 11 | model of a component designed for high flexion? |
| :12:00 | 12 | A.    The way it's described here is plots, it is more -- in |
| :12:08 | 13 | my understanding would be not necessarily a prototype.  It's |
| :12:12 | 14 | just the design, they used that shape of that particular |
| :12:16 | 15 | component.  Though I would have to -- once again, that is |
| :12:19 | 16 | just from looking at that real quickly. |
| :12:23 | 17 | I wouldn't want to assume exactly what was |
| :12:25 | 18 | involved in it. |
| :12:26 | 19 | Q.    You actually don't know if they were looking at |
| :12:28 | 20 | something that was intended for high flexion.  Correct? |
| :12:33 | 21 | A.    I think it was, from the reading of it.  It depends. |
| :12:38 | 22 | We have this issue, too, in the deposition, what you call |
| :12:41 | 23 | high flexion.  So they have something here that says 145 |
| :12:46 | 24 | degrees.  Is that high flexion?  Actually, I would call that |
| :12:51 | 25 | high flexion.  But it's not what's been referred to |

:12:54     1    throughout this trial as high flexion.

:12:57     2    Q.    Let me ask the question another way.  Do you believe

:13:00     3    that they were looking at models of the concept disclosed in

:13:05     4    PTX-110, which is the Insall sketch, or DTX-110?

:13:14     5    A.    Yes, it's plots that meet the shapes, yes.

:13:19     6    Q.    If you will go ahead and turn to the '283 patent,

:13:55     7    which is DTX-3.

:13:58     8    A.    Yes.

:14:06     9    Q.    If you will go ahead and turn to Column 5, down about

:14:11    10    Line 7.

:14:18    11    A.    Column 5, Line 7, okay.

:14:20    12    Q.    Now, during your deposition, would it be fair to say

:14:24    13    that you found Claim 1 to be a little confusing?

:14:28    14    A.    Not after the lawyer pointed it all out to me and I

:14:33    15    got rid of my medical head.  And I think I articulate that

:14:38    16    fairly well in that deposition, that I am thinking in terms

:14:40    17    of a surgeon at one point.  I am actually at a different

:14:44    18    part of that document.  At the end of the -- by the time we

:14:47    19    got through the deposition, we went through each point.  And

:14:49    20    I pointed it out to her, what each point was.

:14:53    21    Q.    Are you saying you didn't find Claim 1 confusing

:14:56    22    during the course of your deposition in this case?

:14:57    23    A.    During the course of the deposition, yes.  But by the

:15:00    24    end of it, no.

:15:01    25    Q.    And if you look at that, where it's talking about the

Callaghan - cross

:15:08    1    bearing, your testimony at your deposition was actually that

:15:14    2    the bearing is the space between the tray and the poly?

:15:22    3    A.    So when I was talking in terms of what a bearing was

:15:26    4    in that part when we were still on two different pages, yes,

:15:32    5    because that's what a bearing is to me, as a surgeon.  It is

:15:35    6    not in this patent.

:15:39    7    Q.    My question is, did you testify that the bearing in

:15:44    8    Claim 1 is the space between the tray and the poly?

:15:53    9    A.    Can I see my deposition?

:15:54   10    Q.    Sure.

:16:44   11          If you will go ahead and look at Page 200, Line

:16:47   12    20.  Then read down to 201, Line 3?

:16:59   13    A.    Line 1 on Page 200 down to which line?

:17:03   14    Q.    Line 20 on Page 200 to Page 201, Line 3.

         15          (Pause.)

:17:49   16    A.    That's true, and then, as you can see, as I go further

:17:52   17    down the next eight lines, I try to clarify is that.

:17:57   18    Q.    Right.  Were you referring to, eight lines later you

:18:02   19    are saying that the bearing is the back side of the

:18:04   20    polyethylene.  Right?

:18:05   21    A.    No.  What I am referring to is very different than

:18:08   22    design in general.  But I apologize for that.

:18:11   23    Q.    But your testimony was that the bearing was the back

:18:14   24    side of the polyethylene, and then you clarified?

:18:17   25    A.    Yes.

:18:18    1    Q.    That this was confusing?

:18:23    2    A.    There is claims and there is what occurs between a

:18:26    3    mobile-bearing knee replacement.

:18:28    4    Q.    Let's just take a quick look at Figure 1 of the '283

:18:34    5    patent.

:18:50    6          MR. FRIEDMAN:  Your Honor, I don't think I have

:18:52    7    objected yet during this trial.  This is the first one.  I

:18:57    8    believe that at this juncture he is going beyond the scope

:19:01    9    of the direct with this witness.  Therefore, on that basis,

:19:11   10    I would object.

:19:14   11          MR. HIGAN:  Your Honor, this witness has talked

:19:16   12    about the scope of the claims or whether something is or is

:19:19   13    not in the claims of each one of these patents.  I think the

:19:23   14    Court is entitled to understand the ability of this witness

:19:27   15    to actually be able to read and apply the various

:19:31   16    terminology related to these patents.  But specific to the

:19:34   17    scope issue, he was asked about the patents and these

:19:37   18    claims, and it's within the scope.

:19:39   19          THE COURT:  I agree.  I will overrule the

:19:41   20    objection.

:19:42   21    BY MR. HIGAN:

:19:42   22    Q.    We were looking at Figure 1.  You can see, there is a

:19:47   23    number 20 that is pointing at what you might think of as the

:19:52   24    poly or the bearing.  Correct?

:20:00   25    A.    In the claim?

Callaghan - cross

| | | |
|---|---|---|
| :20:02 | 1 | Q.    Yes.  In the context of the patent claims. |
| :20:05 | 2 | A.    The poly is the bearing. |
| :20:07 | 3 | Q.    Looking at the figure, do you see the No. 20?  Let's |
| :20:11 | 4 | start with that. |
| :20:13 | 5 | A.    Yes. |
| :20:13 | 6 | Q.    And go ahead and turn to Page 3, go ahead and leave |
| :20:17 | 7 | the figure up. |
| :20:24 | 8 | A.    Let's go over it again. |
| :20:25 | 9 | Q.    Turn to Column 3 of the '283 patent. |
| :20:31 | 10 | A.    Column 3 of the '283 patent.  The claims? |
| :20:37 | 11 | Q.    Column 3 of the '283 patent? |
| :20:44 | 12 | A.    Okay. |
| :20:44 | 13 | Q.    And if you look at about Line 6, it's referring to |
| :20:51 | 14 | bearing 20? |
| :20:55 | 15 | A.    Yes.  So in this claim, the polyethylene is considered |
| :21:02 | 16 | the bearing, it's 20.  It says right here the knee component |
| :21:07 | 17 | including a tray and a bearing 20. |
| :21:09 | 18 |     So the polyethylene is the bearing. |
| :21:12 | 19 | Q.    So your testimony at your deposition that the |
| :21:17 | 20 | underside of the poly was wrong.  Correct? |
| :21:21 | 21 | A.    And then I clarified it for you.  And we went through |
| :21:24 | 22 | in my deposition each one of these numbers and I |
| :21:28 | 23 | specifically looked in the deposition, there was actually -- |
| :21:32 | 24 | we did a picture and went through each one to bring it back |
| :21:37 | 25 | into context of the patent versus my clinical discussion. |

:21:43    1      You have to understand, you know, I do my

:21:46    2  biomechanical research.  We do a lot of this type.  My

:21:50    3  terminology is different.

:21:53    4      Once your counsel went through each of these

:21:56    5  statements with me, and there must be in the deposition, you

:21:59    6  probably have that picture, that I identified each one of

:22:01    7  these surfaces.

:22:02    8      MR. HIGAN:  Your Honor, I would move to strike

:22:04    9  that answer as nonresponsive.

:22:06   10      THE COURT:  No, I am not going to strike it.

:22:08   11  You can go ahead.

:22:09   12  BY MR. HIGAN:

:22:10   13  Q.    In your deposition -- strike that.

:22:14   14      This is your first patent case.  Right?

:22:17   15  A.    Pardon me?

:22:18   16      This is my first patent case, yes.

:22:20   17  Q.    During your deposition, you could not describe or

:22:25   18  explain what the file history was?

:22:28   19  A.    That's correct.  And once again -- I am sorry.  I

:22:40   20  apologize?

:22:40   21  Q.    Now, go ahead and turn back to the claims of the '283

:22:57   22  patent.  Look at Column 6, where Claims 9 through 12 are.

:23:10   23  A.    Okay.

:23:11   24  Q.    Now, there is nothing in these claims that

:23:14   25  distinguishes between the valgus varus and AP liftoff.

Callaghan - cross

:23:21  1   **Right?**

:23:22  2   A.     **That's correct.  Can I look at them carefully.  I have**

:23:26  3   **never been asked that specific question.  And I would have**

:23:31  4   **to review them in context of that question.**

:23:33  5           **THE COURT:  Take your time, Doctor.**

:23:41  6           **THE WITNESS:   Thanks.**

:23:42  7           **(Pause.)**

:24:43  8           **THE WITNESS:  Once again, I need to study this,**

:24:49  9   **and I don't want to hang my hat on this until I spend more**

:24:52  10  **type, but it says inhibiting motion of said bearing relative**

:24:56  11  **to said tibial plateau in a direction generally parallel to**

:25:00  12  **the said axis of rotation.**

:25:02  13          **That doesn't necessarily say that.  So I agree**

:25:05  14  **it doesn't necessarily give which.**

:25:12  15  **BY MR. HIGAN:**

:25:12  16  Q.     **It does not require --**

:25:17  17  A.     **It does not require, I agree with you.**

:25:19  18  Q.     **Go ahead and turn to DTX-1, which is the '729 patent.**

:25:46  19  **If you will, turn to Claim 4, which is at Column 6.**

:25:51  20          **Do you recall testifying about Claim 4 on your**

:26:11  21  **direct examination?**

:26:12  22  A.     **Pardon?**

:26:13  23  Q.     **Do you recall testifying about Claim 4 on your direct**

:26:16  24  **examination?**

:26:17  25  A.     **Not specifically.  On my direct examination, yes.  Not**

Callaghan - cross

| | | |
|---|---|---|
| :26:20 | 1 | in my deposition.  Yes, sir. |
| :26:22 | 2 | Q.    And you were talking about where you believe the |
| :26:27 | 3 | cam-spine interaction could be reflected in Claim 4.  Do you |
| :26:31 | 4 | recall that? |
| :26:32 | 5 | A.    The cam-spine interaction could be -- say it one more |
| :26:38 | 6 | time for me? |
| :26:39 | 7 | Q.    Mr. Friedman asked you if you could identify where |
| :26:42 | 8 | within Claim 4 could be found the cam-spine interaction.  Do |
| :26:46 | 9 | you recall that? |
| :26:47 | 10 | A.    That specific question, you know, I don't recall.  But |
| :26:51 | 11 | we can go through it again for you. |
| :26:53 | 12 | Q.    Let's take a look at the language that starts with |
| :26:56 | 13 | "The cam between the superior posterior condyles to the end |
| :27:00 | 14 | of" -- |
| :27:02 | 15 | A.    Where is that? |
| :27:03 | 16 | Q.    It's down about Line 23 or 22 of Column 6. |
| :27:11 | 17 | A.    It's the cam having an articular surface. |
| :27:15 | 18 | Q.    It starts with a cam between the superior posterior |
| :27:18 | 19 | condyles? |
| :27:19 | 20 | A.    I have got it now. |
| :27:20 | 21 | Q.    If we can go all the way down to where they are flexed |
| :27:27 | 22 | relative to one another beyond 90 degrees? |
| :27:31 | 23 | A.    Okay. |
| :27:31 | 24 | Q.    Let's just talk about this.  A cam between the |
| :27:34 | 25 | superior posterior condyles.  The LPS Flex is not the very |

| | | |
|---|---|---|
| :27:39 | 1 | first knee prostheses to have that feature.  Correct? |
| :27:45 | 2 | A.    Correct. |
| :27:45 | 3 | Q.    It's also not the first to have the cam having an |
| :27:49 | 4 | articular surface? |
| :27:52 | 5 | A.    No. |
| :27:52 | 6 | Q.    It's also not the first to have the cam articular |
| :27:57 | 7 | surface contacting the spine articular surface at varying |
| :28:01 | 8 | vertical locations as the femoral and tibial component are |
| :28:06 | 9 | flexed relative to one another beyond 90 degrees? |
| :28:14 | 10 | A.    Probably not.  I don't know all the designs.  I think |
| :28:16 | 11 | there are some that it changes as you go, like I say. |
| :28:23 | 12 | Q.    Let's take a look at Claim 6.  If you look at the |
| :28:28 | 13 | language that starts at about Line 39, with the cam has a |
| :28:32 | 14 | non-cylindrical articular surface, to the end of the claim? |
| :28:35 | 15 | A.    Yes. |
| :28:35 | 16 | Q.    The LPS Flex was not the first knee prosthesis to have |
| :28:43 | 17 | a cam with a non-cylindrical articular surface, is it? |
| :28:49 | 18 | A.    I went over this with you before.  Even as somebody |
| :28:54 | 19 | who has designed prostheses, I can't tell you the specifics |
| :29:01 | 20 | of some of the areas of the prostheses I have designed, even |
| :29:07 | 21 | there are very small, the differences we have gone through |
| :29:10 | 22 | in the last two days that make it.  I can't tell you that. |
| :29:13 | 23 | I don't know every design and every cam feature of that. |
| :29:15 | 24 | Q.    So you can't -- |
| :29:18 | 25 | A.    It's in a claim of a patent, then I saw it described |

:29:21    1    over the course of those two days.  And, therefore, being in

:29:26    2    the claim, that's what I was asked to describe, if some of

:29:31    3    these things are in the claim of the patent, so --

:29:33    4    Q.   Dr. Callaghan, I am actually talking about the claim

:29:37    5    language.  So let's focus on that, please.

:29:40    6    A.   Okay.

:29:40    7    Q.   If you can't tell me one way or the other whether you

:29:46    8    know that the language the cam has a non-cylindrical

:29:49    9    articular surface being present in other prostheses prior to

:29:54    10    LPS Flex, that's fine.

:29:57    11           Is that correct?

:29:59    12    A.   I can't be sure.

:30:00    13    Q.   Okay.  Can you tell me if the cam having a

:30:07    14    non-cylindrical articular surface with a first spine

:30:10    15    contacting portion and a second spine contacting portion

:30:13    16    located further posteriorly than the first spine contacting

:30:18    17    portion existed prior to the LPS Flex?

:30:25    18    A.   This gets into the fact that, once again, I can't tell

:30:34    19    you specifically if there is ones that might have shown some

:30:38    20    of that.

:30:39    21           What I know is what was described does that.

:30:43    22    Q.   So you are not aware of whether this feature is

:30:46    23    present in the prior art?

:30:50    24    A.   I can't say that.

:30:51    25    Q.   And the features that we looked at before, you aren't

:30:56    1    sure whether that's in the prior art or not, either?

:31:00    2    A.    I didn't review all the prior art that's been done in

:31:03    3    total knee replacement surgery before I made my statements.

:31:12    4    Q.    So is that a yes, you can't tell me whether it is in

:31:16    5    the prior art or not?

:31:17    6    A.    I can't sit here today and tell you that.

:31:19    7    Q.    Let's take a look at Claim 8.  The language I think

:31:27    8    you highlighted here was, the cam articular surface has a

:31:31    9    curved surface whose radius increases from the first contact

:31:34   10    portion to the second contact portion?

:31:37   11    A.    Correct.

:31:37   12    Q.    Can you tell me whether that was in the prior art?

:31:43   13    A.    I think the oblong -- you know, some of these claims

:31:48   14    go on top of each other -- but the oblong -- this would go

:31:52   15    to saying an oblong cam.  You know, the amount of oblong

:31:59   16    cam, I don't know if there has been some that had two

:32:02   17    milliliters of oblong cam in that, I can't.  I didn't read

:32:06   18    all the patent literature on knee replacement surgery before

:32:10   19    I looked at these patents or since I have looked at these

:32:14   20    patents.

:32:15   21            That would be a huge amount of material, I would

:32:18   22    imagine.

:32:19   23    Q.    And now, you just mentioned dimensions.  Go ahead and

:32:24   24    take a look at Claims 1 through 11 of the '729 patent, and

:32:33   25    tell me, aside from degrees associated with range of motion,

:32:36   1   are there any other elements that require a specific

:32:40   2   dimension?

:32:46   3   A.    I would be happy to read the patents and try to tell

:32:51   4   you what my interpretation is today.  But I am going to

:32:55   5   state one thing here right now.  I work in a laboratory.  I

:33:00   6   do this kind of work.  I don't think anybody would be able

:33:03   7   to sit there and tell you that this has not been done or

:33:07   8   whether it does or doesn't.

:33:09   9            That takes studies, that takes time.  And I am

:33:14   10  not comfortable trying to do that, with my knowledge of knee

:33:19   11  replacement surgery and my knowledge of knee implants and my

:33:23   12  knowledge of biomechanics.

:33:25   13  Q.    My question was a little different, actually, Dr.

:33:28   14  Callaghan, on this one.  If you can listen to my question,

:33:32   15  because you brought up the concept of dimensions.  Please

:33:36   16  look at Claims 1 to 11 of the '729 patent, which you have

:33:41   17  opined on today, and tell me, sir, aside from the degree of

:33:46   18  range of motion, are there any specific dimensions required?

:33:58   19  It's a yes or no question.  If you need a little

:34:01   20  explanation, that's okay.

:34:02   21  A.    Give me the question again.  I have got to concentrate

:34:05   22  on that.

:34:06   23            MR. HIGAN:  Can you read that one back to me,

:34:08   24  please.)

:34:34   25            (Record read as requested.)

| | | |
|---|---|---|
| :34:36 | 1 | THE WITNESS:  And can you define dimensions? |
| :34:39 | 2 | BY MR. HIGAN: |
| :34:40 | 3 | Q.    You don't know what the word dimensions means, Dr. |
| :34:45 | 4 | Callaghan? |
| :34:46 | 5 | A.    Dimensions can mean a lot of things and there is a lot |
| :34:49 | 6 | of places that there is dimensions.  I am really not trying |
| :34:51 | 7 | to -- |
| :34:52 | 8 | THE COURT:  Doctor, he is just trying to focus |
| :34:54 | 9 | your attention on the language of the specific claims I |
| :34:58 | 10 | think 1 through 11. |
| :35:00 | 11 | MR. HIGAN:  Yes, Your Honor. |
| :35:01 | 12 | THE COURT:  If you would just scan those.  Then, |
| :35:05 | 13 | if you don't have his question in mind, it can be read back |
| :35:08 | 14 | again. |
| :35:11 | 15 | THE WITNESS:  We are going through Claims 1 |
| :35:14 | 16 | through 11? |
| :35:15 | 17 | THE COURT:  Yes. |
| :35:19 | 18 | THE WITNESS:  I am happy to do this.  It's just |
| :35:22 | 19 | that what the word dimension means is really somewhat vague |
| :35:29 | 20 | to me. |
| :35:29 | 21 | THE COURT:  Doctor, I think he is referencing |
| :35:32 | 22 | numbers.  Are you talking about numbers? |
| :35:34 | 23 | MR. HIGAN:  Yes, Your Honor. |
| :35:36 | 24 | THE COURT:  That is what he means by dimensions. |
| :35:39 | 25 | BY MR. HIGAN: |

| | | |
|---|---|---|
| :35:40 | 1 | Q.    Aside from range of motion? |
| :35:42 | 2 | THE COURT:  Yes, aside from range of motion. |
| :35:44 | 3 | THE WITNESS:  So numbers.  Thank you for that |
| :35:46 | 4 | clarification. |
| :36:17 | 5 | (Pause.) |
| :36:17 | 6 | THE WITNESS:  As I have scanned that, that is |
| :36:19 | 7 | the only place that numbers are mentioned. |
| :36:22 | 8 | BY MR. HIGAN: |
| :36:23 | 9 | Q.    So the only specific dimensions that are set forth in |
| :36:27 | 10 | Claims 1 through 11 of the '729 patent relate to range of |
| :36:31 | 11 | motion.  Correct? |
| :36:32 | 12 | A.    Correct, by that definition, yes. |
| :36:34 | 13 | Q.    Go ahead and let's just look at Claim 9, which is the |
| :36:40 | 14 | last one that you talked about with Mr. Friedman and the |
| :36:45 | 15 | cam-spine interaction, and the language, the first spine |
| :36:48 | 16 | contact portion, through the end of the claim element. |
| :36:52 | 17 | A.    Correct. |
| :36:52 | 18 | Q.    Now, can you say whether or not the claim language, |
| :37:00 | 19 | the first spine contact portion has a radius and the second |
| :37:03 | 20 | spine contact portion has a radius, the radius of the second |
| :37:07 | 21 | spine contact portion being larger than the radius of the |
| :37:11 | 22 | first spine contact portion, is in the prior art? |
| :37:16 | 23 | A.    Like I said, I don't know patent laws.  I don't know |
| :37:19 | 24 | the other patents, other than these that I was asked to look |
| :37:22 | 25 | at.  So I can't be sure. |

:37:24   1   Q.     Go ahead and turn to DTX-5, which is the '786 patent.

:37:37   2   The claims are at Column 6.  Please look at those.

:37:42   3   A.     The claims are what now?

:37:45   4   Q.     Column 6.

:37:47   5          MR. FRIEDMAN:  Your Honor, in this case I think

:37:48   6   it is beyond the scope of the direct.  I don't recall asking

:37:51   7   him about this patent.

:37:52   8          THE COURT:  This patent, at all?

:37:54   9          MR. HIGAN:  If this witness has no opinions

:37:56  10   about the '786 patent, then I will move on, Your Honor.

:37:59  11          THE COURT:  That is not the import of his

:38:01  12   objection.  It was he wasn't questioned on direct about this

:38:05  13   particular patent.  I think it's Mr. Friedman's objection

:38:07  14   that he wasn't questioned about the '786 patent.  And

:38:11  15   therefore, your cross on the '786 exceeds the scope.

:38:14  16          I think that's a fair objection.

:38:18  17          MR. HIGAN:  I will move on from that.

:38:20  18   BY MR. HIGAN:

:38:21  19   Q.     Please turn back to the '283 patent.  Again, the

:38:29  20   claims start at Column 5.  Let me know when your there, Dr.

:38:36  21   Callaghan.

:38:36  22   A.     I am there now.  Thanks.

:38:38  23   Q.     Aside from the approximately 50 degrees of rotational

:38:48  24   motion discussed in Claim 3, are there any specific

:38:53  25   dimensions required by Claims 1 through 12 of the '283

:38:57    1    patent?

:39:05    2    A.    Once again, looking at numbers, no.

:39:13    3              MR. HIGAN:  I don't have any further questions.

:39:14    4              THE COURT:  Redirect.

:39:17    5                    REDIRECT EXAMINATION

:39:18    6    BY MR. FRIEDMAN:

:39:21    7    Q.    Just two or three areas, Doctor.

:39:34    8              Now, just to draw your attention to some subject

:39:39    9    matter, you were presented with a number of documents today

:39:45   10    that you were asked to look at that were not on Schedule B

:39:49   11    to your expert report.  Correct?

:39:51   12    A.    Correct.

:39:51   13    Q.    Having read through those documents, at least in the

:39:56   14    short period of time that you are sitting here, have any of

:40:01   15    those documents in any way changed your opinions or

:40:04   16    conclusions in this case?

:40:07   17    A.    They have not.

:40:08   18    Q.    Now, could we put up the '729 patent, please?

:40:18   19              The first thing I want to ask you is, do you

:40:35   20    know what it means to say that a cam is placed or located in

:40:40   21    the posterior condyle?

:40:41   22    A.    I do.

:40:42   23    Q.    What does that mean?

:40:44   24    A.    That means that it -- so you have an anterior condyle

:40:48   25    of the femur and a posterior condyle of the femur.  It is

:40:51  1    easier for me to show that.  It would have to be right in

:40:54  2    that posterior condyle of the femur.  And there it is.

:40:57  3    Q.    Now, if we can go to Claim 1, please.  In Claim 1 is

:41:10  4    the cam located in the posterior condyle or in the superior

:41:18  5    posterior condyles?

:41:20  6              MR. HIGAN:  Your Honor, this is beyond the scope

:41:21  7    of the direct.  This is more of what should have been

:41:26  8    elicited from this --

:41:27  9              THE COURT:  I agree.  I am going to sustain the

:41:28  10   objection.

:41:29  11             MR. FRIEDMAN:  If I can just say, Your Honor,

:41:32  12   Mr. Higan specifically asked him these questions on his

:41:37  13   cross-examination about the location of the cam.  I would

:41:44  14   just like to clear that up, which I think I am entitled to

:41:49  15   do on redirect.

:41:51  16             MR. HIGAN:  Your Honor, the questions specific

:41:53  17   to the location of the cam were actually related to the same

:41:56  18   claims that were addressed on direct, which is Claims 4, 6,

:42:00  19   8 and 9.  I didn't ask the witness about the location of the

:42:03  20   cam with respect to Claim 1, which is more --

:42:08  21             THE COURT:  Point taken.  I think, Mr. Friedman,

:42:11  22   that is a good point.

:42:12  23   BY MR. FRIEDMAN:

:42:13  24   Q.    In this invention, where is the cam located?

:42:16  25   A.    It's just as we stated.  Right here (indicating).

:42:19   1   Q.   And is that in a superior and posterior position?

:42:23   2   A.   Yes.

:42:24   3   Q.   Now, to your knowledge, in previous implants was the

:42:33   4   cam located in the posterior position?

:42:37   5   A.   Right.

:42:43   6   Q.   Can you identify any time prior to the time this

:42:48   7   patent was issued when the cam was located in the superior

:42:53   8   position?

:42:55   9   A.   Once again, I didn't look at all the patents on knee

:42:59   10   replacement surgery.  But I can't personally.

:43:24   11              MR. FRIEDMAN:  Nothing further, Your Honor.

:43:26   12              THE COURT:  All right.

:43:27   13              Dr. Callaghan, thank you.  You are excused.

:43:31   14              THE WITNESS:  Thank you.

:43:33   15              (Witness excused.)

:43:55   16              MR. TABIN:  Your Honor, our next witness is Dr.

:43:58   17   Scott.

:43:58   18              ... WILLIAM NORMAN SCOTT, having been duly sworn

:44:46   19   as a witness, was examined and testified as follows ...

:44:58   20              MR. RABIN:  Your Honor, may I approach?

:45:00   21              THE COURT:  You may.

:46:08   22              MR. Rabin:  Your Honor, may I proceed?

:46:09   23              THE COURT:  You may.  Just remind me of your

:46:13   24   name.

:46:13   25              MR. RABIN:  Sean Rabin, Susman & Godfrey.

**DIRECT EXAMINATION**

BY MR. RABIN:

Q.    Dr. Scott, can you please begin by telling the Court a little bit about yourself?

A.    Yes.  Your Honor.  I was born in Hoboken, New Jersey, and raised in Jersey City by my mom with two brothers and my father, who had a small printing business in Jersey City.

Q.    Where did you go to high school?

A.    I went to high school in the State of New Jersey, a place called Delbarton.

Q.    Where did you go to college?

A.    The University of Pennsylvania.

Q.    What did you do after college?

A.    After college, I went to medical school.

Q.    Where did you go to medical school?

A.    At Cornell University Medical College.

Q.    And what did you do after medical school?

A.    Al medical school, I did two years of general surgery residency, basically one year internship, one year general surgery, then three years of orthopedic surgery at the Hospital for Special Surgery.

Q.    What did you do after you were at the Hospital for Special Surgery?

A.    After I left the Hospital for Special Surgery, I went into private practice at Lenox Hill Hospital, which is also

:47:30    1    in New York, ten blocks away.

:47:32    2    Q.    And what type of responsibilities did you have at

:47:35    3    Lenox Hill Hospital?

:47:37    4    A.    In addition to my private practice, I was in charge of

:47:40    5    the residency program, and also did a lot of clinical

:47:44    6    research.

:47:45    7    Q.    What did you do after Lenox Hill?

:47:48    8    A.    After Lenox Hill, Dr. Insall and I, in 1991, formed

:47:54    9    our own group, the ISK, which you have heard about.

:47:58   10    Q.    Now, the Court has heard a lot about Dr. Insall.  Can

:48:02   11    you describe your relationship with Dr. Insall?

:48:05   12    A.    Yes.  I was very fortunate.  Dr. Insall was my mentor

:48:09   13    in 1974, and subsequent to that, we continued to collaborate

:48:23   14    and work in the world of knee replacements, became very

:48:28   15    close friends.  It was a great relationship.

:48:33   16    Q.    Where do you work today?

:48:35   17    A.    Today I still work at the ISK.

:48:36   18    Q.    In which states are you admitted to practice medicine?

:48:42   19    A.    In New Jersey, New York, and Connecticut.

:48:44   20    Q.    Do you have any board certifications?

:48:48   21    A.    Yes, I do, in orthopedic surgery.

:48:49   22    Q.    Which professional organizations or associations are

:48:54   23    you a member of?

:48:55   24    A.    I am a member of the American Academy of Orthopedic

:48:58   25    Surgeons.  The AMA.  The American Orthopedic Sports Medicine

Scott - direct

:49:03   1   Society, and germane to this proceeding, the Knee Society.

:49:06   2   Q.    The Court has heard the Knee Society mentioned before.

:49:10   3   Can you explain exactly what the Knee Society is?

:49:15   4   A.    The Knee Society was formed in 1984.  It is a society

:49:20   5   that has about 100 worldwide members.  It's a society that

:49:28   6   you are selected or elected to.  And it's basically based on

:49:34   7   a publishing, academic, educational curriculum vitae.

:49:40   8   Q.    What is your relationship to the Knee Society?

:49:42   9   A.    I was a founding member of the Knee Society.

:49:45  10   Q.    Who else was a founding member of the Knee Society?

:49:48  11   A.    Dr. Insall, and I think there were six or seven

:49:53  12   others.  I forget.

:49:54  13   Q.    Are you involved in an organization called the

:49:57  14   International Congress for Joint Reconstruction?

:49:59  15   A.    Yes.  That's a new organization that was formed about

:50:04  16   2008.  Basically, the International Congress for Joint

:50:10  17   Reconstruction, ICJR, is a not-for-profit philanthropic

:50:18  18   organization.  The purpose of is to take orthopedic

:50:21  19   education in the field of arthroplasty, total hips, total

:50:25  20   knees, total elbows, shoulders, et cetera, and make it

:50:28  21   available to any orthopedic surgeon in the world who does

:50:31  22   one total joint replacement.

:50:33  23            The reason for that is that it's sort of

:50:38  24   distressing, but the majority, even in this country, the

:50:42  25   majority of total joint replacements that are done in this

:50:46   1   country, and it's a lot less in the rest of the world, are

:50:50   2   done by orthopedic surgeons who might only do 15, 20 a

:50:53   3   years.

:50:54   4          When I say majority, I am talking 80 percent of

:50:58   5   the total joint replacements are done by people who do what

:51:00   6   we consider very few numbers.

:51:02   7          So that was the reason, to make sure the ICJR

:51:08   8   could get education out there to everybody.  Of course, the

:51:11   9   Internet opened that opened that up to us.

:51:15   10          I am happy to say, I was talking to the COO

:51:17   11   yesterday, and he told me we now have close to 10,000

:51:21   12   members.

:51:21   13   Q.    What is your relationship to ICJR?

:51:24   14   A.    I am the president and chief executive officer.

:51:26   15   Q.    Have you published or can you gives an example of

:51:32   16   publications and lectures that you do on the subject of

:51:34   17   knees?

:51:35   18   A.    Yes.  Through my career, basically, I have published,

:51:41   19   I think, about 17 books, over a hundred peer-reviewed

:51:45   20   articles.  I would say 70 or more chapters.  And have given

:51:52   21   well over 300 lectures around the world.

:51:57   22   Q.    Can you please describe to the Court the book titled

:52:02   23   Insall and Scott, surgery Of The Knee?

:52:05   24   A.    Insall and Scott, Surgery Of The Knee is now in its

:52:08   25   fifth edition.  It is a comprehensive knee book from

| | | |
|---|---|---|
| :52:12 | 1 | actually pediatric knee surgery all the way through adult |
| :52:17 | 2 | reconstruction and revision, total knee prostheses. |
| :52:21 | 3 | It's been a lot of fun.  It's got e-versions, |
| :52:25 | 4 | it's got all the bells and whistles that all the books have |
| :52:28 | 5 | today. |
| :52:28 | 6 | I guess most importantly, the two leading |
| :52:31 | 7 | orthopedic journals in the world, or certainly most people |
| :52:36 | 8 | would recognize, the British Journal of Orthopedic Surgery |
| :52:40 | 9 | and the American Journal, have recognized it as the |
| :52:44 | 10 | authoritative book of knee surgery. |
| :52:46 | 11 | Q.    For how long have you concentrated your medical |
| :52:49 | 12 | practice on knees? |
| :52:50 | 13 | A.    My entire career, from 1977 on, has been devoted to |
| :52:56 | 14 | knee surgery. |
| :52:57 | 15 | Q.    Other than co-founding the Insall-Scott-Kelly |
| :53:01 | 16 | Institute in 1991, what other positions did you hold as it |
| :53:06 | 17 | related to orthopedics in the early 1990 time frame? |
| :53:11 | 18 | A.    In the 1990 framework, or actually, maybe, a better |
| :53:14 | 19 | perspective to answer, if I may, from 1978 until about 2005, |
| :53:20 | 20 | I had a distinct opportunity to be the head team physician |
| :53:23 | 21 | for the Knicks, the Rangers, and the WNBA, and the women's |
| :53:30 | 22 | NBA, the Liberty. |
| :53:30 | 23 | So that whole stretch encompassed 44 |
| :53:35 | 24 | professional seasons.  And it was a lot of fun.  That's what |
| :53:40 | 25 | I was also doing. |

Scott - direct

| | | |
|---|---|---|
| :53:40 | 1 | Q.    I think Mr. Friedman alluded to this, did you also |
| :53:45 | 2 | have a relationship to the Olympic teams? |
| :53:49 | 3 | A.    Yes.  I was real lucky.  The NBA selected me to be the |
| :53:55 | 4 | head team physician for the Dream Team in 1992.  For those |
| :54:00 | 5 | basketball fans, there is only one Dream Team.  But we will |
| :54:02 | 6 | let that one go. |
| :54:04 | 7 | Because of the circumstances, it was so much |
| :54:08 | 8 | fun, because they didn't qualify.  And in 1992, since we |
| :54:13 | 9 | didn't qualify, we had to go through the Tournament of the |
| :54:16 | 10 | Americas.  So my family and I got to spend close to three |
| :54:20 | 11 | months with the team, and with their families.  It really |
| :54:23 | 12 | was a family atmosphere. |
| :54:28 | 13 | THE COURT:  Have you seen the documentary? |
| :54:30 | 14 | THE WITNESS:  Yes.  It's pretty good.  It's not |
| :54:36 | 15 | in this court.  But the best basketball I have seen, over |
| :54:41 | 16 | 3000 live games, the best basketball game I have ever seen |
| :54:47 | 17 | was that scrimmage in Monte Carlo.  So when you see it, |
| | 18 | anyway... |
| :54:51 | 19 | BY MR. RABIN: |
| :54:51 | 20 | Q.    Let's talk about your consulting relationships with |
| :54:54 | 21 | Zimmer.  When did you first start working with Zimmer? |
| :54:56 | 22 | A.    Either -- about 1990, 1991. |
| :54:59 | 23 | Q.    What type of relationship did you have with Zimmer in |
| :55:01 | 24 | the early 1990s? |
| :55:02 | 25 | A.    In that time frame I was asked to do consulting work |

Scott - direct

:55:05  1   on a prosthesis that I don't think we have mentioned so far

:55:09  2   in these proceedings called the Insall-Burstein prosthesis,

:55:14  3   the IB.  So they asked me to consult on that.

:55:16  4   Q.    What type of work did you do on the consultation on

:55:20  5   the IB?

:55:21  6   A.    Basically, with the exception of Dr. Insall, I

:55:23  7   probably had the world's most experience on the IB and

:55:26  8   publications.  So I was just giving my clinical experience,

:55:32  9   my expertise at that time to Zimmer.

:55:34  10  Q.    How did your involvement with Zimmer progress from

:55:37  11  simply working on the IB to doing more?

:55:41  12  A.    Basically, because of being with Dr. Insall and

:55:45  13  certainly knowing before what eventually became the NexGen

:55:50  14  PS system, we would look at patients together all the time.

:55:53  15          So I was involved in evaluating his patients

:55:56  16  with him.

:55:58  17  Q.    What is the NexGen PS System?

:56:02  18  A.    The NexGen PS system is a -- let me back up.

:56:11  19          The NexGen was Zimmer's way, and about that time

:56:14  20  most of the companies were trying to combine systems.  That

:56:17  21  is a CR system, which I know you have heard about, and a PS

:56:21  22  system.

:56:21  23          So they were trying to bring the parts together

:56:26  24  so they could present to orthopedic surgeons throughout the

:56:30  25  world prostheses.  They could have their choice of whether

Scott - direct

:56:35   1   they wanted to do a CR or a PS.  I might add, at that time

:56:39   2   PS was just starting to really be accepted.  In the world at

:56:44   3   that time, probably 75, 80 percent of the prostheses being

:56:50   4   done were CR, not PS.

:56:56   5          That is why the IB and obviously Dr. Insall and

:57:00   6   my own experience with that was really gigantic, because

:57:04   7   there was a lot of question whether PS's should out there in

:57:07   8   the seventies an eighties.

:57:09   9          Today, I might add, I think it's probably more

:57:12   10  popular than the CR.

:57:13   11  Q.    What knee implant did Zimmer prepare for mass

:57:18   12  production in the early 1990s as part of this NexGen

:57:23   13  grouping?

:57:24   14  A.    Part of it was the prosthesis called the NexGen PS.

:57:31   15  Q.    Did you have opportunity to work with the NexGen PS

:57:33   16  before it was released?

:57:35   17  A.    Before it was released, no, I didn't do any work on

:57:37   18  it.  That was part of an IDE, which, basically, what that

:57:41   19  meant is, I think short of a hundred cases, Zimmer had to

:57:46   20  put in -- not Zimmer, they had to have surgeons and

:57:50   21  consultants put a hundred prostheses in or thereabouts and

:57:54   22  evaluate them.

:57:54   23         They were surgeons throughout the country.

:57:56   24  Q.    What was your opinion of the NexGen PS?

:58:01   25  A.    The results I was seeing were extremely alarming.  It

Scott - direct

:58:07    1    reminded us of a prosthesis Dr. Insall and I had seen and

:58:11    2    actually sort of developed back in the seventies, a

:58:14    3    prosthesis called the Total Condor II.  In simple terms it

:58:20    4    was showing radiolucencies that were consistent to that

:58:22    5    prosthesis.  And that prosthesis, the Total Condor II, we

:58:27    6    just stopped right away.  And we were seeing the same type

:58:30    7    of x-ray things here.

:58:31    8    Q.    How did you communicate these concerns regarding this

:58:35    9    NexGen PS to Zimmer?

:58:37   10    A.    We contacted Zimmer and told them of our concerns, and

:58:42   11    that we were really alarmed at what we were seeing at such

:58:46   12    an early stage.

:58:47   13    Q.    How did Zimmer respond?

:58:51   14    A.    Not particularly well at first.  They basically

:58:56   15    thought it was Dr. Insall's surgical approach and what he

:59:01   16    was doing in surgery that caused the problem.

:59:06   17              We persisted, and we said, well, look, here are

:59:11   18    our radiolucencies, or I think we talked about the x-ray

:59:16   19    evidence of potential lucency, what are the rest of the

:59:20   20    people in the country seeing, because Zimmer had told us the

:59:23   21    rest of the people in the country hadn't really seen any.

:59:25   22    So we said, let's see the films.

:59:27   23              It turned out, the rest of the people in the

:59:29   24    country hadn't really done many films.

:59:32   25              So Bill Rohr, who was at that point -- he was

:59:34     1    here the other day -- he was head of R&D, he collected all

:59:38     2    the films.  They were all sent to us at ISK.  He had already

:59:42     3    come and seen our films and agreed with us.

:59:44     4            When we saw everybody's films, he agreed with

:59:50     5    us.  And I might say, we also collected the CR films and

:59:54     6    looked at the CR films, too.  And we felt they were okay.

:59:58     7    Q.    What did you inform Zimmer of as it related to your

:00:03     8    willingness to implant the NexGen PS in your patients?

:00:07     9    A.    Dr. Insall and I told them we would not use the NexGen

:00:13    10    prosthesis.

:00:13    11    Q.    What did Zimmer do when you told them you would refuse

:00:18    12    to use the NexGen PS and you told them you thought it would

:00:23    13    cause problems in patients?

:00:25    14    A.    They basically told us go ahead and make a PS design

:00:28    15    that you think is really going to work.

:00:29    16    Q.    Can you describe for us the design process that took

:00:33    17    place to make a new PS design for Zimmer?

:00:36    18    A.    Yes, in retrospect it was a lot of fun.  But it was

:00:39    19    hectic.  But it was really something that we were enjoying

:00:45    20    doing because we knew we were going to make something.  The

:00:48    21    premise when we started, and Dr. Rohr told us this, okay,

:00:52    22    make whatever you think is going to be the best PS design

:00:55    23    you can, and so that's how it started.

:00:58    24    Q.    Who else was present during this design phase, when

:01:03    25    you and Dr. Insall were tasked with coming up with a new PS

Scott - direct

:01:07    1   design?

:01:08    2   A.    In addition to Dr. Rohr, Dr. Scuderi.

:01:10    3   Q.    Who from Zimmer other than Dr. Rohr was also involved

:01:17    4   in working with some of you and being assigned to you as it

:01:22    5   related to the new PS implant?

:01:25    6   A.    In addition to Dr. Rohr, who really served as our

:01:29    7   major liaison, as both a surgeon and an engineer, he

:01:32    8   appointed a young engineer by the name of Audrey Beckman,

:01:37    9   who was sort of Zimmer's point person with us.

:01:40   10   Q.    And when did this design process take place?

:01:45   11   A.    We started almost semi-simultaneous when we saw the

:01:51   12   radiolucencies, probably the first quarter of '95.

:01:55   13   Q.    How long was the ultimate design process for this new

:01:59   14   prosthesis?

:02:01   15   A.    It was really quick.  I think the design freeze, as we

:02:06   16   would call it today, basically, was probably by August of

:02:13   17   '96 -- of '95, sorry.

:02:15   18   Q.    And what ultimately was the name assigned to the

:02:19   19   implant that you, Dr. Insall and Dr. Scuderi were designing?

:02:23   20   A.    Ultimately it was called I guess the LPS, as you have

:02:28   21   heard about.

:02:30   22   Q.    During the design of the LPS in the 1995 time frame,

:02:35   23   did anyone take formal notes or meeting minutes of the

:02:39   24   conversations between you, Dr. Rohr, Dr. Insall and Dr.

:02:43   25   Scuderi?

Scott - direct

| | | |
|---|---|---|
| :02:45 | 1 | A.  **No.** |
| :02:46 | 2 | Q.  **Did you take any notes or minutes at these meetings?** |
| :02:50 | 3 | A.  **No.** |
| :02:50 | 4 | Q.  **Did Dr. Insall take any notes or minutes at these** |
| :02:55 | 5 | **meetings?** |
| :02:55 | 6 | A.  **No.** |
| :02:56 | 7 | Q.  **In early 1995 as part of the discussions regarding the** |
| :03:03 | 8 | **design of the LPS, what types of discussions did you have** |
| :03:06 | 9 | **with Dr. Insall, Rohr and Scuderi as it related to achieving** |
| :03:14 | 10 | **flexion of greater than 120 degrees in any implant?** |
| :03:17 | 11 | A.  **Well, we wanted to initially put that into the new** |
| :03:19 | 12 | **implant, to make high flexion.  We also want to put in** |
| :03:22 | 13 | **Gender.  I mean, Zimmer gave us cart blanche, go do what you** |
| :03:27 | 14 | **want.** |
| :03:27 | 15 | **So we wanted to put flexion characteristics into** |
| :03:33 | 16 | **the prosthesis we were developing.** |
| :03:35 | 17 | Q.  **Did you ultimately put the high flexion features into** |
| :03:43 | 18 | **the LPS implant?** |
| :03:46 | 19 | A.  **No.  That was shelved.  The reason it was shelved is** |
| :03:48 | 20 | **that Zimmer really, I think now they recognized and** |
| :03:54 | 21 | **understood the problems with the PS.  They really wanted to** |
| :03:57 | 22 | **get the LPS out as another PS.  And they wanted to get it** |
| :04:00 | 23 | **out quickly.  So the Flex project was put on the back** |
| :04:07 | 24 | **burner.** |
| :04:07 | 25 | Q.  **So we can understand some of the timing as these** |

:04:12   1   **various issues that are taking place, can you describe to us**

:04:17   2   **or compare for us, rather, the timing of discussions**

:04:21   3   **relating to high flexion with the timing of discussions**

:04:24   4   **relating to the design of the LPS?**

:04:28   5   **A.    They were all semi-simultaneous.  We were also**

:04:32   6   **developing another prosthesis at the time in this country**

:04:34   7   **called the LCCK, which is, in simple terms, a prosthesis**

:04:39   8   **that is more used for revision.**

:04:40   9   **Q.    Can we put up Plaintiffs' Exhibit No. 47.**

:04:44  10   **Dr. Scott, I believe you have a binder in front**

:04:50  11   **of you.**

:04:50  12   **A.    Yes.**

:04:50  13   **Q.    If you go to what's been called PTX-47.**

:05:07  14   **A.    Got it.**

:05:08  15   **Q.    Dr. Scott, this is a document dated March 27 of 1995.**

:05:12  16   **What is this document?**

:05:15  17   **A.    This is notes of a meeting that Dr. Rohr and Dr.**

:05:23  18   **Insall and I had.**

:05:23  19   **Q.    From looking at these notes, what can you tell us**

:05:27  20   **about how you, Dr. Insall and Dr. Rohr interacted?**

:05:33  21   **A.    Basically, it was really brainstorming.  I mean, you**

:05:38  22   **had a lot of experience in the room.  So we would talk about**

:05:41  23   **every aspect of the prosthesis, the femur, the tibia, the**

:05:45  24   **bearing surface, whether it should be all polyethylene, et**

:05:49  25   **cetera.**

Scott - direct

:05:49     1          So we would go through each of the aspects to

:05:54     2   it, and see if we could start reaching consensuses as to

:06:00     3   where we should go, where our disagreements were or weren't.

:06:02     4   Q.    Just looking at these notes, can you tell who among

:06:06     5   those present at the meeting made which comments?

:06:09     6   A.    No, not really.

:06:10     7   Q.    If you go down a little bit on this, you will see one

:06:13     8   where it says, "Insall - With this design an all poly is out

:06:19     9   of the question."

:06:19    10          Do you see that?

:06:20    11   A.    I do.

:06:20    12   Q.    Is any type of contribution to any of the other ideas

:06:24    13   identified with any of the meeting participants other than

:06:27    14   that instance on this page?

:06:32    15   A.    On this page, no.

:06:34    16   Q.    Are you able to tell from looking at these notes alone

:06:41    17   who among those present at the meeting made which

:06:43    18   contributions?

:06:44    19   A.    No.

:06:44    20   Q.    As of the date of this document, March 27th, 1995, at

:06:50    21   what stage were you at in the design of the LPS?

:06:53    22   A.    This was probably one of the first meetings, if not

:06:58    23   the first.

:06:59    24   Q.    Let's go a little bit later, about a week later, to

:07:02    25   Plaintiffs' Exhibit No. 50?

Scott - direct

| :07:09 | 1 | A.    Yes, I see it. |
| :07:10 | 2 | Q.    What is the date of this document? |
| :07:12 | 3 | A.    This is April 5th, 1995. |
| :07:15 | 4 | Q.    What is this document? |
| :07:17 | 5 | A.    This is another document that Drs. Rohr, Insall and |
| :07:23 | 6 | myself are meeting with three of the engineers from Zimmer. |
| :07:28 | 7 | Q.    And what can you tell us about how you, Dr. Insall and |
| :07:33 | 8 | Dr. Rohr and the other Zimmer attendees at this meeting |
| :07:37 | 9 | worked by looking at these notes? |
| :07:41 | 10 | A.    Really, just collaboration and thought processes.  We |
| :07:44 | 11 | were going over all the issues again. |
| :07:47 | 12 | Q.    All right.  If you look down on the screen, it's the |
| :07:50 | 13 | last thing, about halfway through the page, you will see |
| :07:53 | 14 | where it says, "Maxim.  Cam action not bad." |
| :07:58 | 15 |          Do you see that? |
| :07:59 | 16 | A.    I do. |
| :08:00 | 17 | Q.    What does that mean? |
| :08:02 | 18 | A.    Basically, as part of our project, in looking at -- |
| :08:07 | 19 |          MR. HALES:  Your Honor, I have a foundational |
| :08:10 | 20 | objection first, because I don't think there has been a |
| :08:13 | 21 | foundation established as to what the notes in this document |
| :08:18 | 22 | mean with regard to things authored by Dr. Scott. |
| :08:21 | 23 |          MR. RABIN:  He was at the meeting according to |
| :08:23 | 24 | these notes.  To the extent he has recollection of what they |
| :08:26 | 25 | are talking about -- |

:08:28    1            THE COURT:  Did you attend this meeting, Doctor?

:08:29    2            THE WITNESS:   I was on the attendees list, yes,

:08:34    3    sir.

:08:34    4            MR. HALES:  If the question were phrased in that

:08:36    5    way, it would be fine.

:08:37    6    BY MR. RABIN:

:08:37    7    Q.    I will rephrase.

:08:39    8            Dr. Scott, as an attendee of this meeting, what

:08:42    9    is your understanding of the phrase concerning "Maxim.  Cam

:08:46   10    action not bad"?

:08:48   11    A.    We were looking at cam-spine interaction in other

:08:51   12    companies' prostheses, to try to see what we liked and what

:08:54   13    we didn't like and what we could improve on, et cetera.

:08:56   14    Q.    Why were you discussing the cam and the spine as early

:09:00   15    as 1995?

:09:02   16    A.    We were discussing it since 1977.  I mean, basically,

:09:08   17    we were always worried about the cam-spine interaction.

:09:11   18            The thesis behind the cam-spine is that you can

:09:15   19    cut out the posterior cruciate ligament.  That's a strong

:09:20   20    statement, where you are going to cut out a ligament that

:09:23   21    might be normal, when our whole goal is to try to get a

:09:27   22    total knee replacement to be a normal knee.

:09:30   23            So we were always worried about the cam and

:09:34   24    spine.

:09:34   25    Q.    If you recall from Dr. Rohr's testimony, he said

:09:37    1    something along the lines of, you were considered at the

:09:41    2    time an expert on the cam-spine interaction.  Why were you

:09:44    3    so knowledgeable on the cam-spine interaction?

:09:47    4    A.    Mainly, there were a lot of dislocation episodes

:09:51    5    reported throughout the country in the early use of the IB

:09:56    6    prosthesis.  The question was, was that due to the

:10:01    7    cam-spine?  Or was it due to surgical technique or something

:10:03    8    that we didn't know about?

:10:05    9          So that was always an interest of mine and of

:10:09    10   Dr. Insall's.  As I said -- actually, I didn't say it.  The

:10:13    11   Insall/Burstein prosthesis was released in 1977 or

:10:19    12   thereabouts.  So, as I mentioned, that was a major leap in

:10:24    13   design.

:10:24    14         So we were watching everything as much as we

:10:30    15   could.  So we were very interested in the cam-spine.

:10:33    16   Q.    Can you tell from the first page of this document

:10:35    17   alone whether Dr. Scuderi is listed as an attendee?

:10:40    18   A.    It's not listed up there.  But the meeting was at ISK.

:10:47    19   It would be virtually impossible unless he was in the

:10:50    20   hospital or something that he wouldn't have been there.

:10:52    21   Q.    If we turn to the last page of this document, that has

:10:55    22   the Bates number ZIM20117, who is listed as present on April

:11:05    23   5th, 1995?

:11:08    24   A.    For the same meeting I just referred to, this is

:11:12    25   another attendee list at that meeting, and it includes Dr.

:11:17    1    Scuderi.

:11:17    2    Q.     Okay.  If we can go back to the first page and

:11:25    3    highlight the attendees of this meeting.  Can you identify

:11:28    4    the six people that are shown on this document as being at

:11:32    5    the meeting on April 5th, 1995?

:11:35    6    A.     Yes.  They are Dr. Insall, Kevin Greig, Jerry Aikins,

:11:42    7    Bill Rohr, Audrey Beckman, and myself.

:11:44    8    Q.     Can you bring up Defendants' Exhibit 382.

:11:51    9           I am not sure if you have the capability to do

:11:54   10    this.  Can you do it in split screen with the previous

:11:57   11    exhibit?

:11:58   12           Can you go to the second page of 382.  Perfect.

:12:11   13    Defendants' Exhibit, so it's DTX.  I think it is at the very

:12:16   14    front of your notebook, 382.

:12:23   15    A.     Yes, I have it.

:12:24   16    Q.     And do you see, what is the comparison in the dates on

:12:30   17    both of these notes?

:12:32   18    A.     April 5th, 1995.

:12:34   19    Q.     And can you tell from looking at the content of these

:12:39   20    two notes on Plaintiffs' Exhibit 50 and Defendants' Exhibit

:12:44   21    382 if these notes are capturing the same meeting?

:13:04   22    A.     Yes, I see a lot of the same topics.

:13:06   23    Q.     For example, if we look at Plaintiffs' Exhibit 50,

:13:09   24    what does it say below that line, in the middle?

:13:14   25    A.     "Five degrees edge load quite common."

:13:17   1   Q.    If we compare that to Defendants' Exhibit 382, what is

:13:20   2   the first thing in the bullet point?

:13:22   3   A.    "Edge loading, five degrees is probably common," et

:13:26   4   cetera.

:13:26   5   Q.    Let's compare the list of attendees on April 5th of

:13:30   6   1995 on these two documents.  You already told us who was

:13:34   7   there on Plaintiffs' Exhibit 50.  Who is listed as being

:13:37   8   there on Defendants' Exhibit 382?

:13:40   9   A.    On 382 is Dr. Insall, Dr. Rohr, Jerry Aikins, Audrey

:13:45   10  Beckman, and Kevin Greig.

:13:48   11  Q.    Who is missing on Defendants' Exhibit 382 from the

:13:51   12  minutes on April 5th of 1995?

:13:55   13  A.    I am.

:13:55   14  Q.    If one were to only look at Defendants' Exhibit 382,

:14:02   15  would it be accurate to say that you were not there because

:14:07   16  your name is not listed on the document?

:14:09   17  A.    If one didn't have context, yes.

:14:14   18  Q.    Okay.  Let's turn to Plaintiffs' Exhibit 53.  Can you

:14:33   19  tell from looking at Plaintiffs' Exhibit 53 who attended

:14:38   20  this meeting?

:14:53   21  A.    No.

:14:53   22  Q.    Is your name anywhere on Plaintiffs' Exhibit 53 as

:15:00   23  shown as being in attendance at this meeting?

:15:05   24  A.    No.

:15:06   25  Q.    Were you at this meeting?

:15:07    1    A.    Yes.

:15:08    2    Q.    Let's go back to Defendants' Exhibit 382.  If you go

:15:20    3    to the second page of Defendants' Exhibit 382, what is the

:15:25    4    date of this meeting?

:15:30    5    A.    That's PTX?

:15:32    6    Q.    I am sorry.  This is Defendants' Exhibit 382.  It

:15:40    7    might help if you look on the screen, too.

:15:44    8    A.    With my glasses, it is probably easier.

:15:46    9    Q.    Whatever is easiest for you.

:15:47   10    A.    This is 4/11/95.  The attendees at this meeting are

:15:52   11    Dr. Insall, me, Dr. Rohr, Audrey, Jerry, I am sure that is

:15:59   12    Jerry Aikins and Kevin is probably Kevin Greig.

:16:03   13    Q.    So if we go back then to Plaintiffs' Exhibit 53,

:16:11   14    although this document has no name, what is your opinion

:16:15   15    based on other things we have seen now that, in fact, you

:16:18   16    were at this meeting?

:16:20   17    A.    I am sure I was.

:16:21   18    Q.    On Plaintiffs' Exhibit 53, can you go to ZIM20126,

:16:39   19    it's about five pages in.

:16:45   20    A.    Yes, I have it.

:16:46   21    Q.    This says, "Start with IB II.  Exchange sagittal

:16:52   22    radius.  Doesn't cure clunk.  Unanimous.  Fix clunk."

:16:59   23          How does what is contained on this page describe

:17:02   24    the collaborative iterative brainstorming process that was

:17:06   25    taking place as you guys were making modifications to the

:17:09    1    new design?

:17:10    2    A.    I think it's clear-cut.  We wanted to fix the clunk.

:17:14    3    Within those three lines was probably a very long discussion

:17:22    4    of exactly how to fix it.

:17:23    5    Q.    If you go down further on the page where it says open

:17:26    6    issues, and then it says, "Spine-cam needs analysis."  What

:17:31    7    types of discussions were you having in April of 1995

:17:36    8    relating to analysis of the spine and cam?

:17:39    9    A.    We really were trying to compare whether the IB

:17:44   10    spine-cam or the NexGen PS cam or the Maxim spine-cam and

:17:53   11    others, which was working the best.  What sort of -- in

:17:58   12    other words, was there fatigue problems with the

:18:00   13    polyethylene on the spine?  Was the cam sufficient in its

:18:05   14    trying to stay low and not dislocating?

:18:09   15            Those are the type of things we needed analysis

:18:11   16    on.

:18:11   17    Q.    Can you explain the analysis as it relates to the cam

:18:15   18    and the spine in relation to the concept of high flexion?

:18:21   19    A.    Yes.  Basically, it's a very simple tradeoff.  The

:18:25   20    more you flex, the more chance you are going to dislocate

:18:29   21    the knee.

:18:30   22            So that was the worry.

:18:32   23            That is what I think has been referred to as the

:18:34   24    jump height, jump space.  Basically, the longer you can keep

:18:39   25    the cam in contact with the spine, the less likely you are

1    going to have a dislocation or subluxation episode.

2    Q.    Now, we have seen notes now from March and April of

3    1995.  During this time period, how often were you, Dr.

4    Rohr, Dr. Insall and Dr. Scuderi meeting to discuss Zimmer's

5    new knee and concepts of high flexion?

6    A.    I will take the word meeting to mean talking on the

7    phone, talking in person, talking among ourselves, and then

8    third-party conversations.

9              So if that is the definition, multiple times a

10   day.

11   Q.    And did you continue to meet multiple times a day in

12   May of 1995 the next month?

13   A.    Oh, absolutely.

14   Q.    Can we put up Defendants' Exhibit 110.  We have seen

15   this a lot, so I am going to go quickly on some of these

16   questions.

17             But very briefly, what is this drawing?

18   A.    This is a drawing I think we have all heard about.

19   This is Dr. Insall's drawing on May 1st, where he is talking

20   about thickening the posterior condyles.

21   Q.    Before filing this lawsuit, had you seen this exact

22   fax?

23   A.    This exact fax?  No.

24   Q.    Had you seen a drawing similar to that which is drawn

25   on this fax?

Scott - direct

:20:01    1    A.      Multiple times.

:20:02    2    Q.      And in what context had you seen a drawing similar to

:20:09    3    this?

:20:09    4    A.      Okay.  What it is, Your Honor, is that basically,

:20:13    5    thickening of the posterior condyles.  In the 1980s, we had

:20:18    6    a problem.  We had a problem because of people with revision

:20:24    7    total knee replacements, there was bone loss, as you heard

:20:27    8    about.  And then we had people that were very large.  You

:20:30    9    are talking about basketball, that was -- I inherited a lot

:20:36   10    of old basketball players, so we didn't have prostheses that

:20:40   11    could fit.  So we had custom-made designs, because there

:20:43   12    wasn't that much available sizing in that period.

:20:46   13              So John and I would custom-make designs.  And

:20:50   14    one of the things we did was to build up the posterior

:20:54   15    condyles for patients that were too large, versus patients

:21:00   16    that had bone loss.

:21:01   17    Q.      And how does building up the posterior condyles relate

:21:07   18    to stability and motion?

:21:12   19    A.      In the eighties, we were worried about stability.  In

:21:17   20    other words, could we put a prosthesis on the bone, and make

:21:21   21    the knee architecture somewhat comparable to a normal

:21:25   22    architecture so patients could actually move the knee?

:21:29   23              That was our focus.

:21:29   24              So we had to use various materials.  To show you

:21:37   25    how it was, we actually went through an era where we used

:21:41  1    screws and cement.  I remember putting 13 screws on a femur

:21:45  2    with cement to build up spaces.

:21:48  3              So we were concerned whether or not building up

:21:50  4    these condyles with augments or pieces of metal would work.

:21:55  5    And we were really, really happy to see that it did.

:21:58  6    Q.    In the 1980s and early 1990s, were you using the

:22:05  7    custom-made designs or the idea of thickness of the

:22:08  8    posterior condyles for the purposes or the sole purpose of

:22:11  9    increasing high flexion or creating high flexion?

:22:14  10   A.    No.  It was really for stability and fixation to the

:22:20  11   bone, to get the components to fit to the bone.

:22:23  12   Q.    If and Dr. Insall had been working with the theory of

:22:27  13   thickening the posterior condyles since the 1980s, why

:22:31  14   hadn't that nationwide product been released that included a

:22:34  15   thickening of the posterior condyles to achieve high

:22:37  16   flexion?

:22:38  17   A.    Because high flexion requires more than just

:22:40  18   thickening the posterior condyles.

:22:43  19   Q.    What conversations did you, Dr. Scuderi, and Dr.

:22:48  20   Insall have about ways to increase the thickness of the

:22:52  21   posterior condyles in a way that would achieve the high

:22:55  22   flexion in this 1995 time period?

:22:57  23   A.    We talked about two ways.  And actually, there is a

:23:02  24   drawing in Dr. Insall's book, and in my book, which I think

:23:08  25   was the first revision to any book, basically to do it with

:23:13   1   one piece of metal, or to just add what we call here module

:23:20   2   or an augment.  So just add a five-millimeter augment, and

:23:24   3   that's why you see five to six, because that's all the size

:23:28   4   of the augment we were using at that time.

:23:32   5        So we wanted one piece or two piece.

:23:34   6   Q.    Did you and Dr. Insall reach an agreement on how thick

:23:38   7   the posterior condyles should be in this time frame?

:23:41   8   A.    No.

:23:41   9   Q.    And what were your differing views?

:23:45   10  A.    Basically, John wanted more, he wanted thicker

:23:51   11  posterior augments.  I wanted thinner.

:23:53   12       The argument really revolved around, the

:23:57   13  principle was the same, but I was very worried about bone

:24:02   14  resection in a person that we were just going to talk about

:24:05   15  high flexion.  You want to preserve as much bone as

:24:09   16  possible.  John didn't think that was as necessary.

:24:11   17       So for a long time, we went back and forth about

:24:15   18  how many millimeters.

:24:17   19  Q.    We have heard a little bit about something called the

:24:20   20  box.  But I don't know if we have ever actually explained

:24:23   21  it.  Can you explain to us what the box is?

:24:26   22  A.    Yes.  Well, in terms, if we look at just the language

:24:29   23  of the patents, the box is this space, from here all the way

:24:35   24  down (indicating).  And, remember, this is a side-view of

:24:38   25  the prosthesis, so this is looking in this perspective, you

Scott - direct

:24:43    1    are holding it here, here is the front, or the patella area,

:24:47    2    and here is the posterior portion.

:24:52    3              So that is the position box, if we were to turn

:24:55    4    it and look at the back, I don't think there is a diagram,

:24:58    5    but, Your Honor, this would be the box in the back.

:25:01    6              So the part that is facing the bone is the box.

:25:04    7    And then we subdivide areas of the box.  I think the one

:25:08    8    that's germane to today is the enter condylar area of the

:25:14    9    box in here in here, which houses the cam.

:25:18   10    Q.    What was your view as it related to the positioning of

:25:20   11    the cam for purposes of increasing flexion?

:25:24   12    A.    My view is that I wanted to put the cam as posterior

:25:29   13    as possible.

:25:30   14    Q.    All right.  Let's take a -- we are still on Exhibit

:25:34   15    110.  If you could just zoom out.

:25:37   16              Dr. Insall writes, "I believe that taken with

:25:42   17    the NexGen cam and post interaction that this could be

:25:46   18    patentable as a full flexion knee for the Asian countries."

:25:53   19              First, why specifically were you looking at the

:25:57   20    concept of high flexion as it relates to the Asian

:26:00   21    countries?

:26:00   22    A.    Well, we were always looking at flexion for everybody.

:26:03   23    To give you an idea, the history, in the seventies, we were

:26:07   24    getting 90 degrees, and we were so happy, because our

:26:12   25    population really was primarily rheumatoid patients.  As we

Scott - direct

| | | |
|---|---|---|
| :26:16 | 1 | get into the eighties and we just got into arthritic |
| :26:23 | 2 | patients, we wanted more.  The idea, to cut to the chase, in |
| :26:29 | 3 | the early nineties was trying to get to probably 100 degrees |
| :26:33 | 4 | of flexion.  We always wanted to increase it.  The Asians |
| :26:37 | 5 | were probably picked out because they take their knee to 160 |
| :26:41 | 6 | degrees more than anybody.  160 is taking your heel and |
| :26:46 | 7 | touching your butt.  That is what squatting is.  You could |
| :26:49 | 8 | compete in the Olympics, with the exception of the high |
| :26:52 | 9 | hurdles, with probably only 120 degrees. |
| :26:55 | 10 | But it was our belief all through this period |
| :26:58 | 11 | that, look, we should have a design that allows people to |
| :27:01 | 12 | achieve whatever they can achieve.  So that's where we were |
| :27:05 | 13 | going. |
| :27:06 | 14 | MR. RABIN:  Your Honor, I am about to move on to |
| :27:08 | 15 | a new area. |
| :27:08 | 16 | THE COURT:  Let's break till 1:30. |
| :27:12 | 17 | (Luncheon Recess taken.) |
| :36:17 | 18 | THE COURT:  Please take your seats. |
| | 19 | BY MR. RABIN: |
| :36:36 | 20 | Q.    Good afternoon, Dr. Scott. |
| :36:37 | 21 | A.    Good afternoon. |
| :36:38 | 22 | Q.    Before we left for lunch, we were talking a little bit |
| :36:41 | 23 | about conversations you were having with Dr. Insall and Dr. |
| :36:46 | 24 | Scuderi relating to the positioning of the cam.  Can you |
| :36:49 | 25 | describe for us in a little more detail the conversations |

Scott - direct

:36:52    1    taking place in 1995 relating to the location of the box and

:36:59    2    the location of the cam?

:37:04    3    A.    Yes.   Basically, Dr. Insall wanted A high box and a

:37:12    4    low cam.   I wanted a low box and a high cam.

:37:18    5              If one looks at this, it gets a little bit

:37:23    6    tedious.   But this is, obviously, as you have heard, Judge,

:37:29    7    the posterior condyles with the cam here.

:37:32    8              So basically, what Dr. Insall wanted was, in

:37:42    9    simple terms, the cam would be here where my pen is, for

:37:45   10    lack of a better way of explaining it, halfway between the

:37:48   11    tip and what we call distal condyles.

:37:51   12              I wanted it where it is here.

:37:55   13    Q.    If we could put up Plaintiffs' Demonstrative No. 12.

:38:00   14              What is the picture depicted here on Plaintiffs'

:38:09   15    Demonstrative 12?

:38:10   16    A.    This is the Insall/Burstein prosthesis which I

:38:13   17    mentioned this morning.

:38:14   18              What you can see here, this is the box.   And

:38:23   19    this is the inner contour box.   So this is in the middle of

:38:29   20    the prosthesis.

:38:31   21              This is, obviously, a very high box.   The cam --

:38:36   22    unfortunately, the projection is not great -- is right there

:38:40   23    (indicating), whereas what I just showed the Court, the cam

:38:43   24    on the prosthesis I just showed you would be up here.

:38:46   25              So that is the difference.

Scott - direct

:38:48    1    Q.    And you mentioned your position was you wanted a low

:38:52    2    box, high cam.   What was Dr. Scuderi's position?

:38:56    3    A.    Dr. Scuderi agreed with me.

:38:59    4    Q.    Let's take a look at Defendants' Exhibit 110 again,

:39:02    5    which is the Dr. Insall fax.

:39:05    6                When Dr. Insall writes, "I believe that taken

:39:10    7    with the NexGen cam and post interaction that this could be

:39:15    8    patentable as a full flexion knee for the Asian countries.

:39:19    9    Let's look into it."

:39:21   10                Did this surprise you?

:39:22   11    A.    Yes, when I saw this fax, this did surprise me.

:39:25   12    Q.    And why is that?

:39:26   13    A.    Because the NexGen cam that Dr. Insall was referring

:39:30   14    to at that point is in the position of what I just showed

:39:33   15    you.   That is a high cam, rather than the lower cam he

:39:38   16    preferred.

:39:38   17    Q.    And for how long did you carry on the conversations

:39:41   18    with Dr. Insall about the location of the box and the cam?

:39:46   19    A.    Oh, we were talking about it, we started long before

:39:51   20    this, months, about where the cam should be, and then we

:39:54   21    continued this until about August of '95.

:39:57   22    Q.    And how was the debate about lowering the box or

:40:02   23    raising the box ultimately resolved?

:40:05   24    A.    In my favor.

:40:05   25    Q.    Let's take a look at Plaintiffs' Exhibit 70.   This is

Scott - direct

:40:16  1    a letter dated August 8, 1995.  It is from Audrey Beckman to

:40:20  2    John Insall.

:40:21  3              Are you familiar with the conversations that

:40:24  4    were taking place in August of 1995 regarding models and

:40:31  5    matching size articular surfaces and the things that are

:40:36  6    disclosed in this letter?

:40:37  7    A.    Absolutely.

:40:37  8    Q.    I want to take a look at the fourth paragraph.  In the

:40:41  9    fourth paragraph, on August 8, 1995, it says, "The box

:40:46  10   height on the new PS remains the same as that of the NexGen

:40:51  11   PS.  The new slot locations on the cutting guides produce

:40:54  12   cuts that allow the femoral component to fit tightly on the

:40:56  13   bone.  Raising the box at this point would require many

:40:59  14   layouts to analyze bone cut locations for each cutting guide

:41:04  15   on each side size of the femoral."

:41:07  16             From the conversations that you were having in

:41:09  17   August of 1995, why were discussions taking place regarding

:41:13  18   the height of the box at this point?

:41:17  19   A.    Dr. Insall was still very uncertain and still probably

:41:21  20   deep in his heart preferred to have the higher box and the

:41:25  21   lower cam.

:41:28  22   Q.    And approximately how many months after the May 1st,

:41:32  23   1995 drawing is this August '95 drawing?

:41:36  24   A.    About three months.

:41:37  25   Q.    What was occurring at ISK during that three-month time

:41:41    1    period?

:41:42    2    A.      The usual.  A lot of discussions about knee designs

:41:45    3    and the flex design in particular.

:41:47    4    Q.      Let's take a look at Plaintiffs' Exhibit No. 341.

:41:57    5    This is a fax that has a date on the top of August 8th,

:42:03    6    1995.  First, are you familiar with the sketch that is on

:42:09    7    this fax?

:42:10    8    A.      Yes, I am.

:42:11    9    Q.      And can you explain to us whose handwriting this

:42:15    10   sketch is?

:42:17    11   A.      The sketch is in Dr. Insall's writing.

:42:21    12   Q.      And what is depicted in this sketch?

:42:25    13   A.      Basically, this is sort of the side-view we are all

:42:29    14   used to looking at now of the prosthesis.  He has got the

:42:33    15   word "box" here, which we just talked about.  This word is

:42:37    16   "new," his penmanship is a little bit off.  And this is the

:42:42    17   cam.

:42:43    18   Q.      And what was Dr. Insall's thoughts, at least as of

:42:47    19   August 1995, as it related to the box and the cam?

:42:51    20              MR. HALES:  Objection as to foundation, Your

:42:53    21   Honor.

:42:53    22              THE COURT:  I agree.

:42:55    23   BY MR. RABIN:

:42:56    24   Q.      Were you involved in conversations in August of 1995

:42:59    25   with Dr. Insall regarding conversations of what to do with

:43:03    1    the box and the cam?

:43:06    2    A.    Can I answer?

:43:07    3              THE COURT:  Yes, you can answer that question.

:43:10    4              THE WITNESS:  I am sorry.  Yes, I was involved

:43:12    5    with discussions with Dr. Insall at that time.

:43:16    6    BY MR. RABIN:

:43:16    7    Q.    Based on those conversations that you had with Dr.

:43:19    8    Insall, what is your understanding of how the proposal or

:43:24    9    what the proposal was as to how to handle the box and the

:43:28    10   location of the cam in the implants that you were designing?

:43:31    11             THE COURT:  I will let him answer.

:43:33    12             THE WITNESS:  Basically, if I understood your

:43:42    13   question correctly, that I really wasn't wavering.  I didn't

:43:48    14   want the high box, even this new version of high box that

:43:53    15   Dr. Insall wanted.

:43:55    16   BY MR. RABIN:

:43:56    17   Q.    What is the new version of the high box?

:43:58    18   A.    The new version is this dotted line.  So rather than

:44:01    19   the box going just like that, it went in this direction.

:44:05    20   Q.    And what decision was made directionally to --

:44:13    21   ultimately, what direction was taken in terms of higher or

:44:16    22   lower, as it related to the box?

:44:20    23   A.    The box was lowered completely to the way I wanted and

:44:24    24   the cam was put in the position the way I wanted.

:44:26    25   Q.    On the right-hand side, there is handwriting.  Do you

:44:30    1    know whose handwriting that is?

:44:31    2    A.    Yes, I believe it's Audrey Beckman's.

:44:33    3    Q.    What does Audrey Beckman write in the upper left-hand

:44:38    4    right-hand corner?

:44:39    5    A.    She uses the term, "Let's drop it.  Thank Dr. Scott."

:44:43    6    Q.    Did you have conversations with Dr. Insall and Ms.

:44:46    7    Beckman in August of 1995 regarding dropping the box?

:44:52    8    A.    I had them with Dr. Insall for sure.  I don't remember

:44:55    9    and I don't think I had a conversation at this particular

:44:58    10    moment in August of '95 with Ms. Beckman.

:45:00    11    Q.    Did Ms. Beckman ever personally thank you for your

:45:04    12    idea of dropping the box?

:45:08    13    A.    To be honest, I don't really remember a personal

:45:10    14    conversation.

:45:11    15    Q.    What did the decision to drop it have on the location

:45:16    16    of the cam that you guys were designing?

:45:19    17    A.    It kept the cam in the posterior superior aspect of

:45:23    18    the component.  And at this point, remember, this is the

:45:32    19    posterior superior aspect of the LPS, because that's what we

:45:38    20    were designing at this stage.

:45:39    21    So it kept the cam there and it kept the box

:45:42    22    low.

:45:42    23    Q.    What was the ISK surgeons' view as to whether the

:45:51    24    implant you were designing could achieve high flexion if you

:45:56    25    had not dropped the box and raised the cam as suggested?

Scott - direct

:46:02 | 1

A.     I didn't think, and so did my partners, we didn't

:46:06 | 2

think that you could get the flexion if you raised the box.

:46:10 | 3

Q.     Let's go to Plaintiffs' Exhibit 71.  And Plaintiffs'

:46:23 | 4

Exhibit 71 is notes of a teleconference with Dr. Insall on

:46:27 | 5

August 9th, 1995.  In this time period, on August 9th, 1995

:46:33 | 6

were you continuing conversations with Dr. Insall before

:46:36 | 7

dropping the box?

:46:37 | 8

A.     Yes.  Basically, this was right up to the last minute,

:46:44 | 9

so to speak, as to John's last stand at trying to keep the

:46:49 | 10

box high.

:46:50 | 11

Q.     If you see at the bottom of this note, it says "Spine

:46:55 | 12

still sticks out at deep flexion angles."

:46:58 | 13

       How does the concept of dropping the box and

:47:02 | 14

raising the cam relate to the problems identified here with

:47:08 | 15

the spine still sticking out at deep flexion angles?

:47:12 | 16

A.     If it pleases the Court, I will just show you this,

:47:14 | 17

then I will talk about the busy diagram in a second.

:47:18 | 18

       Basically, if the box stayed up high, the post

:47:23 | 19

would get kicked out, so they wouldn't engage.

:47:29 | 20

       What you really want in any PS design, in this

:47:32 | 21

type of design, is you want that cam and post engaging the

:47:35 | 22

entire range of motion.

:47:36 | 23

       So because of the box the cam would push out the

:47:43 | 24

spine.

:47:44 | 25

       So there is no way, I didn't think, in my

Scott - direct

:47:47  1   experience, that you could ever achieve 160.  I wasn't sure

:47:52  2   you could achieve 140 if you did that.

:47:54  3           If we look at the diagram -- and I apologize,

:47:57  4   it's really busy, obviously -- but if you look here, this is

:48:06  5   the box -- I am sorry, this is the spine.  And the cam is

:48:13  6   pushed away, so they are separating where they shouldn't

:48:17  7   separate.  All these things you are seeing here are

:48:20  8   positions of the polyethylene bearing in various ranges of

:48:26  9   motion.

:48:26  10          Here is the box that Dr. Insall wanted on that

:48:31  11  drawing we just talked about, the dotted line, where he said

:48:35  12  "New."

:48:37  13          So you would have to do an additional bone cut,

:48:39  14  as you see here.  And this would push, it would separate the

:48:43  15  spine and cam, in simple terms.

:48:45  16  Q.    On the previous exhibit, we saw the notation, "Let's

:48:50  17  drop it, thank Dr. Scott."  What is written here on the

:48:55  18  bottom right before the diagram?

:48:56  19  A.    "Let's drop it."

:48:59  20  Q.    Let's, if we can, put up the '729 patent.  If we go to

:49:10  21  Claim 1 of the '729 patent, at the bottom, where it says,

:49:17  22  the first part talks about thickening the posterior

:49:21  23  condyles.  How does the decision to drop the box and lower

:49:25  24  the cam relate to creating the implant at the very bottom

:49:29  25  there, Line 63, that can accommodate flexion of the femoral

:49:34  1  component relative to the tibial component of at least 160

:49:37  2  degrees?

:49:37  3  A.    That's --

:49:38  4            THE COURT:  Doctor, there is an objection.

:49:40  5            MR. HALES:  Your Honor, I want to make an

:49:42  6  objection for the record that this is getting into expert

:49:44  7  testimony, I think.

:49:45  8            THE COURT:  Mr. Rabin.

:49:46  9            MR. RABIN:  I don't think it's expert testimony.

:49:49  10  He is explaining how his design contributions ultimately

:49:52  11  worked.

:49:52  12            THE COURT:  I disagree, counsel.  Overruled.

:49:56  13            THE WITNESS:  Basically, this is what we just

:49:58  14  described on that busy diagram, that by putting the cam

:50:05  15  where we wanted and dropping the box, we would be able to

:50:09  16  achieve 160 degrees.

:50:11  17  BY MR. RABIN:

:50:12  18  Q.    If we could turn to Claim 4 of this patent.  I

:50:20  19  specifically want to look to the center, around Line 21,

:50:26  20  where it says, "and the femoral component includes a cam

:50:29  21  between the superior posterior condyles."

:50:40  22            How does dropping the box and raising the cam

:50:44  23  relate to the femoral component including a cam between the

:50:47  24  superior posterior condyles?

:50:50  25  A.    That's what the position I wanted is, that the cam has

Scott - direct

:50:53   1   to be at the posterior superior condyles.  So it relates

:50:57   2   directly to it.

:50:58   3   Q.    The LPS prosthesis, can you tell us whether the LPS

:51:04   4   implant contains a superior posterior quadrant?

:51:09   5   A.    It doesn't.

:51:09   6   Q.    And how does that feature of the LPS compare to that

:51:15   7   feature of the LPS Flex that is covered by this patent?

:51:19   8   A.    The LPS Flex does contain a superior posterior

:51:24   9   condyle.

:51:25  10   Q.    Okay.  If we could look at Claim 6 -- actually, I

:51:38  11   apologize, we don't need to look at Claim 6 at this time.

:51:41  12          Were you the first person to come up with the

:51:43  13   idea of using a lower box and a higher cam when you increase

:51:46  14   the thickness of the posterior condyles to achieve high

:51:51  15   flexion?

:51:52  16   A.    I don't know that I was the first.  We talked about it

:51:55  17   in the group.  I wanted the cam in the position where I

:51:58  18   showed you.

:51:59  19   Q.    Well, let's reorient ourselves.

:52:04  20          Defendants' Exhibit 110.  Let's reorient

:52:16  21   ourselves chronologically.  We have this on May 1st, 1995.

:52:19  22   Correct?

:52:20  23   A.    Yes.

:52:20  24   Q.    Now if we can put up Plaintiffs' Exhibit No. 57?

:52:23  25          This is a document we saw earlier today.

:52:32    1    Are you listed -- can you identify the attendees

:52:36    2    at this meeting for me, please?

:52:38    3    A.    Yes, I can.   Jerry Aikins, Audrey Beckman, Ron

:52:43    4    Donkers, John Insall, Todd Johnson, and myself.

:52:47    5    Q.    And if we go to the third page of this document, you

:52:52    6    will see the portion we talked about earlier, which is Full

:52:54    7    Flexion Asian Knee.

:52:55    8         Were you surprised at all two weeks after Dr.

:53:05    9    Insall sent his fax to Audrey Beckman to be discussing a

:53:12    10   concept for the very first time of a full flexion Asian knee

:53:16    11   at this meeting?

:53:17    12   A.    No, not at all.

:53:18    13   Q.    Why was it not a surprise to you to be discussing a

:53:22    14   full flexion Asian knee as of May 15 of 1995?

:53:27    15   A.    Because it wasn't the first time.   We had been talking

:53:29    16   about it for months, how to do it.   This was even, on this

:53:32    17   agenda, as you can see, we were talking about a lot of

:53:35    18   different issues in knee replacement.   This was just

:53:43    19   confirmative for the engineers, telling them exactly what we

:53:45    20   wanted, if there was any misconception.

:53:47    21   Q.    And the first part says, "We reviewed the plots of

:53:51    22   Size B femoral component at 145 degrees of flexion."

:53:55    23        What is your understanding of what the "we"

:53:57    24   refers to here?

:53:58    25   A.    The people in the meeting.   Quite frankly, the

Scott - direct

:54:02   1   engineers, we usually gave them what we thought.  So I think

:54:05   2   "we" probably refers to everyone but certainly refers to

:54:09   3   John and me.

:54:09   4   Q.    What relationship did Dr. Scuderi have at this time

:54:13   5   with Dr. Insall relating to work on design implants?

:54:19   6   A.    Oh, he was very much involved with it.  I am sure, you

:54:24   7   know, he was very likely here at this meeting.

:54:26   8   Q.    Okay.  By May 15th of 1995, had anyone at ISK or at

:54:34   9   Zimmer designed an implant or an idea for an implant that

:54:38   10  was capable of achieving flex of up to 160 degrees?

:54:42   11  A.    No.

:54:42   12  Q.    And what goal was set at this meeting on May 15th of

:54:48   13  1995?

:54:49   14  A.    We wanted to see this design.  We wanted to hit 160

:54:53   15  degrees with a new design.

:54:54   16  Q.    One of the things that it says here is the plots

:55:02   17  indicated that more posterior bone needs to be resected, and

:55:06   18  an additional smaller posterior radius needs to be added to

:55:11   19  prevent excessive posterior contact in deep flexion.

:55:15   20        What does that mean?

:55:20   21  A.    The net result of that is that is your new posterior

:55:24   22  superior articulation.  The smaller additional posterior

:55:28   23  radius is rounding off the tips by increasing a radius on

:55:32   24  the posterior superior aspect of the condyle.

:55:38   25        The bone resection goes back to, I guess, in

Scott - direct

:55:44    1    simple terms, what you saw with Dr. Insall's May 1st

:55:48    2    drawing, which we have all seen.  The only question there,

:55:51    3    as you can see, we are talking about, we needed bone

:55:56    4    resection.  We were still arguing then about how much.

:55:59    5    Q.    Was the concept of taking an additional smaller

:56:02    6    posterior radius disclosed in Dr. Insall's May 1st, 1995

:56:08    7    drawing?

:56:09    8    A.    No.

:56:09    9    Q.    So if we could put Defendants' Exhibit 1 up again, the

:56:13    10   '729 patent.  In Claim 1, on Line, starting on Line 56, it

:56:32    11   says, "And a superior condyle extending superiorly from the

:56:36    12   distal condyle to form a superior articular surface, the

:56:40    13   distal condyles, the posterior condyles, and the superior

:56:44    14   condyles defining a smooth articular surface sentencing

:56:47    15   around the exterior of the implant for articulation with the

:56:51    16   tibial articular surface."

:56:53    17         How does what is discussed here at the meeting

:56:56    18   you attended on May 15th of 1995 regarding taking an

:57:00    19   additional smaller posterior radius relate to the

:57:04    20   highlighted section there of Claim 1?

:57:07    21   A.    It's exactly what it is.  Basically, the distal part

:57:11    22   of the condyle, remember, if you are standing up straight,

:57:14    23   so this is distal, this would be towards the foot, this is

:57:18    24   towards the hip (indicating), so when we talk about

:57:21    25   posterior, it goes from the distal surface all the way out

Scott - direct

:57:26    1    here to the posterior.

:57:27    2            The LPS probably ended right about there.  And

:57:32    3    it was a sharp edge.  I will come back to that in a second,

:57:37    4    actually.

:57:38    5            The increased radius, we just put an R down

:57:42    6    here, you just round it off and make it thicker.  That is a

:57:49    7    combination of both thickening and rounding it off.  The

:57:53    8    radius is just thickening.  The reason we really knew we had

:57:56    9    to have it, we needed the thickening to help us get more

:57:59   10    flexion.  And it also stopped what was a concern for us,

:58:03   11    that in the LPS -- and I don't have one here -- the edge was

:58:07   12    very sharp.  So as you bent, the edge would dig into the

:58:12   13    polyethylene.  And I think Dr. Rohr or someone talked

:58:15   14    yesterday, maybe it was Gil, about osteolysis and so forth.

:58:20   15    That's why we didn't do it.

:58:21   16            THE COURT:  Doctor, you just motioned and you

:58:24   17    said a distance from there.  Could you describe more fully

:58:27   18    for the record what you have in your hand and about how many

:58:30   19    millimeters you were indicating.

:58:32   20            THE WITNESS:  Sure.  So this is Exhibit DTX-469.

:58:42   21    If I look at it from a side-view, that basically, this

:58:50   22    presupposes that the knee is bent 90 degrees, looking at it

:58:53   23    like this.

:58:54   24            So this is the distal part.  This would be the

:58:56   25    part facing your skin.  This is the part facing the back of

:59:00  1    your knee.

:59:01  2              And basically, what we did is we thickened

:59:07  3    the -- actually, the drawing you have seen, imagine, the

:59:12  4    drawing you have seen with Dr. Insall's dotted line, would

:59:15  5    be like this, it can go all the way out here, but the

:59:19  6    thickening would be here, it would just be lower.  I just

:59:22  7    did that graphically.

:59:24  8              So the thickening would be at this level, which

:59:26  9    eventually in this it turned out to be two millimeters.  It

:59:29  10   wasn't five to six.

:59:30  11             But that was his drawing.  He said five to six.

:59:33  12             And basically, it came out.  So right around

:59:37  13   here, by increasing this thickness, we didn't want the sharp

:59:41  14   edge, so we increased the radius here.  And by increasing

:59:46  15   the radius, we didn't have the sharp edge, and it also gave

:59:49  16   us the articulation, which allowed --

:59:53  17             THE COURT:  So you extended the length of the

:59:57  18   condyle and you thickened it.

:59:58  19             THE WITNESS:  Correct.  And we are talking

:00:00  20   millimeters here.  It was thickened two millimeters.  It's

:00:04  21   small.

:00:05  22   BY MR. RABIN:

:00:06  23   Q.   Had you not extended the radius to create a smooth

:00:14  24   articular surface extending around the exterior of the

:00:19  25   implant as discussed in that May 15, 1995 meeting, what is

Scott - direct

:00:24    1    your opinion as to whether the implant would have been able

:00:27    2    to achieve flexion of up to about 160 degrees?

:00:30    3    A.    It wouldn't have, because if we just did that

:00:32    4    hypothetical, basically, that is what we were doing in the

:00:35    5    eighties, that was just thickening the condyles for bone

:00:38    6    loss.

:00:38    7    Q.    Okay.  Can we put up Defendants' Exhibit No. 5, which

:00:41    8    is the '786 patent.  If we can go to the claims of that

:00:49    9    patent.

:00:49    10         When you, Dr. Insall, Dr. Rohr and Dr. Scuderi,

:00:55    11   you were talking about high flexion, were you talking about

:00:58    12   it in terms of a one-piece design or a modular design?

:01:03    13   A.    Both.  Basically, there were two ideas we were

:01:09    14   bouncing back and forth.  One is that if we did it with a

:01:14    15   modular design, we could allow the surgeon to

:01:17    16   intraoperatively make a decision whether to use a High-Flex

:01:21    17   prosthesis or not by just taking this module and screwing it

:01:25    18   or cementing it onto the posterior condyles.

:01:29    19         That was one approach.

:01:33    20         I think pretty much all of us agreed pretty

:01:36    21   quickly that that was probably not the best approach, that

:01:39    22   it would be a lot better if we could make it all a one-piece

:01:45    23   surface.

:01:46    24         This module talks about the two-piece approach.

:01:49    25   And the module was basically designed in the exact same

Scott - direct

:01:56    1    fashion that I just described, using this model, DTX-469.

:02:01    2           So if one could imagine, we just -- this was

:02:06    3    split into two pieces.  And --

:02:09    4           THE COURT:  This being?

:02:10    5           THE WITNESS:  The posterior condyle was

:02:12    6    basically thinner than it is here.  And we fashioned a

:02:19    7    module or an augment into -- to sit into this box here, and

:02:25    8    then round off the condyles.

:02:27    9           That's what this patent refers to.

:02:31   10    BY MR. RABIN:

:02:32   11    Q.    When it says on Line 11 the top surface blending

:02:37   12    functionally with the articular surface to allow

:02:39   13    articulation of the femoral implant on the tibial surface

:02:43   14    such that the implant can achieve about 165 degrees of

:02:48   15    flexion, how does what is written there relate to what was

:02:51   16    discussed on that May 15, 1995 meeting where you and your

:02:54   17    colleagues developed the idea of taking an additional

:02:58   18    radius?

:02:58   19    A.    It's exactly the same thing, just using two pieces

:03:01   20    rather than one.

:03:02   21    Q.    If we could go to Plaintiffs' Exhibit No. 60.

:03:14   22           First, if you could blow up the top, who are the

:03:18   23    attendees at the meeting on June 19th, 1995?

:03:25   24    A.    According to this, Audrey Beckman, Dr. Insall, and

:03:29   25    Mark Lazzeri.

Scott - direct

| | | |
|---|---|---|
| :03:34 | 1 | Q. Your name is, once again, not included.  Correct? |
| :03:37 | 2 | A. That's correct. |
| :03:37 | 3 | Q. Were you at this meeting? |
| :03:39 | 4 | A. Yes I was. |
| :03:39 | 5 | Q. How do you know you were at this meeting? |
| :03:41 | 6 | A. Because there are other notes that show I was at this |
| :03:45 | 7 | meeting. |
| :03:45 | 8 | Q. Okay.  Let's take a look at Plaintiffs' Exhibit No. |
| :03:50 | 9 | 62. |
| :03:54 | 10 | Can you describe what this document is? |
| :03:58 | 11 | A. Yes.  That's a document from Mark Lazzeri to Ron |
| :04:03 | 12 | Donkers dated June 22nd, '95.  It talks about a May 19, '95 |
| :04:13 | 13 | development meeting with Dr. Insall and his group. |
| :04:16 | 14 | I might point out that, since I have obviously |
| :04:21 | 15 | seen this, that May 19th is a typo.  That really should be |
| :04:28 | 16 | the June 19th meeting in the previous exhibit. |
| :04:31 | 17 | Q. Can we put Plaintiffs' Exhibit 62 and 60 side by side? |
| :04:36 | 18 | Okay.  First, on Plaintiffs' Exhibit 62, on the |
| :04:56 | 19 | left-hand side, can you read just for us, so there is no |
| :05:00 | 20 | confusion, those doctors who are discussed in the first |
| :05:05 | 21 | sentence of this document? |
| :05:10 | 22 | A. Drs. Insall, Kelly, Scuderi and Scott. |
| :05:13 | 23 | Q. And then, to confirm that this truly is a |
| :05:18 | 24 | representation of the June 19, 1995 meeting, can you take |
| :05:23 | 25 | and compare what's discussed in No. 1 of Plaintiffs' Exhibit |

Scott - direct

| | | |
|---|---|---|
| :05:27 | 1 | 62 and what is discussed under the first highlight of |
| :05:31 | 2 | Plaintiffs' Exhibit 60? |
| :05:38 | 3 | A.    Yes.  You can see here, we are talking about the |
| :05:41 | 4 | shapes of the femur, whether we should make it symmetrical |
| :05:45 | 5 | or asymmetrical.  Quite frankly, I think we are talking |
| :05:49 | 6 | about right and/or left. |
| :05:51 | 7 | Q.    And then, just for confirmation, can we turn to |
| :05:58 | 8 | Plaintiffs' Exhibit No. 58.  And if we go to ZIM31871. |
| :06:12 | 9 | Do you see where it says week of June 19th? |
| :06:22 | 10 | A.    I do. |
| :06:23 | 11 | Q.    And what does it say under -- first, whose handwriting |
| :06:28 | 12 | is this? |
| :06:28 | 13 | A.    This is Audrey Beckman's. |
| :06:31 | 14 | Q.    What does it say under "Week of June 19th"? |
| :06:34 | 15 | A.    This says, "Mark Lazzeri and I in New York, 6/19." |
| :06:41 | 16 | Q.    What does it say under that? |
| :06:42 | 17 | A.    "Three cases where prototypes used; Scuderi and Scott |
| :06:46 | 18 | scrubbed to see fits, et cetera.  Scott especially for |
| :06:51 | 19 | this." |
| :06:51 | 20 | Q.    Is the Scott here you? |
| :06:53 | 21 | A.    Yes. |
| :06:53 | 22 | Q.    And this is also on that June 19th meeting.  Correct? |
| :06:57 | 23 | A.    Yes.  This is Audrey's notes, and the first one that |
| :07:02 | 24 | omitted me was Audrey's notes. |
| :07:08 | 25 | Q.    If we could put back Plaintiffs' Exhibit No. 62 -- I |

Scott - direct

| :07:18 | 1 | am sorry, Plaintiffs' Exhibit No. 60, and go to the second |
| :07:34 | 2 | page, where it talks about the high flexion knee.  How does |
| :07:41 | 3 | what is being discussed at this meeting, which your name is |
| :07:45 | 4 | not on the attendee list, but you were involved, especially |
| :07:49 | 5 | for this, according to the other document, relate to what is |
| :07:53 | 6 | being discussed with the modules? |
| :07:56 | 7 | A.    This describes what I previously described about the |
| :07:59 | 8 | modular attachments to the posterior condyles, to add the |
| :08:03 | 9 | thickness.  And I think everyone else can read the rest of |
| :08:08 | 10 | it.  It's attributed to Dr. Insall. |
| :08:10 | 11 | Q.    Were you involved in the discussions -- how were you |
| :08:14 | 12 | involved in the discussions regarding the module? |
| :08:16 | 13 | A.    We all were involved in the discussions of the module. |
| :08:22 | 14 | We had come to this conclusion. |
| :08:24 | 15 | Q.    If we go to Defendants' Exhibit 5 again, which is the |
| :08:28 | 16 | '786 patent, and relate what we just discussed here to Claim |
| :08:35 | 17 | 2? |
| :08:41 | 18 | How is the module that was discussed related to |
| :08:49 | 19 | the claim that you see here? |
| :08:53 | 20 | A.    That is the description of the module. |
| :08:56 | 21 | Q.    Now, after you and your colleagues designed the LPS, |
| :09:06 | 22 | what work did you do in trying to come up with a new implant |
| :09:12 | 23 | that ultimately became the LPS Flex? |
| :09:16 | 24 | A.    To put it in time perspective, remember, we have been |
| :09:19 | 25 | talking here about the Flex, most of these meetings we just |

Scott - direct

| | | |
|---|---|---|
| :09:24 | 1 | talked about were May-ish and before, and then up to August. |
| :09:28 | 2 | So simultaneously, we were developing the LPS. |
| :09:34 | 3 | So the LPS started in March of '95, and as I think we said, |
| :09:40 | 4 | we finished somewhere in August of '95.  So the LPS was |
| :09:44 | 5 | finished. |
| :09:45 | 6 | It was in production or it took a year to |
| :09:48 | 7 | actually get it out in manufacturing. |
| :09:49 | 8 | So at this point, Zimmer said, they came back |
| :09:54 | 9 | and said, let's go revisit Flex, High-Flex prosthesis at |
| :10:00 | 10 | that point. |
| :10:00 | 11 | Q.    Okay.  I want to fast-forward, then, to the mid-1996 |
| :10:06 | 12 | time frame? |
| :10:07 | 13 | Were conversations continuing relating to |
| :10:11 | 14 | High-Flex in the mid-'96 time frame? |
| :10:14 | 15 | A.    Yes. |
| :10:14 | 16 | Q.    Let's put up Plaintiffs' Exhibit No. 92.  This appears |
| :10:23 | 17 | to be a fax to you from Jonathan Blamey.  Who is Jonathan |
| :10:29 | 18 | Blamey? |
| :10:30 | 19 | A.    Jonathan Blamey is an engineer who worked for Zimmer |
| :10:34 | 20 | over in Swindon.  So he was the engineer, I think the |
| :10:40 | 21 | primary engineer on a project called MBK, which was the |
| :10:45 | 22 | mobile-bearing knee. |
| :10:46 | 23 | Q.    Where is Swindon? |
| :10:51 | 24 | A.    I am sorry.  In England, or Sweden -- I am not sure, |
| :10:55 | 25 | not Sweden, Scotland.  Sorry. |

Scott - direct

:10:57  1    Q.      When did you first start working on the MBK?

:11:00  2    A.      I started working on the MBK design, a mobile-bearing

:11:04  3    design, in 1995, before my contract actually took place.

:11:08  4    Q.      And why were you working with someone, a Zimmer

:11:11  5    employee in England rather than working on the MBK in the

:11:15  6    United States?

:11:16  7    A.      Mainly because the MBK was not allowed in the United

:11:19  8    States with the exception of one company's prosthesis.  So

:11:24  9    basically, it just hadn't been down-classified to be used.

:11:28  10   So we were doing all our work over there, in Europe.

:11:32  11   Q.      And can you explain the circumstances that led to this

:11:35  12   fax being sent to you from Zimmer employee Jonathan Blamey?

:11:41  13   A.      Yes.  MBK was a cruciate retaining design.  So it was

:11:48  14   a cruciate retaining mobile knee that we were doing over

:11:51  15   there.  Basically, we were over there, we had to operate in

:11:57  16   Europe to actually see how it worked and use prototypes over

:12:01  17   in Europe, because the OR is the best for seeing how things

:12:05  18   do.

:12:05  19           So we went over at this time to Florence, and we

:12:10  20   did about six operations with Dr. Aglietti, who is also on

:12:15  21   the MBK team.  And then, after that, we were going up to

:12:25  22   Rome to have a big NexGen meeting for the release of the

:12:29  23   NexGen system into Europe.

:12:31  24           So we took one of those little mini-buses.  And

:12:35  25   we rode up to Rome.

:12:40    1          Jonathan and I had a conversation that I thought

:12:45    2    that we should change directions or at least maybe go both

:12:48    3    ways, so to speak, in having a CR and a PS type of

:12:55    4    mobile-bearing knee.  And that's the context of this

:13:00    5    discussion.

:13:00    6    Q.    Was Dr. Scuderi on this trip with you in Italy?

:13:05    7    A.    Yes.

:13:05    8    Q.    Let's take a look at the second page, which are -- or

:13:11    9    the third page, I apologize, which are some sketches that --

:13:15   10    what is your understanding of why Jonathan Blamey sent you

:13:20   11    these sketches?

:13:21   12    A.    Because this is what --

:13:24   13          THE COURT:  Objection?

:13:25   14          MR. HALES:  Foundation.

:13:27   15          MR. RABIN:  I apologize.

:13:29   16   BY MR. RABIN:

:13:29   17    Q.    Do you recognize these sketches?

:13:31   18    A.    Yes, I do.

:13:32   19    Q.    What is your understanding of what these sketches

:13:35   20    represent?

:13:35   21    A.    They are a characterization of our conversation with

:13:38   22    Jonathan Blamey, Dr. Insall, Dr. Scuderi, and my

:13:41   23    conversations.

:13:43   24    Q.    And if we go, just to establish the foundation, to the

:13:48   25    first page of 92, what does Jonathan Blamey write to you in

Scott - direct

:13:54    1    the cover letter of this fax?

:13:58    2    A.    "Dr. Scott.   Following our conversations in the bus on

:14:02    3    the journey from Florence to Rome, I have enclosed a brief

:14:06    4    description of the design and sketches.   Please will you let

:14:10    5    me know if these are correct as you see it."

:14:13    6    Q.    Now, if we go to the sketches what was unique about

:14:18    7    what you disclosed to Jonathan Blamey on the bus trip and

:14:22    8    what he has drawn for you here?

:14:24    9    A.    Two things.   The concept of having a posterior

:14:28    10    stabilized mobile-bearing knee versus a CR, and then versus

:14:36    11    something which I don't think the Court has heard about,

:14:38    12    it's called a rotating platform.   And I don't think we have

:14:43    13    to go too far into it.

:14:45    14    A rotating platform would be as if you had a

:14:50    15    base grade like this, and you had polyethylene, but you had

:14:54    16    a big ice cream cone hole right in this base plate.   And

:14:58    17    this polyethylene adds sort of a reverse ice scream cone,

:15:03    18    and you just stuck it in there.

:15:06    19    That was called a rotating platform.

:15:08    20    So the one thing that this did, this was

:15:15    21    describing that, in addition to a CR and a rotating platform

:15:21    22    type of mold bearing knee, that I should thought we should

:15:26    23    have a posterior stabilized version of a total knee.

:15:34    24    Q.    What discussions did you have with Mr. Blamey that he

:15:39    25    is sending you a fax about as it related to the cam and

Scott - direct

:15:46    1    these sketches?

:15:48    2    A.    I am describing to him the position and the shape of

:15:52    3    the cam, as contrasted to what he determined, I think he

:15:58    4    wrote on the first page, the NexGen PS cam.

:16:02    5    Q.    And as far as the shape of the NexGen cam, what was

:16:06    6    your view in 1996 as illustrated here?

:16:09    7    A.    The NexGen cam, in 1996, was a cylinder.  That was its

:16:17    8    dimension.

:16:17    9          What I am describing here is to take it from a

:16:21    10    cylinder and make it elliptical, oblong, et cetera.

:16:25    11    Q.    In addition to the oblong cam, what change in the

:16:33    12    positioning of the cam as it relates to the patella did you

:16:39    13    discuss with Jonathan Blamey and appearing here on the

:16:42    14    sketch?

:16:43    15    A.    Yes.  I wanted the cam closer to the patella flange,

:16:49    16    which is here, to remind everyone.  Remember, this is the

:16:52    17    box.  So this is the flange.  So I wanted the cam

:16:56    18    theoretically to be closer in position to the box -- to the

:17:02    19    posterior aspect -- or the anterior aspect of the box.

:17:06    20    Q.    Let's take a look at Claim 6 of the '729 patent, which

:17:10    21    is Defendants' Exhibit 1.

:17:11    22          If we look at Line 38, where it says, "The

:17:25    23    femoral component includes a cam between the superior

:17:28    24    posterior condyles" -- we already talked about that.

:17:34    25          What I want to focus on is "The cam has that

:17:36    1   non-cylindrical articular surface."

:17:39    2          How does that relate to what you discussed and

:17:41    3   disclosed to Jonathan Blamey in 1996?  That is what I was

:17:45    4   proposing to him.

:17:45    5   Q.    Can you tell whether or not that is depicted in the

:17:51    6   fax that Jonathan Blamey sent to you?

:17:53    7   A.    Yes.

:17:53    8   Q.    How does what you showed here in the sketch relate to

:18:05    9   the second sentence, or the second fragment of Claim 6, if

:18:11   10   we could just go back to Claim 6, where it says "with a

:18:14   11   first spine contacting portion and a second spine contacting

:18:19   12   portion located further posteriorly than the first spine

:18:23   13   contacting portion?

:18:25   14   A.    Basically by, increasing or changing the shape of the

:18:28   15   cam from a cylinder to an elliptical type of surface, by

:18:32   16   increasing its radius, that was allowing us to have the cam

:18:38   17   have more surface area.  So you had a more distinct anterior

:18:43   18   surface and posterior surface.

:18:45   19         So your contact could remain lower and lower as

:18:49   20   you flexed.

:18:50   21   Q.    What difference does it make in terms of what you were

:18:55   22   discussing with Jonathan Blamey that the device you were

:19:01   23   talking to Jonathan Blamey about is the mobile-bearing knee,

:19:05   24   whereas the device that we are talking about in these

:19:10   25   patents is the LPS Flex knee?

Scott - direct

:19:13     1   A.    Because this is what the LPS -- this is what really

:19:16     2   became the LPS Flex, the position.  We are talking here

:19:20     3   about changing the shape of the cam and its position that it

:19:26     4   had to be.

:19:27     5           If we were going to, which we did, develop a

:19:31     6   posterior stabilized flex prosthesis, then we would have had

:19:36     7   to change the MBK condyles anyhow and its exterior surface

:19:44     8   because it was designed for a CR situation.

:19:47     9   Q.    If we can put up Defendants' Exhibit No. 3, which is

:19:53    10   the '283 patent.  Can you just go to some of the figures.

:20:01    11   That's fine.

:20:01    12           What is your understanding of what implant

:20:06    13   that's marketed by Zimmer is depicted in these figures here?

:20:10    14   A.    This is the tibial implant for the Flex mobile

:20:17    15   prosthesis.

:20:18    16   Q.    Is that the same thing as the LPS Flex mobile?

:20:20    17   A.    Yes, I am sorry.

:20:21    18   Q.    When did you start working on -- during what time

:20:29    19   period when you were at Zimmer were you working on these

:20:32    20   mobile-bearing knees?

:20:35    21   A.    From '95, I think is when I actually started on it.

:20:38    22   Q.    And how did that work in terms of the relationship

:20:42    23   between your work on mobile-bearing knees, LCCK, LPS, PS,

:20:47    24   and all the other implants you were working on?

:20:49    25   A.    It was a lot of fun.  We were going back and forth.

Scott - direct

:20:52   1   It was the nineties.  We really weren't sure

:20:55   2   about everything.  So the fixed-bearing, would that be

:20:59   3   better mobile-bearing?  Which would get better motion?

:21:01   4   Which would give us better stability?

:21:04   5   So we were constantly engaging in these

:21:06   6   discussions across the pond, so to speak.

:21:08   7   Q.     And what interactions were there among team members on

:21:12   8   the mobile-bearing knee team and the NexGen teams?

:21:16   9   A.     The mobile-bearing knee had a combination of Europeans

:21:20   10   and Americans, and the Flex team was really just the ISK.

:21:27   11   Q.     If we could go to Plaintiffs' Exhibit No. 177.  And

:21:34   12   turn to the Bates number that is ZIM19548.  Can you describe

:21:46   13   for us what your particular relationship was at Zimmer as it

:21:50   14   related to the two teams that were operating within the

:21:53   15   Zimmer system?

:21:54   16   A.     Basically, I was one of the five people on both teams.

:21:58   17   Q.     So the Scott there, does that refer to you?

:22:01   18   A.     Yes, it does.

:22:02   19   Q.     While we are on it, Dr. Scuderi appears in an adjacent

:22:08   20   circle with a footnote.

:22:10   21   What does it say relating to Dr. Scuderi's role

:22:13   22   in the system overlap?

:22:15   23   A.     Basically, it says, "Developer for NexGen LPS high

:22:22   24   flexion femur (fixed and mobile) and MBK line extensions

:22:27   25   only."

Scott - direct

| | | |
|---|---|---|
| :22:28 | 1 | Q.    What is the relationship between the LPS high flexion |
| :22:31 | 2 | femur fixed and mobile to the patents that we have been |
| :22:33 | 3 | discussing in this case? |
| :22:35 | 4 | A.    Those are the patents. |
| :22:35 | 5 | Q.    Did you actually help design both the MBK and the |
| :22:47 | 6 | NexGen implants? |
| :22:48 | 7 | A.    Absolutely. |
| :22:49 | 8 | Q.    If we could turn to PTX-90.  What is the date of this |
| :23:02 | 9 | document? |
| :23:04 | 10 | A.    June 12th, 1996. |
| :23:07 | 11 | Q.    And what is this document? |
| :23:09 | 12 | A.    This is some notes that someone kept, I am not sure |
| :23:16 | 13 | who, of our surgery that we did in Florence on June 12th, |
| :23:21 | 14 | 1996. |
| :23:25 | 15 | Q.    How are you listed on this document? |
| :23:27 | 16 | A.    I am one of the three operating surgeons. |
| :23:29 | 17 | Q.    And what types of operations were you doing in 1996? |
| :23:35 | 18 | A.    That was kind of exciting.  To operate in Italy, we |
| :23:40 | 19 | had six patients in one room.  I don't think they ever |
| :23:45 | 20 | worked past 2:00.  We went all day, well into the night. |
| :23:49 | 21 | Q.    If I could direct your attention to No. 13.  It says, |
| :23:55 | 22 | "A number of the releases made a huge difference to the |
| :24:00 | 23 | rotation available with the meniscus and a substantial |
| :24:03 | 24 | change to the liftoff which was occurring with the femur |
| :24:06 | 25 | previously." |

Scott - direct

:24:07  1      What was going on during the discussions that

:24:10  2  you were having over in Europe as related to surgeries on

:24:13  3  the MBK?

:24:15  4  A.    If I can indulge Your Honor for a second, it's sort of

:24:18  5  crazy.  This is the way we thought back then.

:24:21  6      First of all, the word releases refers to -- we

:24:26  7  were doing rather deformed knees.  These are really crooked

:24:30  8  in both directions.  In addition to bone resection for that,

:24:34  9  you have to release the ligaments from the sides and do all

:24:39  10  sorts of things that are not germane to here.  So that is

:24:42  11  what the word releases means.

:24:45  12      What was striking about this is we had a belief

:24:48  13  at that time that rotation in the knee, as you went from

:24:51  14  extension to flexion, rotation never took place until you

:24:55  15  hit about 80 degrees, 80, a hundred degrees, at which point

:24:59  16  the knee rotated.  So as we heard yesterday, it is not a

:25:03  17  hinge.  There is a lot of rotation there.

:25:06  18      So when he we put -- this was the MBK -- I think

:25:10  19  this was the MBK III, we did a lot of versions.  We put it

:25:17  20  in, and with these releases we watched the rotating platform

:25:21  21  go every direction it wanted.  It was random.  It was

:25:25  22  totally random.  It didn't fit what I just explained to you.

:25:29  23  So we thought, well, flex it up, it's going to internally

:25:33  24  rotate.  They were going in every direction, and it was a

:25:38  25  surprise to all of us.

:25:39    1    That was a tremendous learning point that helped

:25:42    2    us in developing mobile-bearing knees a tremendous way.

:25:45    3    Q.    If we turn to No. 11, it says, "The tibial tray was

:25:51    4    placed in too much external rotation, thus the plastic looks

:25:53    5    as if it is hanging over the edge of the tray in too much

:25:58    6    internal rotation."

:25:59    7    What conclusions did you and your colleagues who

:26:03    8    were operating in June of 1996 reach relating to whether the

:26:11    9    tibial for the poly should come off of the tibial tray in

:26:14   10    rotation?

:26:15   11    A.    Well, it's pretty logical.  That's bad.  You don't

:26:18   12    want that to happen.  If the poly is overhanging the tray,

:26:22   13    which would mean it would be like that (indicating), it is

:26:25   14    totally unsupported.  It would be a disaster.  That

:26:28   15    basically would crack, break, and you would have all sorts

:26:33   16    of catastrophes.  So what we learned from that and what we

:26:36   17    see in that motion is whatever poly, whether it be an MBK or

:26:40   18    PS design, we had to have the coverage with the polyethylene

:26:46   19    for the overwhelming majority, 95 percent of the surface

:26:50   20    area, if not more, was always covered by the plate.

:26:52   21    Q.    Okay.  If we can put up DTX-3 again, which is the '283

:26:58   22    patent.  And look at Claim 1?

:27:02   23    If we go to around Lines 13, where it talks

:27:31   24    about said bearing having a backing surface engaging said

:27:34   25    tibial plateau which is sized and shaped such that said

Scott - direct

:27:37   1   backing surface is substantially and entirely supported by

:27:40   2   said tibial plateau at any position during said rotational

:27:44   3   movement between said first rotational limit and said second

:27:48   4   rotational limit.

:27:49   5          What did you learn and discuss and decide upon

:27:52   6   in June of 1996 with your colleagues from your MBK surgeries

:27:56   7   as it relates to the backing surface engaging the tibial

:28:00   8   plateau?

:28:01   9   A.     That just says it -- well, probably says it a little

:28:04   10   bit better than what I just pointed out.  It says, that is

:28:08   11   what we found out, that surgery.  You have to be supported.

:28:13   12   Q.     How was the MBK product that was released in Europe

:28:17   13   different from the MBK product that we are talking about

:28:21   14   here, the LPS Flex mobile, how did they differ?

:28:24   15   A.     Good point.

:28:24   16          Another issue we had at that time, we really

:28:27   17   weren't sure how the knee, when it was used in rotation, we

:28:36   18   thought it actually, at about 70 to a hundred degrees, it

:28:41   19   actually moved front to back.  So DTX-468 and DTX-472, the

:28:49   20   polyethylene -- so this is looking at the knee sideways, we

:28:53   21   thought what would happen is it would move back a little,

:28:56   22   maybe about three or four millimeters, and, boom, it would

:28:59   23   rotate then.

:29:00   24          We called that slide and glide.

:29:03   25          That is in contrast to looking at Exhibit No.

Scott - direct

:29:10   1   **477 -- I am sorry, DTX-477 and 476, doing that in contrast,**

:29:17   2   **this is a mobile-bearing with a different mechanism, this**

:29:21   3   **just allows rotation.**

:29:23   4   **So this doesn't have any front-to-back which we**

:29:26   5   **called slide and glide.  I don't know why that was slide and**

:29:30   6   **glide.**

:29:31   7   **Q.    How did getting rid of the slide for the LPS mobile**

:29:36   8   **affect the design of the implant?**

:29:42   9   **A.    It helped it a lot, because, see, if we were going to**

:29:46  10   **get rid of the anterior to posterior, then we could use the**

:29:51  11   **cam-spine mechanism of the PS we have been talking about to**

:29:55  12   **guide the rotation.  So the cam-spine, basically, would sit**

:30:03  13   **here, and that could -- unfortunately, the sides don't**

:30:07  14   **fit -- that could push the motion back and forth as the cam**

:30:10  15   **would engage.  Whereas in the CR, you needed the posterior**

:30:14  16   **cruciate ligament if you were going to do that.**

:30:16  17   **So the posterior cruciate ligament and the**

:30:20  18   **cam-spine are sort of synonymous in what they do.**

:30:24  19   **Q.    How did the decision with you and your colleagues to**

:30:28  20   **get rid of the glide result in what the patent refers to as**

:30:33  21   **the post and the notch?**

:30:39  22   **A.    Basically, if we were going to get rid of the glide,**

:30:43  23   **did we need stops?  And if we look at this area here,**

:30:50  24   **because I don't have an MBK, we would call little nubbings**

:30:55  25   **here, in various ways, stops.  Then in the MBK we had**

Scott - direct

:31:00    1    various iterations, at least two, if not three.

:31:03    2            So if you moved it back and forth, it would hit

:31:05    3    the stop.  Well, if we are not going to have it going front

:31:08    4    to back, then we don't need the stops in the back and the

:31:11    5    side, but we do need a restriction of how much rotation you

:31:16    6    could have.

:31:17    7            So, in other words, if we just allowed too much,

:31:21    8    theoretically, the bearing surface could go off the back, or

:31:27    9    just be ridiculous, which you didn't want.

:31:31   10            So you needed a restraint between the stop we

:31:36   11    finally settled on and the polyethylene.

:31:40   12    Q.    I want to put up Plaintiffs' Exhibit No. 94.  This is

:31:48   13    another fax from Jonathan Blamey to you, I want to draw your

:31:54   14    attention to the second paragraph, where Mr. Blamey writes,

:31:57   15    "In order to generate a rotational moment it may be

:32:00   16    necessary to provide some form of mechanism at the

:32:04   17    plastic/tray junction which may be undesirable as it may

:32:07   18    reduce the freedom of motion which the plastic is allowed."

:32:10   19            What involvement did you have with Mr. Blamey

:32:14   20    and your colleagues as it related to the notch and post

:32:18   21    development that is seen in the LPS/mobile patent?

:32:24   22    A.    Basically, it was sort of a jump over from the MBK

:32:27   23    because we had this concept as a result of this in the MBK.

:32:33   24    So the MBK on the anterior part of the surface has this

:32:39   25    notch.  And basically, it's a little hole here.  But it's an

Scott - direct

:32:43  1   articulation.  The MBK was a little bit wider, but the same

:32:48  2   concept.  And the stop would be that it would hit -- it's

:32:59  3   the wrong one.  But if this were to sit down here

:33:02  4   correctly -- there it goes -- you will see that the stop on

:33:07  5   DTX-477 and the bearing surface of DTX-476, that all of a

:33:14  6   sudden, the groove of the polyethylene hits this and it

:33:19  7   stops the rotation at this point.

:33:22  8          I can't in this case internally or externally

:33:25  9   rotate it anymore.  I come around this way, the same thing.

:33:28  10         We designed that so that would be about 50

:33:33  11  degrees, 25 degrees in both ways.

:33:36  12         So it could go 25 degrees this way, 25 degrees

:33:41  13  that way, which much rotation than the normal human has,

:33:45  14  anyhow.

:33:46  15  Q.    Let's put up Plaintiffs' Exhibit No. 164.  These

:33:53  16  appear to be handwritten notes from March 19th of 1998.

:33:58  17  Before the idea among you and your colleagues for the post

:34:01  18  and the notch was finalized, how were you involved in the

:34:05  19  testing process to determine if it actually worked?

:34:10  20  A.    I was intimately involved, because we did this with

:34:13  21  the MBK.  Actually, in December of '96, Dr. Insall and I

:34:21  22  went back and did some surgeries with the fluted stem, which

:34:28  23  is not germane to this.  But we had a bearing surface, it

:34:32  24  was a mobile-bearing surface that tested also.

:34:35  25  Q.    In this document, what does it illustrate regarding

Scott - direct

:34:38    1    your involvement in the MBK testing?

:34:40    2    A.    It shows my involvement.  You can hardly see, but up

:34:45    3    top are the names.

:34:48    4    Q.    Scott refers to you?

:34:50    5    A.    Yes.

:34:50    6    Q.    Let's switch gears for a moment, a little bit away

:34:57    7    from the technical aspects, and talk about some other

:35:00    8    things.

:35:00    9          Outside the four walls of this courtroom, who

:35:07   10    does Zimmer give credit to for the design and development of

:35:11   11    the LPS Flex fit and mobile devices that are the subject of

:35:14   12    the patents in this case?

:35:16   13    A.    The ISK group, Drs. Insall, Scuderi, Kelly and myself.

:35:21   14    Q.    I am not going to show you the medical literature we

:35:24   15    saw earlier this week.  But I do want to show you PTX-13.

:35:31   16          What is PTX-13?

:35:37   17    A.    I think it's a publication Zimmer has to its sales

:35:44   18    force throughout the country -- throughout the country, if

:35:48   19    not world.  I am not sure.

:35:49   20    Q.    In the second paragraph, what does Zimmer publicize to

:35:55   21    the world as to who developed the LPS Flex implant?

:35:59   22    A.    They publicize that the LPS Flex implant is developed

:36:04   23    in conjunction with Drs. Insall, Kelly, myself and Scuderi.

:36:10   24    Q.    How do the changes that occur from the LPS to the LPS

:36:22   25    Flex relate to the ideas that are described in the patents

Scott - direct

:36:28    1    in this case?

:36:29    2    A.    Basically, those are the changes, the patent reflects

:36:34    3    the changes that are in the flex, fixed and Flex mobile

:36:39    4    implants.

:36:39    5    Q.    All right.  I want to talk a little bit about your

:36:43    6    license agreements.  In 1994, what type of contracts did you

:36:50    7    have with Zimmer?

:36:51    8    A.    In 1994, I had a license agreement with Zimmer to work

:36:57    9    on the NexGen system.

:36:59   10    Q.    And what limits were placed on you in 1994 in regards

:37:03   11    to how much money you could earn?

:37:05   12    A.    There was a financial limit in that contract.  I think

:37:08   13    it was 17 million dollars over the length of the contract.

:37:13   14    The length of the contract at that point was roughly about

:37:18   15    22 years.  Zimmer was -- we got into that contract, I was

:37:22   16    committed to them for the rest of my professional career,

:37:25   17    which is, in essence, was going to turn out to be about 22

:37:30   18    years.

:37:30   19    Q.    And what do you mean by you were committed to them for

:37:35   20    the rest of your professional career?

:37:37   21    A.    Basically, at that particular time, the contract, the

:37:43   22    contract could have expired in 2010, which, obviously, '94

:37:48   23    to 2010, it's 17 years or 16.

:37:53   24          But there was a confidentiality clause in that

:37:57   25    contract that it would be for all practicality impossible

Scott - direct

:38:02    1    for me to go work with any other company, because it

:38:05    2    restricted all my know-how that I would have achieved during

:38:10    3    that time.

:38:11    4    Q.    At the time that you were approached by Zimmer to sign

:38:15    5    this license agreement, what type of demand was there for

:38:18    6    your services?

:38:21    7    A.    There was a lot.  And primarily, because, as I

:38:25    8    mentioned before, all the companies started to recognize the

:38:30    9    PS was here to stay and it was a big deal.  And so, if they

:38:36    10   weren't in it, they wanted to get into it more.

:38:39    11          With the exception of Dr. Insall, there weren't

:38:43    12   many people that had more experience than I did.

:38:45    13   Q.    Where at the time did Dr. Insall work -- with whom did

:38:49    14   Dr. Insall work?

:38:50    15   A.    Dr. Insall worked with Zimmer.

:38:51    16   Q.    How your relationship progressed as it relates to Dr.

:38:58    17   Insall by the time we reach 1994 and 1995?

:39:01    18   A.    We had been together for 20 years at that point.

:39:06    19   While he was my mentor, I think he would say that by '91 we

:39:15    20   became partners, and even though he might have he wasn't my

:39:19    21   mentor anymore, I think he is always my mentor.  And

:39:23    22   basically, that's why we formed the ISK.

:39:25    23          We had a great professional relationship.  We

:39:32    24   could finish each other's sentences, as far as knee

:39:36    25   replacements.

:39:36   1            And we had a very complete social relationship.

:39:40   2   All we ever talked about was knees, family and golf, because

:39:46   3   he didn't like basketball.

:39:48   4   Q.    Did you and Dr. Insall ever discuss patent

:39:51   5   applications?

:39:51   6   A.    No.

:39:52   7   Q.    Did you and Dr. Insall usually talk about things like

:39:57   8   patent applications?

:39:58   9   A.    No.  We really didn't talk about administrative stuff.

:40:01   10   If you knew John, it was overwhelming talking about knees.

:40:04   11   And as I said, the other two issues.

:40:06   12   Q.    At ISK when you were with John Insall, did you share

:40:11   13   secretaries with him?

:40:12   14   A.    No.

:40:12   15   Q.    Do you share your secretarial staff with anyone?

:40:16   16   A.    No, I didn't.

:40:17   17   Q.    That is back then and even today?

:40:20   18   A.    Yes, that's correct.

:40:21   19   Q.    Before Dr. Insall died, did you ever have access to

:40:25   20   his files?

:40:26   21   A.    No.

:40:27   22   Q.    After John Insall died did you have access to Dr.

:40:31   23   Insall's files?

:40:32   24   A.    No, I didn't.  And I might add, I am not sure how much

:40:36   25   he had in the way of files other than patient files.

Scott - direct

| | | |
|---|---|---|
| :40:43 | 1 | Q.    Okay.  How did the license agreement that you had with |
| :40:46 | 2 | Zimmer that had a cap of about 17 million dollars in 1994 |
| :40:50 | 3 | change in 1995? |
| :40:53 | 4 | A.    In 1995 Zimmer changed the contract.  I think they did |
| :41:00 | 5 | it in recognition that we saved them, with the NexGen PS and |
| :41:06 | 6 | developing the LPS, and they were grateful. |
| :41:07 | 7 | It changed in the fashion that the absolute cap |
| :41:16 | 8 | was eliminated and the royalty rate was increased. |
| :41:19 | 9 | And the duration or the length of the contract |
| :41:22 | 10 | was also increased. |
| :41:25 | 11 | Q.    If the products that you designed for Zimmer were a |
| :41:29 | 12 | complete failure, how much money would you have received in |
| :41:33 | 13 | compensation under your license agreements? |
| :41:35 | 14 | A.    Zero.  My contract with Zimmer was strictly a |
| :41:41 | 15 | make-good contract. |
| :41:42 | 16 | If something worked and we sold it, they did |
| :41:47 | 17 | well, I did well, and vice versa. |
| :41:49 | 18 | If it failed, I made nothing. |
| :41:52 | 19 | Q.    Did your contract have any clauses that you are aware |
| :41:57 | 20 | of relating to patents? |
| :41:59 | 21 | A.    It did have a patent clause, yes. |
| :42:02 | 22 | Q.    And the three patents at issue in this case relate to |
| :42:06 | 23 | which implants again? |
| :42:07 | 24 | A.    To the LPS Flex fixed and Flex mobile. |
| :42:13 | 25 | Q.    Has Zimmer paid you for your contributions to the |

Scott - direct

| | | |
|---|---|---|
| :42:15 | 1 | design of the LPS Flex fixed and LPS Flex mobile? |
| :42:19 | 2 | A.    Yes, they have. |
| :42:21 | 3 | MR. HALES:  Your Honor.  Objection.  Belated, |
| :42:25 | 4 | but leading. |
| :42:26 | 5 | THE COURT:  We need to take a quick recess. |
| :42:28 | 6 | (Recess taken.) |
| :47:43 | 7 | THE COURT:  Sorry, counsel. |
| :48:14 | 8 | MR. RABIN:  We conferred regarding my objection, |
| :48:16 | 9 | so I am going to change my question. |
| :48:17 | 10 | THE COURT:  While we are on the subject, let's |
| :48:20 | 11 | break in ten minutes, and then I will see you at sidebar. |
| :48:25 | 12 | MR. HALES:  Your Honor, because there was a |
| :48:27 | 13 | question and answer already on the record, I think that is |
| :48:31 | 14 | going -- I am assuming there is some withdrawal of the |
| :48:35 | 15 | previous question and answer and rephrasing it. |
| :48:37 | 16 | THE COURT:  I think he did say that. |
| :48:39 | 17 | MR. HALES:  I clarify that because it was |
| :48:41 | 18 | already on the record.  It was just the pending question, |
| :48:46 | 19 | there was an answer to it. |
| :48:47 | 20 | THE COURT:  Fair enough. |
| :48:49 | 21 | BY MR. RABIN: |
| :48:50 | 22 | Q.    From the release of the LPS Flex mobile and the LPS |
| :48:56 | 23 | Flex fixed to 2010, were you paid royalties on those |
| :49:01 | 24 | implants? |
| :49:02 | 25 | A.    Yes, I was. |

Scott - direct

:49:03    1    Q.    Because you were paid royalties on both the LPS Flex

:49:14    2    fixed and LPS Flex mobile, what reason did you have under

:49:19    3    your license agreement to ever investigate whether you

:49:23    4    should have been named an inventor on a patent related to

:49:26    5    the LPS Flex fixed or Flex mobile?

:49:31    6                 MR. HALES:  Leading.

:49:33    7    BY MR. RABIN:

:49:33    8    Q.    I said what reason?

:49:35    9                 MR. HALES:  I think what preceded that was

:49:38    10   leading.

:49:38    11                THE COURT:  Rephrase, counsel.

:49:39    12   BY MR. RABIN:

:49:39    13   Q.    Based on your previous answer, where you said you were

:49:42    14   paid royalties on the LPS Flex fixed and LPS Flex mobile,

:49:47    15   what reason would you have under your license agreement to

:49:53    16   investigate whether you had any patents on the LPS Flex

:49:57    17   fixed or LPS Flex mobile implant?

:50:00    18                MR. HALES:  I think it's leading still, Your

:50:03    19   Honor.

:50:03    20                THE COURT:  A bit.  But I will let him answer.

:50:05    21                THE WITNESS:  The answer is, I had no reason.

:50:11    22   BY MR. RABIN:

:50:13    23   Q.    After the release of the LPS Flex fixed and Flex

:50:19    24   mobile, at what time period did a dispute arise between you

:50:26    25   and Zimmer relating to your license agreement?

Scott - direct

| :50:30 | 1 | A.    Roughly 2004. |

A.    Roughly 2004.

Q.    And what did you do as a result of the dispute that you were having with Zimmer in 2004 regarding your license agreement?

A.    I filed an arbitration.

Q.    Did the 2004 arbitration in any way involve whether you should receive royalties on the LPS Flex fixed or mobile implants?

A.    No.

Q.    Did the 2004 arbitration in any way involve whether you should receive royalties based on patents covering the LPS Flex fixed or mobile implants in 2004?

A.    No.

Q.    Did the 2004 arbitration in any way involve the patents in this case?

A.    No.

Q.    Who was your lawyer in the 2004 arbitration?

A.    Deb Lans.

Q.    And what did the 2004 arbitration involve?

A.    The 2004 arbitration involved a question of whether I should be paid on instruments.

Q.    Do the patents in this case involve instruments?

A.    No.

Q.    To the extent you know, what type of lawyer is Deb Lans?

Scott - direct

:51:57     1     A.     She, I believe, is a commercial litigator in a divorce

:52:01     2     firm. I got to Deb from a divorce lawyer friend who works

:52:09     3     in that office.

:52:10     4     Q.     Did the 2004 arbitration in any way involve

:52:24     5     contributions you believe you made to the LPS Flex fixed or

:52:28     6     flex Flex mobile implants?

:52:30     7     A.     No.

:52:31     8     Q.     Did the subject of patents generally, broadly, ever

:52:34     9     come up in the 2004 arbitration?

:52:39     10     A.     Broadly, the subject of instrument patents came up.

:52:44     11     Q.     I am putting up Defendants' Exhibit No. 71. Do you

:52:57     12     recognize this document?

:52:58     13     A.     I do.

:52:59     14     Q.     And what is this document?

:53:02     15     A.     This document is something from my stationery. It's

:53:08     16     my handwriting, with a lot of numbers.

:53:11     17     Q.     Do you know the context in which you would have

:53:16     18     written this document?

:53:21     19     A.     I think I wrote this in the context of the issue about

:53:28     20     instrument patents that Zimmer brought up during the 2004

:53:36     21     arbitration.

:53:37     22     Q.     What level of certainty do you have regarding the

:53:44     23     circumstances under which you wrote this document?

:53:48     24     A.     Not real great.

:53:49     25     Q.     Did you at any time look up any of these patents?

Scott - direct

:53:56    1    A.    No.

:53:56    2    Q.    About halfway down the first page, you see the No.

:54:03    3    5443518.  Do you see that?

:54:06    4    A.    Yes.

:54:06    5    Q.    Then it says -- I will let you read your own

:54:11    6    handwriting?

:54:12    7    A.    It gives a number, then it says, "1995-8/22, knee

:54:19    8    position indicator-JI."

:54:22    9    Q.    What does JI refer to?

:54:24   10    A.    I am sure it refers to John Insall.

:54:26   11    Q.    Is the '518 patent a patent in this case?

:54:30   12    A.    No.

:54:31   13    Q.    Are you asking to be named as an inventor on any of

:54:35   14    the patents on this page?

:54:37   15    A.    No.

:54:37   16    Q.    How was the arbitration in 2004 ultimately resolved?

:54:44   17    A.    The arbitration was resolved in my favor by Ray

:54:50   18    Elliott, the CEO and I, had a conversation.  And in that

:54:55   19    conversation, he gave me 2.4 million dollars spread over

:55:02   20    time, and increased my rate going forward in 2011.

:55:08   21           MR. HALES:  I am sorry, Your Honor.  I have an

:55:11   22    objection to that, because, as counsel is aware and Dr.

:55:14   23    Scott as well, there is a dispute.  Part of the issue we

:55:18   24    have been disputing in the arbitration that we had in May

:55:20   25    and the one that may come relates to this license agreement

Scott - direct

:55:24      1    in parts.  My objection is to Dr. Scott's characterization

:55:26      2    of it being a win.  There is an integration clause in there.

:55:31      3    That is the point that I wanted to make on that.  It is not

:55:35      4    relevant to this issue.

:55:36      5                   THE COURT:  Is you are motion to strike the

:55:38      6    answer?

:55:38      7                   MR. HALES:  Yes, Your Honor, yes.

:55:40      8                   MR. RABIN:  I am fine striking the part of the

:55:44      9    answer referring to it as "in my favor."  It was a

:55:47     10    settlement.

:55:48     11                   MR. HALES:  Agreed.

:55:48     12                   THE COURT:  Fair enough.

:55:50     13    BY MR. RABIN:

:55:51     14    Q.    What was your relationship with Mr. Elliott, the CEO

:55:54     15    of Zimmer, in this 2004-2005 frame, when he called you to

:55:59     16    settle this case?

:56:00     17    A.    It was good.  I mean, Ray and I would play golf twice

:56:04     18    a year.  We would have dinner once or twice, three times a

:56:08     19    year.  It was a good relationship.  We went through this

:56:12     20    dispute, sometimes joking about it, but it was obviously

:56:19     21    serious.

:56:20     22             But, you know, it was something I would

:56:24     23    characterize as a proper disagreement that was resolved and

:56:29     24    our relationship moved on.

:56:30     25    Q.    Let's put up Plaintiffs' Exhibit No. 30.  This says

:56:36   1   Release and Settlement Agreement, dated as of April 6th of

:56:41   2   2005.  Do you recognize this as the settlement agreement

:56:44   3   from that arbitration?

:56:45   4   A.    I do.

:56:45   5   Q.    After Mr. Elliott called you to say he wanted to

:56:50   6   resolve the case, can you describe for us the extent of your

:56:55   7   involvement in the legal process, without divulging any

:56:59   8   attorney-client communications, just the extent of your

:57:02   9   involvement in the process of what occurred after Mr.

:57:04   10  Elliott had agreed to settle the case with you?

:57:07   11  A.    I told my attorneys about it.  Both Ray and I turned

:57:10   12  it over to our attorneys.

:57:13   13          That was the extent of the involvement, really.

:57:15   14  Q.    And if we could go to Page 2, on Paragraph 3, which is

:57:20   15  the release language -- I am sorry, there, it says, "Except

:57:28   16  as otherwise provided in this agreement, Dr. Scott, on

:57:32   17  behalf" -- I am going to fast-forward a little bit --

:57:36   18  "hereby releases, forever discharges, and covenants not to

:57:41   19  sue Zimmer,"fast-forwarding against, "from and against all

:57:44   20  of the claims, demands, damages, debts, liabilities,

:57:48   21  obligations, causes of action suits, legal fees and costs of

:57:49   22  whatever nature, character and description."

:57:51   23          And this is the part I want to ask you about.

:57:55   24  "...presently known or which could be reasonable known to

:57:58   25  Dr. Scott or his attorney"?

Scott - direct

:57:59    1               Do you see that?

:58:00    2    A.    I do.

:58:02    3    Q.    In April of 2005, did you know that you had a cause of

:58:10    4    action against Zimmer because your name was not included on

:58:12    5    the patents at issue in this case?

:58:14    6    A.    No.

:58:17    7    Q.    In 2005, what was your familiarity with patents?

:58:21    8    A.    None.

:58:23    9    Q.    Had you ever been named as an inventor on a patent by

:58:27   10    2005?

:58:28   11    A.    No.

:58:28   12    Q.    Had you ever been involved in the patent process

:58:31   13    before 2005?

:58:32   14    A.    No.

:58:35   15    Q.    Is it fair that at least you knew patents existed as

:58:39   16    an entity?

:58:40   17    A.    As an entity, yes.  But I didn't know much about them.

:58:42   18    Q.    Did you ever learn anything in 2005 or before that

:58:48   19    caused you to reasonably think that somehow you were

:58:50   20    excluded from one of the patents in this case?

:58:52   21    A.    No, I didn't.

:58:56   22    Q.    In 2005, would being named an inventor on a patent

:59:02   23    related to the LPS Flex fixed or the LPS Flex mobile in any

:59:10   24    way change the royalties you would have received on those

:59:12   25    two devices at that time period?

Scott - direct

| :59:14 | 1 | A.    No. |
| :59:18 | 2 | Q.    When you spoke to Mr. Elliott, the CEO of Zimmer, what |

A.    No.

Q.    When you spoke to Mr. Elliott, the CEO of Zimmer, what conversations did you have regarding patents when you agreed to settle the case?

A.    Absolutely none.

Q.    Now --

          MR. RABIN:  Would you like to take a break, Your Honor?

          THE COURT:  How close are you to being finished?

          MR. RABIN:  Still have 15 to 20 minutes.

          THE COURT:  Let let's take a stretch and let me see counsel off the record.

          (Sidebar conference not reported.)

          (Recess taken.)

BY MR. RABIN:

Q.    Starting in 2000, were you implanting the LPS Flex fixed and LPS flexed mobile implants into patients?

A.    In roughly 2000, the LPS Flex fixed, not the LPS Flex mobile.

Q.    And as a surgeon, when you get an LPS Flex fixed to install it into a patient's knee, can you walk the Court through the process of what you as the surgeon actually see for purposes of installing the implant?

A.    Sure.  Basically, you are at the operating theater, at the table, you have done all your procedure.  You have

Scott - direct

:19:36    1    what's called provisional prostheses, so you put the

:19:41    2    provisions on for sizes, fits, et cetera.  So you are happy

:19:45    3    with those sizes.

:19:45    4         And so you tell your scrub tech, I want a Size

:19:52    5    D, No. 4 plateau, et cetera, at which point you start

:19:59    6    cementing, you clean the bone and prepare the cement, they

:20:02    7    prepare it and so forth.  Then, when the cement is ready,

:20:05    8    you put the prosthesis in.

:20:06    9         How the prosthesis got to the table, basically,

:20:11   10    the circumstance later, the circulating nurse, who is not

:20:16   11    described, gets a box from someplace and, when we tell her

:20:20   12    what sizes, she opens the outside of the box, usually

:20:24   13    outside the room.  And then in the room, like for a

:20:31   14    component like this tibial bearing surface, it probably

:20:35   15    comes in two or three boxes.  So there is an outside box,

:20:38   16    then there is an inside box that's still not sterile.  She

:20:43   17    opens that.

:20:44   18         And then she, it depends on how many other boxes

:20:48   19    are in there, she gives the box to the scrub technician,

:20:51   20    that is just really a clear box.  Just a transparent box.

:20:57   21         Then they give us the devices.

:21:06   22    Q.    As a surgeon, do you see the first big box, the box

:21:09   23    the device is shipped in?

:21:10   24    A.    No.

:21:12   25    Q.    Do you see any of the inserts that come with the

Scott - direct

:21:15    1    implant, talking about what the implant is?

:21:20    2    A.    You mean like if you buy sneakers?  I don't know.  I

:21:24    3    didn't even know that there are inserts.  So, no.

:21:27    4           THE COURT:  Product inserts?

:21:29    5           MR. RABIN:  Product inserts.

:21:30    6           THE WITNESS:  I don't even know that there are

:21:32    7    product inserts in it.  I have never seen it.

:21:34    8    BY MR. RABIN:

:21:36    9    Q.    As a surgeon, do you see these boxes?

:21:38   10    A.    No.

:21:38   11    Q.    When the implant gets to the stage where it is handed

:21:42   12    to you is there any type of marking or etching denoting a

:21:49   13    patent number on the implant that you see and install into

:21:53   14    the patient?

:21:54   15    A.    I don't think so.  I have never seen one.

:21:56   16    Q.    From a surgeon's perspective, what concerns would you

:22:03   17    have about a patent number being placed on a device that's

:22:07   18    about to be inserted into a human being?

:22:13   19    A.    I guess what I would have -- we get a size, you will

:22:17   20    see a size on it.  It might have Size D.  But I don't know

:22:21   21    the process, how they do it.  It's imbedded in the surface.

:22:25   22    There is no surface irregularity whatsoever.

:22:28   23          So what I would be concerned about is if they

:22:30   24    put anything on there that has a surface irregularity.  That

:22:36   25    could mess up the procedure.

Scott - direct

:22:37  1   Q.    For the exhibits that are handed up to the Court and

:22:40  2   are on your table, do you see any patent markings on those

:22:44  3   implants?

:22:50  4   A.    No.

:22:51  5   Q.    Now, before the break, we had talked about the

:22:55  6   conversation that you had with Mr. Elliott.  Did there come

:23:01  7   a time at Zimmer -- let me rephrase the question.

:23:08  8        How did the top management at Zimmer change in

:23:10  9   the 2005-2006 time frame after you signed the agreement

:23:15  10  resolving the 2005 arbitration?

:23:18  11  A.    Mr. Elliott left around 2006, 2007, I am not sure

:23:27  12  exactly.  And basically new management took over.

:23:31  13  Q.    What happened to the payment of your royalties after

:23:35  14  new management took over?

:23:37  15  A.    They stopped my payment.

:23:39  16  Q.    What was taking place at Zimmer at the time period

:23:44  17  that they stopped paying you the royalties that you believed

:23:47  18  you were owed?

:23:49  19  A.    Zimmer had been accused by the government of criminal

:23:53  20  activity, and entered a deferred prosecution agreement

:23:59  21  involving that activity at about that time.

:24:02  22  Q.    At that time, did Zimmer stop paying you royalties on

:24:07  23  the LPS Flex fixed implant?

:24:09  24  A.    Yes, they did.

:24:09  25  Q.    Did Zimmer stop paying you royalties on the LPS Flex

Scott - direct

| | | |
|---|---|---|
| :24:14 | 1 | mobile implant? |
| :24:15 | 2 | A.    Yes. |
| :24:15 | 3 | Q.    What did you do as a result of Zimmer's refusal to pay |
| :24:19 | 4 | you royalties that you believed you were owed? |
| :24:23 | 5 | A.    I was forced to file an arbitration. |
| :24:25 | 6 | Q.    And what argument did Zimmer make in that proceeding |
| :24:29 | 7 | as to why you were no longer owed royalties on the LPS Flex |
| :24:33 | 8 | fixed and LPS Flex mobile implants? |
| :24:37 | 9 | A.    Zimmer said they had to ascertain that I actually |
| :24:41 | 10 | contributed technology to the implants I was receiving money |
| :24:49 | 11 | for. |
| :24:52 | 12 | Q.    How did the 2008 arbitration get resolved? |
| :24:58 | 13 | A.    About a week or so before the arbitration, Zimmer -- |
| :25:05 | 14 | THE COURT:  Yes, sir. |
| :25:06 | 15 | MR. HALES:  I have a relevance objection I want |
| :25:08 | 16 | to impose now. |
| :25:09 | 17 | MR. RABIN:  The relevance, Your Honor, is it |
| :25:11 | 18 | relates to what caused Dr. Scott to start investigating the |
| :25:14 | 19 | patents at issue in this case, which are the subject of |
| :25:16 | 20 | their laches defense. |
| :25:17 | 21 | THE COURT:  I guess you could ask generally was |
| :25:20 | 22 | it resolved satisfactorily.  Apparently, it wasn't. |
| :25:22 | 23 | MR. RABIN:  It was, Your Honor.  But it was a |
| :25:25 | 24 | finding by a Federal District Court that caused Dr. Scott to |
| :25:30 | 25 | investigate it further. |

Scott - direct

:25:30   1           **THE COURT:  I agree with the objection.  I am**

:25:34   2  **going to sustain it and ask you to take a different**

:25:37   3  **approach.  I think you understand the import of his**

:25:41   4  **objection.**

:25:42   5  **BY MR. RABIN:**

:25:42   6  **Q.   Was the arbitration resolved in a way in which you**

:25:47   7  **were paid everything that you alleged you were owed?**

:25:50   8  **A.   Yes.**

:25:51   9  **Q.   Were you paid -- I am trying not to lead, I am sorry.**

:26:00  10  **Can you tell us whether or not you were paid --**

:26:03  11  **which implants were included in those -- in the category of**

:26:09  12  **royalties which you received the amounts that you were owed?**

:26:15  13  **A.   The implants, certainly, involved, today, the Flex**

:26:19  14  **prostheses.**

:26:21  15  **Q.   Is that Flex mobile and fixed?**

:26:24  16  **A.   That's correct.**

:26:24  17  **Q.   What caused you, in the 2008 time period, to begin**

:26:36  18  **investigating whether, in fact, you had patents on which you**

:26:43  19  **should be a named inventor?**

:26:46  20  **A.   Basically, the arbitrators wanted to have a hearing**

:26:53  21  **after the payment was made to see if there was bad faith on**

:27:00  22  **Zimmer's part in these proceedings.  We had a hearing.  The**

:27:08  23  **arbitrators ruled that Zimmer had acted in bad faith towards**

:27:15  24  **me.**

:27:15  25  **MR. HALES:  Your Honor --**

Scott - direct

:27:17    1         THE COURT:  I will strike it.

:27:18    2         MR. HALES:  Thank you.

:27:19    3    BY MR. RABIN:

:27:19    4    Q.    My question is -- well, did you, unlike the 2004-2005

:27:28    5    arbitration, did you personally feel the disagreement you

:27:33    6    were having with Zimmer relating to the payment of royalties

:27:36    7    in 2008 as a genuine disagreement or one in which you

:27:42    8    thought that you were not being treated fairly?

:27:44    9    A.    The latter, absolutely.  I felt I was not being

:27:49   10    treated fairly.

:27:50   11    Q.    And what did you do as a result of this feeling you

:27:54   12    were receiving that you were not being treated fairly?

:27:56   13    A.    Basically, I went and searched, got a patent lawyer to

:28:03   14    see about patents.

:28:04   15    Q.    Now, after the 2000 arbitration, from 2008 to 2010,

:28:10   16    can you describe to the Court on which implants you received

:28:14   17    royalties?

:28:16   18    A.    From 2008 to 2010, I received royalties on everything

:28:23   19    on everything.  The payments were resumed, that includes the

:28:27   20    LPS flexed, fixed flex, fixed and mobile.

:28:31   21    Q.    What is your understanding as it related to the

:28:37   22    Department of Justice investigation and deferred prosecution

:28:41   23    agreement under the guidance of John Ashcroft, as to what

:28:46   24    level of involvement surgeons had to have for being able to

:28:52   25    receive royalties from a device manufacturer?

:28:55    1          MR. HALES:  Objection.  Relevance, foundation.

:28:59    2          THE COURT:  Well, let's start with foundation.

:29:03    3          MR. RABIN:  Sure.  The foundation is, Dr. Scott

:29:05    4    was involved in many communications with Zimmer relating to

:29:08    5    the Department of Justice investigation and the deferred

:29:10    6    prosecution agreements.

:29:11    7          THE COURT:  You can ask him those questions.

:29:13    8          MR. RABIN:  Then the relevance is, Zimmer is

:29:16    9    contending that Dr. Scott did not contribute technology to

:29:19   10    the implants that are covered by the patents in this case.

:29:22   11    Even under John Ashcroft's view --

:29:25   12          THE COURT:  Overruled.

:29:27   13    BY MR. RABIN:

:29:27   14    Q.    What was your understanding of the level of

:29:31   15    contribution that designer surgeons had to have made to the

:29:34   16    implants covered by the patents in this case in order for

:29:37   17    you to be paid royalties?

:29:39   18          THE COURT:  Do you want to establish how he

:29:41   19    would have an understanding?

:29:42   20          MR. RABIN:  I am sorry.

:29:43   21    BY MR. RABIN:

:29:43   22    Q.    What involvement of discussions did you have with

:29:45   23    Zimmer relating to the payment of royalties in the John

:29:50   24    Ashcroft deferred prosecution agreement time period?

:29:55   25    A.    There were communications, and basically the

:29:59    1    understanding I had was that Zimmer or any company, for that

:30:03    2    matter, could not pay a design surgeon any sense of

:30:09    3    royalties or moneys of any sort unless the contribution to

:30:13    4    technology was documented.

:30:15    5    Q.    What happened to most of Zimmer's design surgeons in

:30:22    6    the post John Ashcroft deferred prosecution agreement

:30:27    7    context as it related to Zimmer's payment of royalties?

:30:31    8            THE COURT:  Do we know how he would even know

:30:34    9    that?

:30:34   10            You are getting an objection behind you.  And I

:30:38   11    am sure it is a foundational objection.  Sustained.

:30:41   12    BY MR. RABIN:

:30:42   13    Q.    Did you have an understanding, as a result of working

:30:45   14    with Zimmer, about how other surgeons such as yourself were

:30:48   15    treated as to their payment of royalties as part of the

:30:52   16    deferred prosecution agreement?

:30:53   17    A.    Yes, I did have an understanding.

:30:56   18    Q.    What is the basis of your understanding?

:30:58   19    A.    The understanding was, Zimmer wanted to have a present

:31:05   20    valuation buyout of existing contractors that they had.  It

:31:10   21    was a different situation than all the other companies.

:31:15   22    Zimmer was the only one to do that.

:31:17   23    Q.    Was your contract bought out?

:31:19   24    A.    No.

:31:19   25    Q.    What happened to the payment of royalties in this post

Scott - direct

:31:25    1    John Ashcroft era as it related to the LPS Flex fixed and

:31:30    2    LPS Flex mobile?

:31:32    3    A.      Zimmer continued to pay me.

:31:33    4    Q.      Approximately how much money has Zimmer paid you over

:31:39    5    the 17 years that you have been associated with them and

:31:44    6    designed implants for them?

:31:46    7    A.      About 67-issue million dollars.

:31:51    8    Q.      And how much approximately has Zimmer earned in

:31:54    9    revenue using the knee implants that you designed for them?

:31:57   10             MR. HALES:   Objection.   Foundation.

:31:59   11             THE COURT:   Could you establish how he would

:32:01   12    know that, if he knows it?

:32:03   13    BY MR. RABIN:

:32:04   14    Q.      In your license agreement, how is your royalty set up

:32:17   15    as it relates to sales of implants that Zimmer sells

:32:20   16    throughout the world?

:32:21   17    A.      It's based on a percentage of sales.

:32:25   18    Q.      As a surgeon who -- do you want Zimmer's knees to do

:32:33   19    well?

:32:33   20    A.      Absolutely.

:32:33   21    Q.      Why do you want Zimmer's knees to sell well?

:32:36   22    A.      Because the more they make, the more I make.

:32:38   23    Q.      Do you track Zimmer's sales?

:32:41   24    A.      I watch them, yes.

:32:42   25    Q.      Approximately how much has Zimmer earned in revenue by

:32:47    1    using the knee implants that you have helped design?

:32:51    2    A.    I would say in excess of 20 billion dollars.

:32:57    3    Q.    20 billion, with a B?

:32:59    4    A.    Billion.

:33:00    5    Q.    How has the popularity of Zimmer's LPS flex implants

:33:07    6    that you helped design changed from the first implant that

:33:13    7    Zimmer had, called the NexGen PS, to the implants they are

:33:21    8    selling today?

:33:21    9    A.    I believe by far it's their number one seller.

:33:25   10    Q.    How much money has Zimmer -- has Zimmer continued to

:33:30   11    have sales of the LPS Flex and the LPS mobile similar to the

:33:35   12    sales that they had in the pre-2010 time period?

:33:39   13    A.    Yes, they have.

:33:39   14    Q.    And how much money has Zimmer paid you for the

:33:43   15    contributions that you gave them to the LPS Flex and the LPS

:33:46   16    mobile covered by the patents in this case since 2010?

:33:51   17    A.    Nothing.

:33:53   18    Q.    From 2000 to 2010, how much money do you believe

:33:57   19    Zimmer would have paid you on the LPS Flex fixed and mobile

:34:01   20    if, in fact, you had not contributed to the implants which

:34:05   21    are covered by the patents in this case?

:34:06   22             MR. HALES:  I think --

:34:09   23             THE COURT:  I think it's relevant.  I think he

:34:12   24    can testify, he would know that, yes.

:34:15   25             THE WITNESS:  If I remember your question, you

Scott - direct

| | | |
|---|---|---|
| :34:19 | 1 | say if I hadn't contributed, they would have paid me |
| :34:22 | 2 | nothing. |
| :34:22 | 3 | MR. RABIN:  Thank you, Dr. Scott. |
| :34:24 | 4 | THE COURT:  Counsel, you may cross-examine. |
| :34:27 | 5 | MR. HALES:  May I have just a moment, Your |
| :34:33 | 6 | Honor? |
| :34:34 | 7 | THE COURT:  Sure. |
| :34:34 | 8 | (Pause.) |
| :35:27 | 9 | MR. HALES:  May I approach, Your Honor? |
| :35:34 | 10 | THE COURT:  Yes, you may. |
| :36:26 | 11 | MR. HALES:  May I proceed, Your Honor? |
| :36:29 | 12 | THE COURT:  Yes. |
| :36:30 | 13 | CROSS-EXAMINATION |
| :36:31 | 14 | BY MR. HALES: |
| :36:53 | 15 | Q.    Good afternoon, Dr. Scott. |
| :36:55 | 16 | A.    Good afternoon. |
| :36:56 | 17 | Q.    It seems we have done this not too long ago. |
| :37:00 | 18 | A.    I think so. |
| :37:01 | 19 | Q.    During the course of this case, Dr. Scott, you have |
| :37:06 | 20 | taken the position, a little bit broader than we heard in |
| :37:13 | 21 | the proceedings, that you and the other ISK surgeons, Dr. |
| :37:16 | 22 | Scott, Dr. Scuderi, Dr. Kelly, contributed to every element |
| :37:22 | 23 | of every patent of every claim at issue.  Correct? |
| :37:27 | 24 | A.    I am not sure that it's different from my previous |
| :37:30 | 25 | position.  But the answer is correct, other than that. |

Scott - cross

:37:33   1    Q.      I want to pick up where Mr. Rabin left off, more or

:37:51   2    less, and talk about your agreement and royalties and so

:37:57   3    forth.

:37:58   4             You said that you got paid 67 million dollars

:38:01   5    approximately from Zimmer from the mid-1990s, roughly 1994,

:38:05   6    until 2010.  Correct?

:38:07   7    A.      That's correct.

:38:07   8    Q.      And you would agree that during the time, say the

:38:12   9    years 2008, 2009, 2010, the royalties you were earning were

:38:18   10   about 8 million dollars year?

:38:20   11   A.      I am not sure exactly what they were at that

:38:23   12   particular time.  I can just tell you the sum, just the

:38:30   13   overall amount.

:38:30   14   Q.      Does that figure sound about right, give or take?

:38:34   15   A.      It could be.

:38:37   16   Q.      You don't dispute that figure?

:38:39   17   A.      No.

:38:39   18   Q.      During the course of your relationship with Zimmer,

:38:42   19   you have been advised by counsel, you have had lawyers

:38:45   20   representing you.  Is that fair?

:38:46   21   A.      That's correct.

:38:46   22   Q.      They represented you in your agreements with Zimmer?

:38:50   23   A.      Correct.

:38:50   24   Q.      Negotiating the agreements?

:38:52   25   A.      Yes.

Scott - cross

| | | |
|---|---|---|
| :38:52 | 1 | Q. **Represented you in proceedings against Zimmer?** |
| :38:54 | 2 | A. **Correct.** |
| :38:54 | 3 | Q. **And are doing so today?** |
| :38:57 | 4 | A. **Correct.** |
| :38:58 | 5 | Q. **Now, during your negotiations leading up to your** |
| :39:06 | 6 | **original agreement, you had counsel in those negotiations?** |
| :39:11 | 7 | A. **I did.** |
| :39:11 | 8 | Q. **Who was that counsel?** |
| :39:14 | 9 | A. **David Lerner.** |
| :39:14 | 10 | Q. **David Lerner.** |
| :39:15 | 11 | **Let's take a look, if we could, at DTX-463.  Dr.** |
| :39:24 | 12 | **Scott, this is your original license agreement, just for** |
| :39:28 | 13 | **reference?** |
| :39:28 | 14 | A. **All right.  Just so I have it, 463?** |
| :39:32 | 15 | Q. **463, yes.** |
| :39:33 | 16 | **I take it that is your signature at the end,** |
| :39:58 | 17 | **about the third-to-last page, probably.** |
| :40:12 | 18 | A. **That's correct.** |
| :40:12 | 19 | Q. **Two pages after your signature, there is an Attachment** |
| :40:16 | 20 | **B, which is the place where patents or applications would be** |
| :40:19 | 21 | **identified if you had any.  Correct?** |
| :40:22 | 22 | A. **I think so, yes.** |
| :40:22 | 23 | Q. **There is none identified there?** |
| :40:24 | 24 | A. **That's correct.** |
| :40:24 | 25 | Q. **Now, you testified during your direct examination that** |

Scott - cross

| | | |
|---|---|---|
| :40:28 | 1 | you understood that your agreement for 63 had provisions in |
| :40:34 | 2 | it pertaining to patents.  Correct? |
| :40:36 | 3 | A.    I did. |
| :40:37 | 4 | Q.    In fact, there are provisions in there that pay you |
| :40:40 | 5 | royalties if you are a licensor of patents.  Correct? |
| :40:43 | 6 | A.    That's correct. |
| :40:44 | 7 | Q.    There are also provisions that pay you if you are a |
| :40:48 | 8 | licensor of what's defined as technology in the agreement? |
| :40:51 | 9 | A.    That's correct. |
| :40:52 | 10 | Q.    Now, at the end of your examination, I think your |
| :40:59 | 11 | testimony was suggesting -- if I misunderstood it, by all |
| :41:03 | 12 | means, correct me -- that the result of the Department of |
| :41:11 | 13 | Justice investigation or the requirement was that you have |
| :41:13 | 14 | to have proved -- well, I will strike that and start over. |
| :41:18 | 15 | Would you agree that, or to your knowledge, does |
| :41:21 | 16 | anything about the Department of Justice investigation |
| :41:24 | 17 | require you to have contributed to the conception of a |
| :41:27 | 18 | patent to get paid royalties? |
| :41:30 | 19 | A.    In my understanding, it doesn't. |
| :41:32 | 20 | Q.    It does not? |
| :41:33 | 21 | A.    It does not. |
| :41:34 | 22 | Q.    So it wasn't an issue in that proceeding, to your |
| :41:37 | 23 | knowledge, not proceeding, but that examination, whether or |
| :41:42 | 24 | not you proved to be a patent owner licensing patents to |
| :41:47 | 25 | Zimmer.  Correct? |

Scott - cross

:41:49    1    A.    I am not sure I understand the question.

:41:50    2    Q.    The definition of technology under your license

:41:53    3    agreement is different than licensed patents.  Correct?

:41:56    4    A.    Correct.

:41:57    5    Q.    It is broader than licensed patents?

:41:59    6    A.    Yes.

:41:59    7    Q.    So in order to satisfy the monitor, you would agree

:42:02    8    and understand that Zimmer, if they established that you had

:42:06    9    had sufficient participation in designing the devices, they

:42:13    10   could resume your payment.  Correct?

:42:16    11   A.    Correct.

:42:16    12   Q.    So it wasn't an issue of proving specific

:42:20    13   contributions of technology.  Corrects?

:42:22    14   A.    No, I don't think that's correct.

:42:24    15   Q.    You didn't provide any evidence to Zimmer to give to

:42:28    16   the monitor of specific evidence of technological

:42:33    17   contributions by yourself, did you?

:42:35    18   A.    I did.  I mean, that was the basis for the 2008

:42:39    19   arbitration, is that, basically, Zimmer, similar to what

:42:45    20   they did to Dr. Insall, they said that my contract was

:42:50    21   possibly illegal, and I didn't contribute.  And that's why

:42:55    22   we had to have the arbitration.

:42:58    23          That's why they paid me -- or the solution was,

:43:03    24   they paid me prior to that.  They are still going -- they

:43:08    25   are still in litigation with Dr. Insall's widow about that.

Scott - cross

| :43:11 | 1 | Q.    Dr. Insall's estate? |

:43:11  1   Q.    Dr. Insall's estate?

:43:13  2   A.    His widow.  That's his estate.

:43:16  3   Q.    Dr. Scott, you didn't have to establish as part of the

:43:20  4   2008 arbitration or to get payments resumed that you had

:43:25  5   contributed to the original conception of any ideas.  Is

:43:28  6   that correct?

:43:29  7   A.    That's correct.  That's not what you asked me.  I am

:43:32  8   sorry, that's what I understood.

:43:33  9   Q.    If I asked a confusing question, I apologize.  But

:43:37  10  there is a difference in what we are talking about here,

:43:39  11  which requires conception, involvement -- I think you

:43:43  12  understand.  Correct?

:43:44  13  A.    I do.

:43:44  14  Q.    And what was at issue in the license agreement

:43:46  15  disputes and the Department of Justice activities which

:43:49  16  related to the broader definition of contributing technology

:43:51  17  to an implant?

:43:54  18  A.    That's correct.

:43:55  19  Q.    Now, you said that Zimmer had stopped paying you in

:44:08  20  2010.  Correct?

:44:09  21  A.    In 2010, that's correct.

:44:11  22  Q.    Now, you understand that one of the ways in which your

:44:16  23  agreement can terminate by its terms is the arrival --

:44:22  24  January 1st, 2011.  Correct?

:44:25  25  A.    That's one of the possible ways.

Scott - cross

| :44:26 | 1 | Q.   Now, you knew before December 31st, 2010, I think, |
| :44:31 | 2 | that Zimmer had the view that your agreement would expire by |
| :44:36 | 3 | its terms on December 31st, 2010.  Is that correct? |
| :44:39 | 4 | A.   No, I did not. |
| :44:40 | 5 | Q.   Let's take a look at -- -we need to take a look at |
| :45:03 | 6 | Defendants' Trial Exhibit 31. |
| :45:06 | 7 | Turn to the exhibit, now that I have got you |
| :45:12 | 8 | started there -- before we look at it, let me ask a couple |
| :45:15 | 9 | of followup questions. |
| :45:17 | 10 | Now, in terms of, you have some familiarity with |
| :45:22 | 11 | the Anti-Kickback Statute.  Correct? |
| :45:24 | 12 | A.   Some. |
| :45:25 | 13 | Q.   Have you ever gotten advice of counsel regarding the |
| :45:28 | 14 | Anti-Kickback Statute, talked to a lawyer, I mean? |
| :45:33 | 15 | A.   I think we did.  I think in the 2008 arbitration. |
| :45:37 | 16 | Q.   You understand, I think, that it's both parties to the |
| :45:41 | 17 | transaction that can be accused of having, either the payor |
| :45:48 | 18 | of something that violates the statute or the recipient? |
| :45:51 | 19 | A.   I understand. |
| :45:51 | 20 | Q.   Fair enough, I will just leave it at that. |
| :45:57 | 21 | Did you ever come to learn, or have it explained |
| :46:00 | 22 | to you, that Zimmer's monitor wouldn't approve the |
| :46:04 | 23 | resumption of your payments? |
| :46:10 | 24 | A.   My understanding of that, through the 2008 |
| :46:16 | 25 | arbitration, testimony given by Zimmer, and the recent |

:46:19      1    testimony given by Mr. Phipps, who gave the same -- who was

:46:24      2    the same person who testified in 2008, that it is a question

:46:29      3    of whether I am not sure if my contract was ever shown to

:46:32      4    the monitor, because, if I remember correctly, Mr. Phipps's

:46:38      5    testimony was a little irregular.

:46:41      6              MR. HALES:  Your Honor, I had a yes or no

:46:43      7    question of whether he understood something and we are going

:46:47      8    way beyond that.

:46:48      9              THE COURT:  Mr. Maurer, could you read the

:46:50     10    question back.

:47:04     11              (Question read.)

:47:04     12              THE COURT:  Do you have that question in mind?

:47:09     13              THE WITNESS:  I have it in mind.

:47:11     14              THE COURT:  Try it again, sir.

:47:13     15              THE WITNESS:  That wasn't my understanding.

:47:14     16    BY MR. HALES:

:47:15     17    Q.    I will just move on from that.

:47:18     18              Let's take a look at DTX-31, which I ask be

:47:23     19    returned to the monitor.

:47:24     20              That is the 1995 amendment to your agreement?

:47:29     21    A.    That's correct.

:47:30     22    Q.    The agreement we looked at was DTX-463?

:47:35     23    A.    Previous agreement, yes.

:47:36     24    Q.    So it has an expiration provision in it.  This is

:47:39     25    where the expiration provision exists -- existed as of its

Scott - cross

| | | |
|---|---|---|
| :47:45 | 1 | amendment, and that's -- if I can have Paragraph 9 pulled |
| :47:52 | 2 | up.  Do you see, Dr. Scott, in Paragraph 9, how the |
| :48:00 | 3 | expiration provision of your agreement is modified? |
| :48:03 | 4 | A.    I do. |
| :48:03 | 5 | Q.    And so one of the ways that your agreement would |
| :48:08 | 6 | expire -- and it expires on the later of one of three |
| :48:12 | 7 | things, it would expire.  Correct? |
| :48:14 | 8 | A.    That's correct. |
| :48:14 | 9 | Q.    Those are the three enumerated things in Paragraph 9 |
| :48:18 | 10 | of DTX-31? |
| :48:20 | 11 | A.    That's correct. |
| :48:20 | 12 | Q.    One of the ways your agreement conspires is on January |
| :48:23 | 13 | 1st, 2011? |
| :48:25 | 14 | A.    That's correct. |
| :48:25 | 15 | Q.    If we look at the third option there, December 31st of |
| :48:32 | 16 | the final year of the product or component having the last |
| :48:35 | 17 | initial date of commercial sale, do you see that? |
| :48:37 | 18 | A.    I do. |
| :48:38 | 19 | Q.    Now, you understand that the final year is the tenth |
| :48:41 | 20 | year, I think.  Right? |
| :48:43 | 21 | A.    Correct.  The tenth year after the first sale. |
| :48:45 | 22 | Q.    So the third provision would relate to situations |
| :48:49 | 23 | where there is something that qualifies as a Capital B |
| :48:53 | 24 | product, that defined term there, and it would be the latest |
| :48:59 | 25 | of those, the tenth year of sales? |

Scott - cross

| | | |
|---|---|---|
| :49:01 | 1 | A.    That's correct. |
| :49:02 | 2 | Q.    Now, you filed an arbitration against Zimmer in May of |
| :49:07 | 3 | 2010.  Correct? |
| :49:10 | 4 | A.    I will take your word that that was the date. |
| :49:12 | 5 | Q.    And the second one in August of 2010? |
| :49:16 | 6 | A.    Thereabouts, yes. |
| :49:17 | 7 | Q.    And in both of those arbitrations, you are asking the |
| :49:22 | 8 | panels to qualify Zimmer prostheses as products, which would |
| :49:28 | 9 | trigger this third provision? |
| :49:29 | 10 | A.    That's what they are. |
| :49:30 | 11 | Q.    Well, there is a dispute over that, you understand |
| :49:33 | 12 | that? |
| :49:33 | 13 | A.    Correct. |
| :49:34 | 14 | Q.    But your position is, you are trying to qualify things |
| :49:37 | 15 | as products that would trigger this provision? |
| :49:40 | 16 | A.    That's our interpretation of what they are, yes. |
| :49:42 | 17 | Q.    Now, those products, what you are saying are products, |
| :49:47 | 18 | include LPS Flex, LPS Flex mobile.  Correct? |
| :49:55 | 19 | A.    No.  I say that with hesitation only because I just |
| :50:03 | 20 | forget the date of the initial sale of the mobile.  I forget |
| :50:11 | 21 | mobile being sold in Europe, if it was closer to 2000 -- I |
| :50:15 | 22 | just don't remember.  But basically, the principle would be |
| :50:17 | 23 | the same if the ten-year clock had expired, that's all. |
| :50:20 | 24 | Q.    The other arbitration you filed, you filed in August |
| :50:26 | 25 | of 2010.  Correct? |

Scott - cross

| | | |
|---|---|---|
| :50:27 | 1 | A.    I will take your word for it. |
| :50:29 | 2 | Q.    In that arbitration, part of it overlaps the first, |
| :50:31 | 3 | but there is also another system that you are seeking to |
| :50:36 | 4 | have qualify as a product.  Correct? |
| :50:38 | 5 | A.    That's correct. |
| :50:38 | 6 | Q.    That system hasn't yet been released? |
| :50:42 | 7 | A.    That system has been released. |
| :50:43 | 8 | Q.    Not to the public fully.  Correct? |
| :50:47 | 9 | A.    It's been released.  I think your definition, Zimmer's |
| :50:51 | 10 | definition is released at the time of the first sale, and I |
| :50:56 | 11 | know they have sold it to our hospital.  So I think that |
| :50:58 | 12 | qualifies for release. |
| :50:59 | 13 | Q.    You were not involved in the design and development |
| :51:03 | 14 | team for that product.  Correct?  That system? |
| :51:06 | 15 | MR. RABIN:  Your Honor, I object.  This has gone |
| :51:09 | 16 | far too much in the into the next case that we unfortunately |
| :51:14 | 17 | have with Zimmer.  Relevancy. |
| :51:15 | 18 | MR. HALES:  I want the Court to understand the |
| :51:17 | 19 | motivations behind these provisions and so forth.  There was |
| :51:20 | 20 | testimony elicited on direct examination about what Dr. |
| :51:23 | 21 | Scott's motivations were.  I am not going to get very much |
| :51:27 | 22 | further into the details of the proceedings. |
| :51:29 | 23 | THE COURT:  Overrule the objection. |
| :51:31 | 24 | MR. HALES:  Thank you, Your Honor. |
| :51:32 | 25 | BY MR. HALES: |

Scott - cross

| | | |
|---|---|---|
| :51:34 | 1 | Q.    The first paragraph is the -- the first item, I am |
| :51:39 | 2 | sorry, is the -- |
| :51:41 | 3 | A.    You mean No. 9? |
| :51:43 | 4 | Q.    Under No. 9, the first subsection, The last to expire |
| :51:46 | 5 | of the patents licensed hereunder? |
| :51:48 | 6 |         Do you see that? |
| :51:49 | 7 | A.    Yes. |
| :51:50 | 8 | Q.    You have no patents issued in your name that would |
| :51:52 | 9 | trigger that provision? |
| :51:54 | 10 | A.    That's correct. |
| :51:54 | 11 | Q.    Now, if you, in 2010 -- I take it from your direct |
| :52:01 | 12 | examination that you were, something prompted you in 2009 to |
| :52:06 | 13 | start looking for ways to extend this agreement.  Correct? |
| :52:11 | 14 | A.    No.  It looked -- what prompted me was understanding |
| :52:16 | 15 | that the new management of Zimmer was acting in bad faith |
| :52:20 | 16 | towards me, and I have to really review everything about my |
| :52:23 | 17 | contract.  That's what prompted me. |
| :52:25 | 18 | Q.    Now, when your royalties were halted in 2007, you |
| :52:30 | 19 | understood that all of the royalties that Zimmer paid |
| :52:35 | 20 | developer surgeons were halted at that time.  Correct? |
| :52:38 | 21 | A.    They all were.  And like the other surgeons, I waited |
| :52:40 | 22 | for a period of time to see what was going to happen.  And I |
| :52:43 | 23 | couldn't get the information. |
| :52:46 | 24 |         MR. HALES:  Your Honor, it was a simple question |
| :52:48 | 25 | of whether they were halted or not. |

Scott - cross

| | | |
|---|---|---|
| :52:51 | 1 | THE COURT:  Okay. |
| :52:51 | 2 | Doctor, do your best to focus on his questions. |
| :52:57 | 3 | Mr. Rabin will get a chance to ask you additional questions. |
| :53:03 | 4 | BY MR. HALES: |
| :53:03 | 5 | Q.    You weren't isolated among the other surgeons, |
| :53:06 | 6 | correct, at the time the payments were halted? |
| :53:09 | 7 | A.    Could you tell me what you mean by isolated? |
| :53:10 | 8 | Q.    You weren't the only surgeon whose payments were |
| :53:14 | 9 | halted in 2007.  Is that correct? |
| :53:17 | 10 | A.    That's correct. |
| :53:17 | 11 | Q.    Now, if you are able to establish that something |
| :53:23 | 12 | qualifies as a product in one of the arbitrations, the life |
| :53:27 | 13 | of your agreement will be extended.  Correct? |
| :53:30 | 14 | A.    That's correct. |
| :53:30 | 15 | Q.    If you are able to establish in this proceeding that |
| :53:33 | 16 | you should be a named inventor on these patents from 2000, |
| :53:36 | 17 | 2001, 2002, the life of your agreement will be extended. |
| :53:40 | 18 | Correct? |
| :53:41 | 19 | A.    That's correct. |
| :53:41 | 20 | Q.    And that could entitle you to additional royalties. |
| :53:44 | 21 | Correct? |
| :53:44 | 22 | A.    That's correct. |
| :53:45 | 23 | Q.    I think you claim that if you were a named inventor on |
| :53:58 | 24 | the patents, your royalties would run out until 2019 or so. |
| :54:02 | 25 | Correct? |

:54:04   1   A.    I forget.  It sounds about right.

:54:11   2   Q.    Let's take a look at -- I want to talk to you about

:54:15   3   the release agreement from the 2005 arbitration.

:54:21   4        In 2004, you said you initiated an arbitration

:54:25   5   proceeding against Zimmer.  Correct?

:54:28   6   A.    About that time.

:54:29   7   Q.    And you were claiming that you should get additional

:54:32   8   royalties on instruments, and you had an audit in there as

:54:37   9   well and it was pertaining to the NexGen license agreement

:54:40   10  that we looked at?

:54:42   11  A.    It was pertaining to the amendments -- the

:54:45   12  instruments, yes, of the NexGen --

:54:48   13  Q.    The agreement under which you filed the proceeding was

:54:50   14  the NexGen license agreement?

:54:52   15  A.    Yes.

:54:52   16  Q.    Now, if you could take a look at DTX-29.  That is your

:55:06   17  amended arbitration demand in 2004.  I think, if you look at

:55:20   18  the final page, you would see that your attorney, Ms. Lans,

:55:25   19  signed the document.  You assume that you reviewed it before

:55:27   20  it was submitted or had input into it.  Is that fair?

:55:39   21  A.    I think I maybe have the wrong thing.  I see my

:55:42   22  signature.  I don't see Ms. Lans's.

:55:44   23  Q.    I am sorry, your signature is on there, you are

:55:47   24  correct.

:55:47   25  A.    My signature, yes.

:55:48  1    Q.    I take it -- that makes the question easier.  I take

:55:53  2    it you reviewed the document before you signed it?

:55:58  3    A.    Yes, I probably did.

:56:05  4    Q.    Now, if you turn --

:56:06  5              MR. RABIN:  I object.  I think they are on

:56:13  6    different pages as far as which documents we are looking at.

:56:17  7              MR. HALES:  Yes.  I was going a little fast,

:56:20  8    Your Honor.

:56:20  9    BY MR. HALES:

:56:21  10   Q.    It has attachments to it, I forgot that, so Page 16

:56:35  11   has your name, care of Ms. Lans and her signature?

:56:41  12   A.    I think I am reading something different.  Page 16

:56:44  13   here has development recognition.

:56:46  14   Q.    Yes.

:56:48  15              MR. HALES:  I can I approach, Your Honor?

:56:51  16              THE COURT:  Yes, you may.

:56:52  17   BY MR. HALES:

:56:53  18   Q.    There is a number of things attached.

:57:05  19   A.    Okay.

:57:05  20   Q.    Now we have got Page 16?

:57:11  21   A.    16, right before Exhibit 1.

:57:13  22   Q.    Yes.  Your name is there, care of Ms. Lans and her

:57:16  23   signature is on there?

:57:17  24   A.    That's correct.

:57:18  25   Q.    So in this, if we take a look back at Page 5 --

Scott - cross

:57:23    1    Paragraph 5, I am sorry, Page 2, what is noted in the start

:57:33    2    of Paragraph 5 is that as discussed in detail below, Dr.

:57:37    3    Scott licenses to Zimmer his designs, innovations, patents,

:57:40    4    surgical tools and other medical technology, et cetera.  Do

:57:43    5    you see that?

:57:44    6    A.    I do.

:57:44    7    Q.    If we look at Paragraph 7 on the next page, it talks

:57:50    8    about the NexGen Knee contract, and in the fourth line notes

:57:58    9    that you grant to Zimmer an exclusive worldwide right to

:58:05   10    exploit your patents and technology?

:58:06   11          Do you see that?

:58:08   12    A.    I do.

:58:08   13    Q.    You also understand, right, that royalties can be paid

:58:14   14    under the agreement if you infringe a valid claim of a

:58:18   15    patent that you have licensed.  Correct?

:58:23   16    A.    I am really not sure.

:58:27   17    Q.    Royalties can be paid if a claim that you have is

:58:32   18    covered -- a claim of a patent that you have covers a Zimmer

:58:37   19    product?

:58:39   20    A.    Claim of a patent I have.

:58:41   21    Q.    Yes.

:58:43   22    A.    Covers a Zimmer --

:58:44   23    Q.    That's how you determined that you would be paid by

:58:49   24    Zimmer on that?

:58:50   25    A.    I am sorry.  I am just searching.  Can you give me an

Scott - cross

| | | |
|---|---|---|
| :58:53 | 1 | example, make it easier for me? |
| :58:54 | 2 | Q.    We probably covered it enough, and I will move on. |
| :58:58 | 3 | A.    Okay. |
| :58:58 | 4 | Q.    Mr. Lerner represented you in the contract |
| :59:00 | 5 | negotiations with Zimmer.  I think we established that. |
| :59:03 | 6 | Right? |
| :59:03 | 7 | A.    In the initial '94-95 contract, yes. |
| :59:08 | 8 | Q.    Mr. Lerner also represented you around the time of the |
| :59:13 | 9 | 2004 arbitration.  Correct? |
| :59:17 | 10 | A.    The main person was Deb Lans. |
| :59:19 | 11 | Q.    She represented you in the arbitration as the main |
| :59:22 | 12 | person but Mr. Lerner was also your counsel at that time. |
| :59:25 | 13 | Correct? |
| :59:29 | 14 | A.    I think, yes. |
| :59:30 | 15 | Q.    And, in fact, Mr. Lerner was receiving from time to |
| :59:35 | 16 | time materials, documents and so forth, your submissions in |
| :59:39 | 17 | the 2004 arbitration against Zimmer.  Correct? |
| :59:44 | 18 | A.    I am not sure about that.  I am just not sure. |
| :59:47 | 19 | Q.    But he was your lawyer at that time? |
| :59:49 | 20 | A.    As I said -- |
| :59:50 | 21 | Q.    One of your lawyers? |
| :59:52 | 22 | A.    Deb Lans was my main lawyer, that is who I spoke with. |
| :59:55 | 23 | I don't really remember interacting with David very much. |
| :59:57 | 24 | Q.    But he was your counsel at the time? |
| :00:01 | 25 | A.    If it says it in the record, I am not disputing it.  I |

Scott - cross

| :00:06 | 1 | just don't really remember. |
| :00:08 | 2 | Q.    Let's take a look real quick, just to make sure, at |
| :00:15 | 3 | DTX-41. |
| :00:16 | 4 |          Are you at DTX-41? |
| :00:31 | 5 | A.    Yes. |
| :00:32 | 6 | Q.    Okay.  Now, in DTX-41, that is dated March 2nd, 2005. |
| :00:38 | 7 | It is sent from Deb Lans, who is your counsel in the |
| :00:42 | 8 | arbitration.  Do you recognize this as a submission during |
| :00:46 | 9 | that arbitration? |
| :00:46 | 10 | A.    Correct.  I see what you are saying, yes. |
| :00:54 | 11 | Q.    It does relate to the 2004 arbitration? |
| :01:00 | 12 |          MR. RABIN:  Objection.  Foundation, Your Honor. |
| :01:05 | 13 |          THE COURT:  Could you establish his basis of |
| :01:08 | 14 | knowledge? |
| :01:09 | 15 | BY MR. HALES: |
| :01:11 | 16 | Q.    Yes.  If you can turn one page, Dr. Scott? |
| :01:15 | 17 | A.    Okay. |
| :01:15 | 18 | Q.    And do you see a fax'd transmission report at the top |
| :01:18 | 19 | that has your name on it, on the third page of the document? |
| :01:22 | 20 | It's the next one over. |
| :01:24 | 21 | A.    The third page. |
| :01:25 | 22 | Q.    Yes? |
| :01:27 | 23 | A.    988? |
| :01:29 | 24 | Q.    988, exactly. |
| :01:31 | 25 | A.    Okay. |

Scott - cross

| | | |
|---|---|---|
| :01:31 | 1 | Q.    Do you see your name in the upper right corner? |
| :01:40 | 2 | A.    I see my name printed there, but I don't see it as |
| :01:48 | 3 | part of -- well, I am sorry.  It's on the screen, I didn't |
| :01:51 | 4 | realize it.  I see what you see. |
| :01:53 | 5 | Q.    So this is -- let me go back to the first page. |
| :02:02 | 6 | Whether or not -- |
| :02:04 | 7 | THE COURT:  The record really -- he can't |
| :02:07 | 8 | testify. |
| :02:08 | 9 | Did you see your name up there? |
| :02:10 | 10 | THE WITNESS:  I saw my name written up top. |
| :02:12 | 11 | THE COURT:  In cursive? |
| :02:13 | 12 | THE WITNESS:  With the yellow marker. |
| :02:15 | 13 | BY MR. HALES: |
| :02:15 | 14 | Q.    On the top of the fax sheet? |
| :02:18 | 15 | A.    I didn't see any place else on the sheet. |
| :02:20 | 16 | Q.    Do you recognize the number on the fax sheet? |
| :02:23 | 17 | A.    No. |
| :02:26 | 18 | Q.    Now, do you see -- if we go back to the first page -- |
| :02:30 | 19 | A.    I am sorry.  What number are you talking about I am |
| :02:33 | 20 | supposed to recognize? |
| :02:35 | 21 | Q.    The fax numbers that's on that transmission sheet that |
| :02:39 | 22 | has your name on it. |
| :02:46 | 23 | A.    Yes, I think that was my fax number.  It's not now. |
| :02:51 | 24 | But it was I think my fax number. |
| :02:53 | 25 | Q.    So this document was fax'd to you I take it by Ms. |

Scott - cross

| :02:56 | 1 | Lans, is what is indicated here? |

:02:59  2  A.    I don't know who it was fax'd by.  But that looks like

:03:01  3  my number.

:03:03  4  Q.    If we go back to the first page, let's go to the Re

:03:08  5  line.  AAA, lengthy number, '04.  I will represent to you if

:03:14  6  you don't understand it, that is the number of the 2004

:03:17  7  arbitration that you initiated against Zimmer.  Do you

:03:19  8  recognize it?

:03:20  9  A.    The number, no.  But I trust you.

:03:22  10  Q.    Ms. Lans was representing you at that time in

:03:28  11  proceeding against Zimmer?

:03:29  12  A.    That's correct.

:03:30  13  Q.    You see here, there is reference to positions taken at

:03:32  14  Zimmer's prehearing brief, and I am looking in the second

:03:37  15  paragraph?

:03:37  16          MR. RABIN:  Same objection.  Foundation.

:03:40  17          THE COURT:  Well, he is just asking does he see

:03:43  18  it.

:03:43  19          MR. HALES:  Yes.  Thank you.

:03:48  20          THE WITNESS:  I see the sentence you are

:03:49  21  highlighting, yes.

:03:50  22  BY MR. HALES:

:03:51  23  Q.    And there is a discussion in there about what's in

:03:56  24  Zimmer's prehearing brief and the reaction that Ms. Lans has

:04:00  25  to it, it's a letter that she is submitting -- in which she

:04:05     1     is asking for certain materials, or for a phone call.  Do

:04:09     2     you see that?

:04:09     3     A.     Can I read it?

:04:10     4     Q.     Yes.

:04:34     5            There is no phone number.  I apologize.  I was

:04:36     6     thinking of a different document.

           7                (Pause.)

:04:51     8     A.     I have read it, yes.

:04:52     9     Q.     I am going to ask a different question.  I was

:04:55    10     thinking of a different document.

:04:56    11     A.     I was going to ask you to repeat it anyway.

:04:59    12     Q.     The question is this:  This is a submission in the

:05:02    13     2004 arbitration proceeding by your counsel, Ms. Lans.  What

:05:06    14     I want you to do is look at the next page, turn the page

:05:09    15     over.  You see that David Lerner is copied there?

:05:12    16     A.     I do.

:05:12    17     Q.     So David Lerner was copied on, as indicated here, this

:05:17    18     submission relating to the 2004 arbitration proceeding?

:05:23    19     A.     If this -- yes, yes.

:05:25    20     Q.     That is the same David Lerner we have talked about as

:05:28    21     being your lawyer?

:05:30    22     A.     Correct.

:05:30    23     Q.     Okay.  Now, let's look at DTX-44.  This is a February

:05:53    24     26, 2005 letter from the firm of Cohen Lans to you, Dr.

:05:58    25     Scott.  Do you see that?

Scott - cross

| | | |
|---|---|---|
| :05:59 | 1 | A.    I do. |
| :06:00 | 2 | Q.    This is sent by a Gary Lerner, not to be confused with |
| :06:06 | 3 | David Lerner? |
| :06:07 | 4 | A.    Correct. |
| :06:07 | 5 | Q.    You understand Gary Lerner to be an attorney that was |
| :06:11 | 6 | at Cohen Lans at the time? |
| :06:12 | 7 | A.    A different Lerner. |
| :06:13 | 8 | Q.    What is submitted to you here is materials related to |
| :06:21 | 9 | the AAA proceeding, what is sent to you, including a number |
| :06:27 | 10 | of things that are being prepared as you are approaching a |
| :06:31 | 11 | hearing in that proceeding.  Is that fair? |
| :06:40 | 12 | A.    Yes, I think that's fair. |
| :06:41 | 13 | Q.    And you can see, I mean, you have a prehearing |
| :06:45 | 14 | memorandum of law, summary of testimony given by Joseph |
| :06:53 | 15 | Leshkowtiz, et cetera.  Correct? |
| :06:54 | 16 | A.    I do. |
| :06:54 | 17 | Q.    If we look down a little lower, David Lerner, the |
| :06:59 | 18 | other counsel Lerner, your counsel, is copied on this set of |
| :07:03 | 19 | materials as well? |
| :07:04 | 20 | A.    I do see that. |
| :07:04 | 21 | Q.    Now let's take a look at DTX-46. |
| :07:23 | 22 |         This is the release and settlement agreement.  I |
| :07:36 | 23 | will try to reduce the paper burden. |
| :07:39 | 24 |         Plaintiffs' Exhibit 30.  We are looking now at |
| :07:58 | 25 | Plaintiffs' Exhibit 30. |

Scott - cross

:08:03  1    Dr. Scott, this is the release and settlement

:08:06  2  agreement that you entered on April 6, 2005?

:08:11  3  A.    You said Plaintiffs' Exhibit 30?  I have 47.  Are we

:08:14  4  doing something wrong here?  DTX-47?

:08:17  5  Q.    I am sorry.  They are the same thing.

:08:20  6  A.    Okay.  You said 30, I wanted to make sure I was on the

:08:24  7  right page.

:08:26  8  Q.    Plaintiffs' Exhibit 30.

:08:27  9  A.    I don't see Plaintiffs' Exhibit 30 on here.  I see

:08:30  10  DTX-46, Deposition Exhibit 20.

:08:32  11         MR. HALES:  May I approach, Your Honor?

:08:34  12         THE COURT:  Yes.

:08:35  13  BY MR. HALES:

:08:36  14  Q.    Dr. Scott, you need to switch back to the other

:08:40  15  binder.  It's the same document.  We are trying to minimize

:08:47  16  the number of times we have the same document come into the

:08:50  17  court.

:08:51  18  A.    So this is PTX-30.

:08:53  19  Q.    PTX-30, yes.

:08:58  20  A.    Okay.

:08:59  21  Q.    So PTX-30, this is the release and settlement

:09:03  22  agreement you entered with Zimmer on April 6, 2005.

:09:07  23  Correct?

:09:09  24  A.    Yes.

:09:10  25  Q.    And you reviewed that before signing and then signed

Scott - cross

:09:15     1    it.  Is that correct?

:09:19     2    A.    I don't have a recollection of whether I just signed

:09:21     3    it or reviewed it.  I am not sure.

:09:23     4    Q.    On Page of PTX-30 we will find your signature.  Is

:09:28     5    that correct?

:09:29     6    A.    That's correct.

:09:29     7    Q.    Now, you had counsel assisting you with the

:09:33     8    negotiation of this agreement.  Correct?

:09:35     9    A.    That's correct.

:09:35    10    Q.    And also, at the same time, there was a modification

:09:40    11    to your license agreement.  Correct?

:09:44    12    A.    Yes.

:09:45    13    Q.    And I just want to very quickly, for the sake of

:09:48    14    completeness, look at DTX-464.  Now you have to go back to

:09:53    15    the white binder.

:09:54    16    A.    You said 464?

:09:56    17    Q.    464.  Apologies for the binder shuffling.

:10:09    18          Do you recognize DTX-464, Dr. Scott, to be the

:10:14    19    April 6, 2005 amendment to your license agreement?

:10:18    20    A.    I do.

:10:19    21    Q.    That was executed at the same time and with the

:10:20    22    release and settlement agreement we were looking at as

:10:25    23    PTX-30?

:10:33    24    A.    Yes.

:10:35    25    Q.    All right.  Now, let's go back, we are going to go

Scott - cross

| | | |
|---|---|---|
| :10:39 | 1 | back to PTX-30, my apologies again.  We will spend a few |
| :10:45 | 2 | minutes there now. |
| :10:46 | 3 | Ms. Lans has been your counsel for probably |
| :11:01 | 4 | about a decade or more at this point? |
| :11:06 | 5 | A.   Yes, that's about right. |
| :11:07 | 6 | Q.   And she has represented you in a number of proceedings |
| :11:10 | 7 | against Zimmer.  Fair to say? |
| :11:12 | 8 | A.   That's correct. |
| :11:12 | 9 | Q.   I take it that you would agree, she is pretty |
| :11:15 | 10 | knowledgeable about your relationship with Zimmer and the |
| :11:18 | 11 | agreements that underlie your relationship with Zimmer? |
| :11:24 | 12 | A.   She has become more knowledgeable, yes. |
| :11:26 | 13 | Q.   Now, let's take a look at, in Plaintiffs' Trial |
| :11:31 | 14 | Exhibit 30, Recital E, it's on the first page. |
| :11:41 | 15 | A.   I see it. |
| :11:42 | 16 | Q.   Recital E states, "The parties hereto, in entering |
| :11:46 | 17 | this agreement, desire fully and finally to resolve all |
| :11:50 | 18 | controversy, claims, disputes and liens of whatever nature |
| :11:54 | 19 | between them, including the dispute and the arbitration, |
| :11:57 | 20 | subject to the further terms hereof." |
| :12:01 | 21 | Do you see that? |
| :12:02 | 22 | A.   I do. |
| :12:02 | 23 | Q.   Now, let's take a look, then, if you will, on Page 2 |
| :12:07 | 24 | at Paragraph 3.  You are now at Paragraph 3.  In exchange -- |
| :12:20 | 25 | you got out of this 2.4 million dollars, I think you said. |

Scott - cross

:12:23    1    Correct?

:12:27    2    A.    And a higher rate past 2011.

:12:29    3    Q.    And the amendment to the agreement, the license

:12:35    4    agreement that we just talked about, was also made, correct,

:12:38    5    as part of this overall arrangement?

:12:41    6    A.    That's correct.

:12:41    7    Q.    Now, turning to where I directed you, Paragraph 3 on

:12:45    8    Page 2, this is the release language.  Do you see that?

:12:52    9    A.    I do.

:12:52   10    Q.    And in the release language, you have agreed -- and

:12:59   11    this is bit repetitive with what Mr. Rabin did to get us

:13:04   12    grounded, I apologize -- but you have agreed to release,

:13:11   13    forever discharge and covenant not to sue Zimmer, and then a

:13:15   14    whole string of entities or people who are related to

:13:20   15    Zimmer.

:13:20   16          Then if I can pick up here again, "..from and

:13:24   17    against any and all of the claims, demands, damages, debts,

:13:28   18    liabilities, obligations, causes of action, suits, legal

:13:33   19    fees and costs, of whatever nature, character or

:13:37   20    description, presently known or which could be reasonably

:13:43   21    known to Dr. Scott or his attorney, including as a result of

:13:47   22    disclosures made during arbitration. "

:13:52   23          Then it goes on to say, which Dr. Scott may have

:13:57   24    or hereinafter have, et cetera.

:14:01   25          Do you see that?

Scott - cross

:14:01    1    A.    I do see that.

:14:02    2    Q.    Take a look, if you will, also at Paragraph 4.

:14:10    3    Actually, before we go there, hang on one second.  I do want

:14:14    4    to continue a little bit further on this Paragraph 3.

:14:17    5         I had stopped reading at including as the result

:14:21    6    of disclosures made during the arbitration.

:14:23    7         What it continues to say, Dr. Scott is, "which

:14:27    8    Dr. Scott has or may here have or claim to have against any

:14:32    9    Zimmer released party as of the date" -- now we have to go

:14:36   10    to the next page -- "hereof, including, without limitation,

:14:47   11    claims arising out of, related to, or connected with,

:14:50   12    directly or indirectly, any matter referred to in the

:14:53   13    recitals above, the contracts, the dispute and the

:14:57   14    arbitration."

:14:59   15         Do you see that?

:14:59   16    A.    I do.

:15:00   17    Q.    Now, the patents that you seek to add your name as an

:15:08   18    inventor to relate to implants that you contend would be

:15:13   19    paid royalties under these contracts.  Correct?

:15:17   20    A.    Correct.

:15:17   21    Q.    And they arise out of, you contend, development work

:15:22   22    that was done and that you were involved in pursuant to your

:15:25   23    license agreement with Zimmer.  Correct?

:15:28   24    A.    That's correct.

:15:29   25    Q.    Now let's take a look at Paragraph 4, where I was

:15:32   1    about to go a moment ago.

:15:36   2                Paragraph 4 is entitled Intention of the

:15:39   3    Parties.  Are you with me there?

:15:40   4    A.    I am.

:15:41   5    Q.    Paragraph 4 states:  "It is the intention of the

:15:44   6    parties that this agreement shall be effective as a full and

:15:46   7    final accord and satisfaction and release of each and every

:15:50   8    matter specifically or generally referred to herein.  Dr.

:15:55   9    Scott acknowledges that he has had the opportunity to have

:15:58   10   this agreement reviewed by the advisors of his choice.  Dr.

:16:03   11   Scott acknowledges that he may hereafter discover facts in

:16:07   12   addition to or different from those which he now knows or

:16:12   13   believes to be true with respect to the subject matter of

:16:15   14   this agreement, but it is his intention to fully and finally

:16:20   15   and forever to settle and release any and all matters,

:16:24   16   disputes and differences, which do now exist, may exist or

:16:28   17   heretofore have existed against the Zimmer released parties

:16:32   18   to the full extent stated in Section 3."

:16:35   19                Do you see that?

:16:36   20   A.    I do see that.

:16:36   21   Q.    I think I managed to read that correctly.

:16:40   22   A.    You missed one word.  But that's okay.

:16:43   23   Q.    Fair enough.

:16:44   24                You understood at the time of signing, Dr.

:16:46   25   Scott -- and it's expressed in there that you might later

Scott - cross

| | | |
|---|---|---|
| :16:49 | 1 | discover facts in addition to or different from the ones you |
| :16:53 | 2 | knew at the time of signing? |
| :16:56 | 3 | A.    At the time I signed this, I am not sure what I |
| :16:58 | 4 | understood.  But I agree with the way you just read this. |
| :17:02 | 5 | Q.    Okay.  There is nothing that we went over in here that |
| :17:11 | 6 | restricts this, that you saw, is there, to just the disputes |
| :17:13 | 7 | that were at issue in the 2004 proceeding? |
| :17:18 | 8 | A.    This is a whole release thing.  I am not a lawyer.  I |
| :17:22 | 9 | don't know what else, any other paragraphs might counter |
| :17:25 | 10 | this or not. |
| :17:26 | 11 | Q.    Fair enough. |
| :17:27 | 12 |      Now, do you recall at any point that you wanted |
| :17:37 | 13 | the release to be narrower than the one that was entered? |
| :17:43 | 14 | More restrictive is what I mean. |
| :17:45 | 15 | A.    I don't have a recollection of that, to tell you the |
| :17:48 | 16 | truth. |
| :17:48 | 17 | Q.    Let's take a look at DTX-47. |
| :18:15 | 18 | A.    Okay. |
| :18:16 | 19 | Q.    Dr. Scott, DTX-47 is an e-mail from Ms. Lans to David |
| :18:23 | 20 | Royster, among others.  Do you see that? |
| :18:26 | 21 | A.    I do. |
| :18:26 | 22 | Q.    This is from Ms. Lans to counsel at Zimmer, and Ms. |
| :18:31 | 23 | Lans attaches red lines to a draft of the amendment and |
| :18:36 | 24 | settlement agreement.  Do you see that? |
| :18:38 | 25 | A.    I just read the first sentence.  It seems to be saying |

Scott - cross

:18:41    1    that, yes.

:18:42    2    Q.    Let's take a look for a moment at some of these

:18:45    3    revisions.  So what we see if we look at Page 1 -- and I

:18:55    4    want to look down at Recital E.  You understand from the

:18:59    5    first line again that Ms. Lans has provided a red-line to a

:19:04    6    draft that had been sent to her by Zimmer.  Correct?

:19:10    7    A.    I am sure I am right about this.  I want to be sure,

:19:12    8    where we see the blackouts, that's what you are calling

:19:16    9    red-lines.

:19:16   10    Q.    Yes.  She used that word, too?

:19:23   11    A.    Yes, she does.  It is obviously not red.  It's late in

:19:27   12    the day, but it's not red.

:19:29   13    Q.    So in Paragraph E, you can see that there was language

:19:33   14    in there, language like we read, in the final, that was

:19:39   15    stricken out, and with the strikeouts and additions that Ms.

:19:45   16    Lans made, for example, the full and final resolution would

:19:49   17    have been pared down to the dispute, to resolve the dispute

:19:56   18    and terminate the arbitration.  Do you see that?

:20:07   19    A.    I see that's the part that's not red-lined.

:20:11   20    Q.    Let me take it a little easier way.

:20:14   21          What Ms. Lans in her revision back did is strike

:20:17   22    out the reference to all controversies, claims, disputes and

:20:22   23    claims of whatever nature between them and replace it with

:20:25   24    "the dispute"?

:20:28   25    A.    You know, once again, I am just not a lawyer.  I will

Scott - cross

| | | |
|---|---|---|
| :20:30 | 1 | take your word for it.  That's what it looks like.  But |
| :20:33 | 2 | there is a whole contract here.  I don't know its relevance |
| :20:37 | 3 | in that context. |
| :20:38 | 4 | Q.    That's fair enough and I won't spend much more time on |
| :20:42 | 5 | it.  Do you have any recollection of wanting the release at |
| :20:45 | 6 | any point to be narrower than the one that was entered? |
| :20:48 | 7 | A.    I have no recollection of that. |
| :20:56 | 8 | Q.    Let's take a look at DTX-33.  Do you have that one, |
| :21:16 | 9 | Dr. Scott? |
| :21:17 | 10 | A.    Yes. |
| :21:17 | 11 | Q.    DTX-33, Dr. Scott, is another letter from Ms. Lans, |
| :21:23 | 12 | this is the arbitrator, on March 1st, 2005, in the 2004 |
| :21:30 | 13 | arbitration.  And I can represent that to you if you are not |
| :21:37 | 14 | familiar with it, it is the same AAA claim pending in '04. |
| :21:43 | 15 | A.    I accept your representation. |
| :21:44 | 16 | Q.    One of the things that Ms. Lans is doing here is |
| :21:47 | 17 | asking for production, and let's look down on the third |
| :21:53 | 18 | paragraph, Ms. Lans says, "Zimmer has never produced |
| :21:56 | 19 | documents which would bear on -- i.e., either substantiate |
| :22:00 | 20 | or disprove -- these assertions.  Dr. Scott is entitled to |
| :22:05 | 21 | test these assertions that Zimmer has injected in this case. |
| :22:09 | 22 | Accordingly we ask that you direct Zimmer to produce to us |
| :22:12 | 23 | by March 8, 2005," and I want to direct your attention down |
| :22:16 | 24 | to Item 2.  Item 2 says, "documents concerning every patent |
| :22:22 | 25 | held by each member of the design team." |

Scott - cross

:22:25  1       Do you see that?

:22:26  2  A.  Yes.

:22:26  3  Q.  So there was a motion to compel filed with the

:22:29  4  arbitration panel in 2005 in this 2004 arbitration dispute

:22:37  5  asking for patents from the members of the design team.

:22:41  6  Correct?

:22:41  7  A.  I am not sure what a motion to compel is.

:22:44  8  Q.  There was a request for documents?

:22:46  9  A.  Looks like that, yes.

:22:48  10  Q.  One of the members of that design team is Dr. Insall.

:22:52  11  Correct?

:23:01  12  A.  In Paragraph 1 it says that.

:23:03  13  Q.  His name is there but you also understand that Dr.

:23:06  14  Insall was a member of the NexGen design team?

:23:18  15  A.  Correct.

:23:18  16  Q.  This document that we are looking at, DTX-33, this

:23:22  17  has, if you look in the lower right-hand corner, the Bates

:23:26  18  stamp S&S7977.  Do you see that?

:23:32  19  A.  Yes.

:23:32  20  Q.  That S&S designates that this was produced by you to

:23:37  21  Zimmer in this proceeding.  Correct?

:23:41  22  A.  I am not sure about that.

:23:44  23  Q.  We don't need to go into that.

:23:46  24     MR. HALES:  We have a pretrial order stipulation

:23:48  25  on what the Bates stamps are, Your Honor.  So that is okay.

Scott - cross

1    BY MR. HALES:

:24:01   2    Q.    All right.  Now, if we go a few pages further to 7895,

:24:07   3    the one with the number on the bottom 7895, let me know when

:24:16   4    your there.

:24:19   5    A.    7895?

:24:22   6    Q.    I am sorry, 7894 and 5.

:24:24   7          7984, 7985.  I am sorry.

:24:36   8    A.    79, yes, I see that.

:24:37   9    Q.    And what you see again here, similar to what we saw

:24:41   10   before, that this document was copied to you by fax.  Do you

:24:46   11   see that?

:24:47   12   A.    I see, yes, my number.

:24:49   13   Q.    Your number and somebody wrote up there in their hand

:24:53   14   that this is the indication that it was sent to you?

:24:56   15   A.    Correct.

:24:56   16   Q.    So you would have received about this time this

:25:00   17   request that documents be produced related to patents in the

:25:04   18   2004 arbitration proceeding?

:25:08   19   A.    Theoretically, yes.

:25:08   20   Q.    No reason to dispute that?

:25:12   21   A.    No.

:25:12   22   Q.    In fact, I think it indicates on there, at least the

:25:19   23   transmission result is okay?

:25:27   24         Do you see that?

:25:28   25   A.    No.  I don't know how to look for that.  If you tell

Scott - cross

| | |
|---|---|
| :25:31 | 1 |

me, I will take your word for it.

:25:32   2   Q.   It's right there next to the phone number.   Result:

:25:37   3   Okay.

:25:37   4   A.   Okay.

:25:38   5   Q.   Now take a look at DTX-35.  Dr. Scott, DTX-35 is

:25:56   6   another document that was produced to Zimmer by you and Dr.

:26:00   7   Scuderi in this case, and this is a -- that is indicated by

:26:06   8   the S&S stamp below.  Do you see the S&S stamp in the lower

:26:11   9   right?

:26:11   10   A.   I see the stamp, yes.

:26:12   11   Q.   This was a letter that was sent by Ms. Lans, your

:26:15   12   counsel, in the 2004 arbitration from Zimmer's counsel in

:26:19   13   the 2004 arbitration.  Do you see that?

:26:25   14   A.   Yes, I do.

:26:26   15   Q.   And if I can direct your attention to the first line,

:26:33   16   it's stated that the letter is in response to the March 3rd,

:26:37   17   2005 conference with Mr. Wassong, who is the arbitrator.

:26:42   18   Attached to this e-mail are the following documents.

:26:44   19        Do you see that?

:26:45   20   A.   I do.

:26:45   21   Q.   If we look down at No. 6, No. 6 indicates ZIM/SCO

:26:55   22   24511 to 24512 - list of NexGen patents that can be obtained

:27:01   23   from the website of the U.S. Patent and Trademark Office.

:27:06   24   Do you see that?

:27:06   25   A.   I do.

Scott - cross

| | | |
|---|---|---|
| :27:19 | 1 | THE COURT:  I think this would be a good time. |
| :27:21 | 2 | Judge Thynge will be waiting for you. |
| :27:24 | 3 | MR. HALES:  I was about to say that. |
| :27:26 | 4 | THE COURT:  We will resume at 9:00. |
| :27:29 | 5 | (Court recessed at 4:28 p.m.) |
| :27:33 | 6 | - - - |
| | 7 | Reporter:  Kevin Maurer` |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |